UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

United States of America,

                                  Criminal No. 25-20560

              Plaintiff,          Hon. Terrence G. Berg

v.

D-2 Michelle Brannon,

              Defendant.

_____/

## United States' Memorandum in Support of Detention in the Eastern District of Michigan

The United States submits this updated memorandum in support of its motion, pursuant to 18 U.S.C. §§ 3142(f)(1)(A), (f)(2)(A), and (f)(2)(B), that MICHELLE BRANNON be detained pending trial as she is unable to rebut the applicable presumption of detention and there is no condition or combination of conditions of release that will reasonably assure her appearance, the integrity of this proceeding, or the safety of any person or the community.

Section 3142(f)(1)(A) provides a basis for a detention hearing where, as here, the charged offenses involve a crime of violence, specifically violations of 18 U.S.C. § 1589 (Forced Labor). 18 U.S.C. §

1

3142(f)(1)(A); *see also* 18 U.S.C. § 3156(a)(4) (defining "crime of violence" for purposes of the Bail Reform Act to include any Chapter 77 felony). In addition, the serious risk that BRANNON will flee and attempt to intimate victims and witnesses provides additional bases for the government's request for detention. 18 U.S.C. §§ 3142(f)(2)(A) and (f)(2)(B).

BRANNON is unable to rebut the presumption of detention that applies under 18 U.S.C. § 3142(e)(3)(D). In addition, an analysis of the factors set forth in 18 U.S.C. § 3142(g) leads to the conclusion that detention is appropriate because there is no condition or combination of conditions that will reasonably assure BRANNON's appearance, the integrity of this proceeding, or the safety of any person or the community. Accordingly, the Court should detain BRANNON pending trial.

## PROCEDURAL AND FACTUAL BACKGROUND

### A. Procedural Background

On July 23, 2025, a federal grand jury in the Eastern District of Michigan indicted BRANNON and her co-defendant, David Taylor, on one count of Conspiracy to Commit Forced Labor in violation of 18

U.S.C. § 1594(b) (Count One); five counts of Forced Labor in violation of 18 U.S.C. § 1589 (Counts Two through Seven); and one count of Money Laundering Conspiracy in violation of 18 U.S.C. § 1956(h) (Count Ten). Defendant Taylor is charged with an additional two counts of Forced Labor in violation of 18 U.S.C. § 1589 (Counts Eight and Nine).

These charges arise from defendants' roles as principal leaders of Kingdom of God Global Church (KOGGC), formerly Joshua Media Ministries International (JMMI). Taylor is the original founder of JMMI and refers to himself as "Apostle" and "Jesus's best friend," claiming that God has given him the "keys to the Kingdom on Earth." BRANNON is Taylor's second-in-command as the Executive Director of KOGGC.  Together, since 2013, Taylor and BRANNON have compelled the labor of individuals who joined their organization by prohibited means including force, physical restraint, serious harm, and threats of those actions.

On August 27, 2025, agents arrested BRANNON in Tampa, Florida. At the time of her arrest, BRANNON was living at a house, owned by KOGGC, with approximately 57 KOGGC workers and victims of Taylor and BRANNON's coerced labor. BRANNON, though, lied to

Pretrial Services in Tampa when the Pretrial Services Officer asked

BRANNON who resided with her at the Tampa house. BRANNON said

she lived "with her son and six co-workers." *See* Tampa Pretrial

Services Report, pg. 1. BRANNON also lied to Pretrial Services when

she stated that two of the workers living with her in Tampa were her

"employers." As BRANNON admitted during her interview, she is an

"Executive Officer" of KOGGC; however, the two workers she asked

Pretrial Services to call to confirm her personal information report *to*

her and *to* Taylor not vice versa. *See* Tampa Pretrial Services Report,

pg. 2.

BRANNON requested a detention hearing in the Eastern District

of Michigan and consented to detention until she arrived in Michigan.

The United States Marshal Service successfully responded to

BRANNON's medical needs while she was in their custody and then

transported her from the Middle District of Florida to the Eastern

District of Michigan.

On August 27, 2025, agents arrested Taylor in Durham, North

Carolina. At the time of his arrest, Taylor was living at a house leased

by KOGGC/JMMI where one of his "armor bearers" worked and a

4

female KOGGC worker also lived. As described in the Indictment and below, "armor bearers" worked as Taylor's personal servants, fulfilling Taylor's demands around the clock.

## B. KOGGC/JMMI Organization

Taylor's organization operated under the name JMMI from 2008 through 2021 and then KOGGC from 2021 to the present. Until their arrests on August 27, 2025, Taylor and BRANNON operated call centers that offered prayer and dream interpretation and solicited donations. Call centers were the main source of revenue for KOGGC/JMMI. Taylor established his first call center in Taylor, Michigan, over ten years ago. KOGGC/JMMI has since opened and operated call centers in other locations in the United States including in Missouri, Florida, and Texas.

Taylor and BRANNON orchestrated a forced labor scheme that resulted in KOGGC/JMMI receiving millions of dollars in donations each year through the call centers, much of which Taylor used to purchase luxury properties, luxury cars, and costly sporting equipment such as a boat, jet skis, and ATVs. In total, KOGGC/JMMI received approximately $50 million in donations since 2014.

5

## C. Defendants Engaged in a Scheme to Coerce the Named Victims and Other Workers to Provide Labor

KOGGC/JMMI call centers were worked by "full-time" KOGGC/JMMI workers. Taylor also selected men from the full-time workers to work as his "armor bearers." Armor bearers worked as Taylor's personal servants, fulfilling Taylor's demands around the clock. The victims in Counts Two through Seven of the Indictment worked as full-time laborers; the victims in Counts Eight and Nine of the Indictment worked as armor bearers.

Taylor and BRANNON did not pay any full-time workers—their victims—for their labor. Taylor and BRANNON, who worked with Taylor to manage the organization and carry out his orders, are two of only three members of KOGGC/JMMI who received a salary. The workers were placed into different working groups, such as a media team, a finance team, a call center team, or a music team. Almost all workers were expected to participate in call center work to assist in bringing in monetary donations. Taylor created training regimens to teach workers how to effectively solicit monetary donations and to increase productivity and discipline. BRANNON supervised and managed the workers—the victims of their scheme—and taught them

how to successfully solicit donations for KOGGC/JMMI.

As part of their scheme to coerce the workers' labor, BRANNON and Taylor used various methods of fraud to establish trust and loyalty and to keep the workers laboring in hopes of an eventual payoff. Taylor first lured in workers with promises of filling their spiritual hunger, making them feel intensely loved and special through "love bombing," and promising them a unique closeness to God by serving God through KOGGC/JMMI. Taylor promised that, through faithful service and entering a "20-year process," what workers most desired would be given to them. BRANNON parroted these promises in staff meetings. Taylor and BRANNON taught members that (1) Taylor is God's best friend and his second-in-command; (2) God will bring his Kingdom on Earth through Taylor; and (3) being a full-time staff member is the only way to ensure your place in the Kingdom and to become ready to encounter God face-to-face as Taylor does. Taylor and BRANNON also both made other significant fraudulent promises to their workers which never materialized.

Once Taylor and BRANNON drew the workers in, they then took control over every aspect of the workers' lives. Taylor and BRANNON

7

physically and mentally weakened the workers by subjecting them to daily public humiliation and psychological abuse, imposing excruciating work hours—sometimes more than 20 hours per day—resulting in severe sleep deprivation, housing them in cramped quarters without privacy or adequate bedding, and, in some instances, withholding food and medical care. Taylor and BRANNON controlled where and when the workers slept, when and what they ate, what they wore, how they spoke, and when they could go to the bathroom. They insisted that workers give up outside employment, making them wholly reliant on KOGGC/JMMI for food and shelter.

They also forbade relationships and punished workers for disobeying this rule, thereby isolating them from other staff and ensuring that their primary loyalty to KOGGC/JMMI was not compromised. In addition, Taylor and BRANNON isolated workers from the outside world by breaking up marriages and other relationships, forcing them to block family that questioned Taylor and his teachings, and establishing grueling work hours that left them almost no time to have contact with anyone outside of KOGGC/JMMI. Taylor and BRANNON physically and mentally wore down the workers' will to

8

resist or to question what Taylor and BRANNON told them. Their
conduct made the workers, the victims, more vulnerable and, therefore,
easier to exploit.

As Taylor and BRANNON gained control over and weakened the
workers, they also used a combination of means to create a climate of
fear through psychological manipulation and physical violence that
caused the workers to fear serious harm if they made a mistake,
complained, did not meet monetary quotas, or left KOGGC/JMMI.

First, Taylor and BRANNON used physical violence to intimidate
and control. Specifically, the defendants sometimes assaulted workers
when the actions or behaviors of workers were not consistent with the
rules instituted by Taylor and/or BRANNON. While much of the
physical abuse was directed towards men, women witnessed and heard
about the assaults and feared assault as a possible consequence. This
abuse helped create a climate of fear in which the workers feared
physical violence for any type of noncompliance.

Second, Taylor and BRANNON also used sleep deprivation and
withholding of food for failure to meet monetary quotas, as additional
means of instilling a climate of fear.

9

Third, Taylor and BRANNON both fostered this climate of fear by frequently "rebuking" workers when they did not follow a rule or meet an expectation imposed by Taylor or BRANNON. Rebuking involved yelling at workers, standing inches from their face, calling them wicked and demanding that they get on their knees and repent, reminding them of the ultimate consequence of failure to comply: eternal damnation. Taylor and BRANNON issued many of these punishments in a public forum, berating and name-calling individual workers in front of the entire staff as a warning to others. These rebukings were both humiliating and terrifying. During a rebuking, Taylor, BRANNON, or a worker (as instructed by Taylor or BRANNON), got inches from the face of another worker and screamed at them, calling them names like stupid, dumb, wicked, n***a, Lucifer, etc. Many times, workers were forced to kneel and repent to Taylor and God. Rebukings could last a few minutes to a few hours depending on the situation. The rebukings, sometimes coupled with the threat of being "put out" into a garage or a homeless shelter, constituted psychological coercion designed to compel the workers' labor. And as the result of the actions of Taylor and BRANNON, workers truly feared that burning in hell or meeting with

10

some catastrophic end would be the consequence of defying Taylor in any way.

This power to condemn or "curse" the workers was particularly potent in establishing a climate of fear. Though the workers lived in constant fear of punishment, they were even more afraid of being deemed a "traitor." Through his sermons and teachings, Taylor directly instilled in them a deep fear that those who left suffered tragic consequences and the threat of eternal damnation. He repeatedly told stories of this occurring to others, tying tragic illnesses, for example, to Biblical passages where those chosen by God had such powers to call down God's judgment. BRANNON parroted these threats in worker meetings and rebukings.

Since approximately 2020, Taylor has not been living at any of the call centers, so Taylor began exclusively using cell phones to communicate with KOGGC/JMMI workers. BRANNON was instructed and entrusted by Taylor to carry out his orders and punishments for workers. Taylor and BRANNON frequently communicated their orders and punishments via text messages. The text messages received by workers from BRANNON included the following messages:

- On or about October 6, 2020, at 5:31am, BRANNON sent a text message to several members of the "media team" including V-3, stating, "Media team no going to sleep until the Mosaic video is done!"

- On or about May 30, 2022, at 7:10am, BRANNON, unhappy with the manner in which a worker was solicitating donations, sent a text stating, "Did you rebuke him for this ?? He needs to be raked over the coals for this ?? He can die for this  !!"

- On or about October 19, 2022, at 11:46pm, BRANNON texted a group including V-2, "FROM APOSTLE WARNING . . . TENT AND GARAGE JUDGMENT STARTING TONIGHT FOR 7 DAYS IF AFTER 7 – 14 Days There is no change it's the public shelter for 1 solid month."

- On or about October 20, 2022, at 4:57pm, BRANNON texted a group including V-2, "WARNING FROM APOSTLE . . . TOP 6 YOUR LOW NUMBERS EACH DAY . . . IT HAS TO STOP NOW . . You will be punished constantly until you obey and train your heart and mind to obey the training . . ."

BRANNON's leadership of KOGGC/JMMI is also documented in recorded staff meetings. For example, in March 2023 and May 2023, BRANNON said:

- . . . single need. All they have to focus on is God and raising finances and, and, uh, connecting with people. And it's, uh, we've seen stats. It's not happening. We, we have to tell them to turn in their stats every hour and get on them, give them consequences, taking meals, like you said. And it's just still, it's, it's just a pattern. Like where is your heart? Why don't you wanna do this? And even, like you said, Apostle, the six even that, like you could tell, um, yesterday I was so irritated seeing and we had to take food away or give them bland food for, um, just seeing some of them raising 200 and then 400 over the course of six hours. And these are people who know how to

12

raise money.

- When you call a meeting like this, what makes me so angry is for people to be dishonorable to you and for example, [*name of worker redacted to protect identity*] in the middle while you, while you began the meeting, Apostle, while you started the meeting, [*name of worker redacted to protect identity*] went into the weight room and fell asleep. He was awake when you first started the meeting. How he got by non-executive and all of the staff, he went into the weight room and fell asleep during your meeting. These are the type of stuff that's gonna kill people.

As this sampling of texts and recordings demonstrate, BRANNON held a leadership role in KOGGC/JMMI and adeptly used the climate of fear she and TAYLOR created, as well as other prohibited means, to compel the labor and services of the workers, their victims. Through this forced labor scheme, Taylor and BRANNON have grossed approximately $50 million since 2014.

Agents  located evidence corroborating the allegations in the Indictment during the execution of a search warrant at the Taylor, Michigan, KOGGC/JMMI building.[1] For example, agents recovered a binder entitled "Apostle David E. Taylor's Boot Camp Training" that

---

[1]The government is providing some samples of corroborating evidence located at three search warrant locations. There is substantial additional corroborating evidence not detailed in this memorandum.

contains hundreds of pages of training and instructions, memos and messages "from Apostle" (referring to Taylor), worker schedules and assignments, specific monetary quotas, lists of workers and the amounts of money they have raised, and handwritten notes of a worker.

Within the binder, there are hundreds of pages of "Memos from Apostle David E. Taylor," which include the following:

- May 26, 2022: "MEMO -You'll should be in marathon all day !! We have to raise $92k a day starting today for 6 days !! Michele make them push !!  WARNING~- FROM APOSTLE Michele deal out consequences to all the closers starting with those among the top 9 and bottom below now that are not bringing in their amount .. Garage in tampa and take away food now ! ! I want those in Ocala who supposed to be doing their work but are not punished and out in the garage and their food taken away to enforce all of them applying their training .. Everyone especially those who are part of the closing circle that suppose to be bringing in finances !! I WANT THIS DONE NOW MICHELE BECAUSE THESE TOP 9 ARE NOT ADMINISTERING ANYTHING THAT IS CREATING FORCED CHANGE"

- May 27, 2022: "WARNING . . . . If this $548k is not caught up in 6 days I'm sending them back to the bootcamp in Ocala!! All of them have to go back!! . . . . JUDGMENT . . . Michele deal out consequences to all the closers starting with those among the top 9 and bottom below now that are not bringing in their amount .. Garage jn tampa and take away food now !! . . . . I want those in Ocala who supposed to be doing their work but are not punished and put in the garage and their food taken away to enforce all of them applying their training"

- July 26, 2022, directed to Brannon: "It don't matter if you bring in $400k if you don't stay on top of the daily operation and the

top 9 their numbers keeping order by dealing out consequences to these lazy inconsistent people ! . . . . If they don't do this they don't deserve to be in that tampa house they are all going back to Ocala packed like sardines with consequences in the garage !! Back in bootcamp in the trenches !!"

- August 13, 2022: "MEMO-TOP 10 MUST RAISE $17.4k TODAY!! . . . . [worker name omitted to protect their identity] after this is going to the shelter because of his lack of repentance and focus ! ! After what he's been taught he shouldn't be bringing in 1k a whole day ! ! He's messing around wasting our day and time ., Michelle after this drill and meeting today he needs to be taken to the shelter."

Agents also found evidence contrary to BRANNON's statements to Pretrial Services in Tampa and corroborating the forced labor allegations in the Indictment when executing a search warrant at the house in Tampa where BRANNON was living on August 27, 2025. For example, agents observed evidence that multiple people were sleeping together in a single room and sharing a single bathroom, and some people were sleeping directly on the floor, instead of on a bed or mattress. Agents also observed evidence that approximately thirteen people were sleeping in the living quarters above the garage, sharing a single bathroom. BRANNON, by contrast, enjoyed her own lavishly furnished multi-room bedroom suite with ensuite bathroom. The bedroom suite included an expansive sitting room with a large screen television, two large walk-in closets, a treadmill, a spinning bike, a

15

refrigerator, a microwave, and a workspace. The ensuite bathroom included two showers and four vanities.

In addition, in executing search warrants on August 27, 2025, at the house in Tampa and at other KOGGC/JMMI locations, agents recovered the following evidence supporting the forced labor allegations:

- an explicit masturbation video sent to Taylor by a female worker in which the worker cries and apologizes for the "delay" in completing the "assignment," referring to the masturbation video, and states that she "understand[s] that [she] need[s] to do this and can't delay."

- evidence that Taylor frequently solicited, and received, sexually explicit photos and videos from multiple female KOGGC/JMMI workers, adding up to thousands of such photos and videos.

- notebooks documenting workers' schedules for making calls to solicit donations; specific monetary quotas; and schedules for other required work, such as cooking, cleaning, and watching children.

- evidence of certain consequences Taylor and/or BRANNON imposed on workers for not meeting monetary quotas, such as restrictions on food and making workers pick up trash outside for 24 hours straight.

Even more disturbingly, after the execution of search warrants at KOGGC/JMMI properties, the government confirmed that multiple minor children of KOGGC/JMMI workers lived in the call centers and/or properties operated by KOGGC/JMMI. Some of these children have been separated from their parents for years. One minor, who was

recently interviewed, corroborated aspects of the forced labor scheme and reported her own emotional, psychological, and sometimes physical trauma caused by her involvement in KOGGC/JMMI.

### D. Defendants Laundered the Proceeds of their Forced Labor Scheme to Enrich Themselves

KOGGC/JMMI obtained millions of dollars in donations each year by subjecting its workers to forced labor. Taylor and BRANNON used proceeds of the forced labor offenses that were deposited into the KOGGC/JMMI accounts listed below for monetary transactions greater than $10,000, in violation of 18 U.S.C. § 1956(h) (Money Laundering Conspiracy). Taylor and BRANNON were authorized signatories on these bank accounts.

| Bank Account | Authorized Signatories or Named Individual |
| --- | --- |
| JMMI US Bank Acct #xx75 | David Taylor, MICHELLE BRANNON, and two others known to the grand jury |
| Michelle Brannon US Bank Acct#xx58 | MICHELLE BRANNON |
| JMMI Regions Bank Acct#xx73 | MICHELLE BRANNON and one other known to the grand jury |
| KOGGC Chase Bank Acct#xx55 | MICHELLE BRANNON and one other known to the grand jury |
| JMMI PayPal Acct#xx72 | David Taylor's name associated with PayPal Account |

Taylor and BRANNON used KOGGC/JMMI funds obtained by forced labor to support Taylor's extravagant lifestyle and to enrich BRANNON. Taylor and BRANNON conspired to purchase and did purchase, among other items, a boat, luxury cars, ATVs, and jet skis. Some examples of monetary transactions greater than $10,000 are shown in the chart below:

| ITEM | TRANSACTION AMOUNT | ON OR ABOUT DATE |
|---|---|---|
| Mercedes Benz | $63,195.94 | 4/21/2018 |
| Bentley Continental | $70,000 downpayment | 5/04/2018 |
| Crownline Boat | $105,595 | 11/08/2019 |
| Bentley Continental | $15,000 downpayment | 6/29/2020 |
| Bentley Mulsanne | $50,000 downpayment | 6/30/2020 |
| Mercedes Benz | $14,908 | 9/09/2020 |
| Mercedes Benz | $13,695 | 9/09/2020 |
| Mercedes Benz | $12,485 | 9/09/2020 |
| 5 ATVs<br>St. Louis Power Sports | $31,805.00 | 6/17/2021 |
| 2 Jet Skis and a jet ski trailer<br>St. Louis Power Sports | $24,332.00 | 6/17/2021 |
| 2 Jet Skis and a jet ski trailer<br>Holzhauer Pro Motorsports | $24,962.20 | 6/17/2021 |
| 125 lbs. of Super Colossal Red King Crab Legs, 6 Seafood Shears, and 30 Crab Cutters | $10,353.44 | 9/30/2021 |
| Rolls Royce Cullinan | $123,028.09 lease signing payment | 5/21/2024 |

| Bulletproof Automotive (custom work on the Rolls Royce Cullinan) | $33,930 | 5/31/2024 |
| Bulletproof Automotive (custom work on the Rolls Royce Cullinan) | $32,630 | 7/08/2024 |
| Bulletproof Automotive (custom work on the Rolls Royce Cullinan) | $37,500 | 7/24/2024 |
| Bulletproof Automotive (custom work on the Rolls Royce Cullinan) | $18,302.76 | 2/14/2025 |

These purchases benefited BRANNON as well as Taylor. For example, in a video dated on or about July 11, 2020, obtained from Taylor's iCloud account data, BRANNON thanks Taylor for her new car as the video shows the black Bentley Continental purchased on June 29, 2020.

Evidence recovered during the execution of search warrants on August 27, 2025, at the house where BRANNON was living and at other KOGGC/JMMI locations also corroborates the money laundering allegations in the Indictment. For example, agents recovered from the Tampa house:

- an estimated $500,000 in gold bars in a locked safe in a closet in BRANNON's bedroom;

- $60,000 in cash in a closet in BRANNON's bedroom;

- valuable jewelry from a locked safe in a closet in BRANNON's bedroom;

- expensive designer clothing and purses from BRANNON's

bedroom;

- foreign currency from a closet in BRANNON's bedroom;

- multiple recently delivered life-sized expensive stone statues and decorative pillars for landscape installation on the property grounds;

- seven Mercedes Benz sedans; and

- two Bentley sedans.

Agents recovered from other KOGGC/JMMI locations:

- Over $4.1 million from the primary KOGGC/JMMI bank accounts;

- one new Lincoln Navigator from the house where Taylor was staying in Durham, North Carolina;

- silver coins from the Houston, Texas, and Taylor, Michigan locations;

- $2,500 in cash and additional foreign currency from the Taylor, Michigan location;

- two Bentleys, one Rolls Royce, and one Mercedes Benz from the Missouri location; and

- boxes of ledgers and spreadsheets documenting the money KOGGC/JMMI was bringing in from the house where Taylor was staying in Durham, North Carolina.

# ARGUMENT

## A. Applicable Law and Presumption in Favor of Detention

Under the Bail Reform Act, 18 U.S.C. §§ 3141 *et seq.*, federal courts "shall" order a defendant's detention pending trial upon a determination that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). Section 3142(f) establishes when the court should hold a detention hearing, while § 3142(g) provides the factors for the court to consider in determining whether to detain the defendant. *See United States v. Demmings*, No. 3:25-cr-21, 2025 U.S. Dist. LEXIS 52547, at *2-3 (S.D. Ohio March 21, 2025). Pursuant to 18 U.S.C. § 3142(f)(1), the judicial officer shall hold a hearing on the question of detention upon the motion of the government in a case that involves a crime of violence, a serious risk that the defendant will flee, or a serious risk that the defendant will obstruct or attempt to obstruct justice. 18 U.S.C. §§ 3142(f)(1)(A) and (f)(2)(A)-(b). In this case, the charged crimes of Conspiracy to Commit Forced Labor and Forced Labor are both Chapter 77 felony offenses and, accordingly, crimes of violence under the Bail Reform Act.

21

18 U.S.C. §§ 3156(a)(4)(C), 1589, and 1594. Furthermore, there is a serious risk that BRANNON will flee and that BRANNON will attempt to intimidate victims and witnesses, as discussed below. 18 U.S.C. §§ 3142(f)(2)(A)-(b).

Under § 3142(e)(3)(D), a presumption in favor of detention exists in this case. That is, where a court finds probable cause in cases involving a Chapter 77 offense "for which a maximum term of imprisonment of 20 years or more is proscribed," the court "shall . . . presume[] that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community[.]" 18 U.S.C. § 3142(e)(3)(D). "A grand jury indictment, by itself, establishes probable cause to believe that a defendant committed the crime with which he is charged." *Stone*, 608 F.3d at 945. Here, the charged crimes that trigger this presumption are Conspiracy to Commit Forced Labor and Forced Labor, both of which are Chapter 77 offenses that carry a maximum term of imprisonment of twenty years. 18 U.S.C. §§ 1589(d), 1594(b).

The presumption of § 3142(e) imposes a burden of production on the defendant, requiring the defendant to come forward with evidence

that he does not pose a danger to the community or a risk of flight. *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010); *see also United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985) (stating that the presumption "operate[s] at a minimum to impose a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption"). Even when the defendant "satisfies this burden . . . the presumption becomes 'an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g).'" *United States v. Baker*, No. 6:21-cr-32, 2021 U.S. Dist. LEXIS 123219, at *12 (E.D. Ky. July 1, 2021) (quoting *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986)); *see also United States v. Nuckols*, No. 4:24-cr-23, 2025 U.S. Dist. LEXIS 92758, at *5-6 (W.D. Ky. May 15, 2025) (where the defendant "satisfies his burden of production, the presumption favoring detention does not disappear entirely but remains a factor to be considered among those weighed by the court").  As the Sixth Circuit has observed, "[t]he presumption [of detention] remains as a factor because it is not simply an evidentiary tool designed for the courts. Instead, the presumption reflects Congress's substantive judgment that particular classes of offenders

23

should ordinarily be detained prior to trial." *Stone*, 608 F.3d at 945-46 ("To rebut the presumption, therefore, a defendant should 'present all the special features of his case' that take it outside 'the congressional paradigm.'").

In addition to the presumption of detention, the Court must consider the following factors to determine whether there are conditions of release that would reasonably assure the appearance of the defendant as required and the safety of any other person and the community: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including "the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings;" and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g). The Court applies a preponderance of the evidence standard in determining whether the defendant poses a flight risk, *United States v. Hinton*, 113

24

F. App'x 76, 77 (6th Cir. 2004), and a clear and convincing standard in determining whether the defendant poses a danger to the community. *Stone*, 608 F.3d at 945.

Because there is no condition or combination of conditions that will reasonably assure her appearance, the safety of any other person and the community, or the integrity of this proceeding, BRANNON should be detained.

### 1. Nature and Circumstances of Charged Offenses

When considering the nature and circumstances of the charged offenses, one factor a court takes into account is "whether the offense is a crime of violence." 18 U.S.C. § 3142(g)(1). In this case, as discussed above, the charged forced labor offenses are crimes of violence under the Bail Reform Act. 18 U.S.C. § 3156(a)(4). As this Court has observed, "[b]y definition, human trafficking is a violent, fraudulent, and coercive crime." *United States v. Bell*, No. 17-cr-20183, 2020 U.S. Dist. LEXIS 58850, at *11-12 (E.D. Mich. Apr. 3, 2020) (denying defendant's motion for pretrial release in a case involving a human trafficking and drug distribution conspiracy); *see also United States v. Walls*, 784 F.3d 543, 548 (9th Cir. 2015) ("Congress [has] recognized that human trafficking

25

. . . 'is a modern form of slavery, and it is the largest manifestation of slavery today.'") (quoting 22 U.S.C. § 2101(b)(1)). Furthermore, as discussed in detail below, BRANNON's offenses carry stiff penalties— each offense carries a statutory maximum penalty of twenty years in prison. These penalties reflect the serious nature of these crimes. *See*, *e.g.*, *Baldwin v. N.Y.*, 399 U.S. 66, 68 (1970) ("In deciding whether an offense is 'petty,' we have sought objective criteria reflecting the seriousness with which society regards the offense . . . and we have found the most relevant such criteria in the severity of the maximum authorized penalty.").

Indeed, the nature and circumstances of the charged forced labor offenses involve an extensive scheme, devised and carried out by Taylor and BRANNON, to obtain the unpaid labor of the victims in the Indictment and many other workers through prohibited means including force, threats of force, and coercion. Significantly, victims who managed to escape KOGGC/JMMI have reported profound trauma and intense fear of Taylor and BRANNON. BRANNON also is charged with laundering the money obtained through the forced labor scheme. Taylor and BRANNON were leaders and organizers of these schemes.

26

The charged offenses required intelligence, planning, sophistication, a disregard for the physical and psychological well-being of others, and a willingness to use religious belief to prey on others for their own personal financial gain. Taylor has spent over a decade pretending to be a religious renunciate and scamming people out of money, in partnership with BRANNON, while living a life of luxury. The serious nature and circumstances of the charged forced labor and money laundering offenses weigh in favor of detention.

## 2. Weight of the Evidence

"The second factor goes to the weight of the evidence of dangerousness or risk of flight, not the weight of the evidence of the defendant's guilt." *United States v. Naser*, 2025 U.S. App. LEXIS 10008, at *5 (6th Cir. Apr. 25, 2025) (quotation omitted). Significantly, courts have recognized that financial crimes like money laundering in the instant case—not just violent offenses—present a danger to the community. *See United States v. Phillips*, No. 3:25-cr-26, 2025 U.S. Dist. LEXIS 50081, at *9-11 (W.D. Ky. March 18, 2025) (collecting cases that find that financial crimes pose a danger to the community and stating that "[t]here is no question that economic crimes have victims and

27

negatively impact the community").

In addition, where, as here, the defendant is facing a "lengthy" term of imprisonment," there is an increased risk that the defendant will flee to avoid future court proceedings. *United States v. King*, No. 3:22-cr-60, 2022 U.S. Dist. LEXIS 152150, at *11 (E.D. Tenn. Aug. 24, 2022) (finding that a "lengthy" potential term of imprisonment of five to twenty years "increases the risk of flight and warrants pretrial detention"); *see also United States v. Cisneros*, 328 F.3d 610, 618 (10th Cir. 2003) (finding that defendant was a flight risk because her knowledge of the seriousness of the charges against her provided a strong incentive to abscond); *United States v. Ingram*, 415 F. Supp. 3d 1072, 1085 (N.D. Fla. 2019) (finding that a "defendant facing a substantial term of imprisonment has commensurate incentive to flee insofar as the cost of taking his chances at trial is great in comparison to the cost of fleeing"). A court's analysis of this factor includes the "circumstances surrounding the instant allegations." *United States v. Wesley-Hughes*, No. 5:22-mj-5132, 2022 U.S. Dist. LEXIS 75592, at *10 (E.D. Ky. Apr. 26, 2022).

In this case, the evidence is strong and credible that BRANNON is

both a danger to the community and a flight risk. BRANNON and
Taylor victimized, terrorized, and traumatized their workers for over a
decade by using *inter alia* an organized and disciplined regimen of
violence, threats of violence, threats of eternal damnation, sleep
deprivation, and food deprivation. They forced their workers to work
extraordinarily long hours soliciting money from strangers and
punished them when they failed to meet staggeringly high monetary
quotas. Taylor and BRANNON wielded power from the top of the
organization, doling out brutal consequences to those who did not bring
in enough money or those who disobeyed one of their orders. With their
extensive manipulation and deceit, they acquired approximately $50
million in donations over the past eleven years. Then, instead of using
the proceeds to benefit the communities where they were located across
the country as a legitimate church would do, they spent the majority of
the proceeds of their forced labor scheme on themselves.

      BRANNON's years of victimizing and manipulating individuals,
through violence and coercion and by laundering the donations she and
KOGGC/JMMI solicited under false pretenses, coupled with her lies to
Pretrial Services in Tampa, Florida, show that she is a danger to the

community.

In addition, the charged offenses—eight separate counts—each carry a statutory maximum penalty of 20 years in prison. The base offense level for Forced Labor is 22 under U.S.S.G. § 2H4.1(a)(1). With the likely applicable enhancements, the government's initial estimated calculation of BRANNON's offense level, as of today's date, is 34. The corresponding sentencing range is 151 to 188 months in prison. Under U.S.S.G. § 2S1.1(a), the offense level for the charged Money Laundering Conspiracy is that of "the underlying offense from which the laundered funds were derived." In this case, the underlying offense is Forced Labor. Accordingly, the government's initial estimated calculation of the offense level for the Money Laundering Conspiracy, as of today's date, is 34. Based on these calculations, BRANNON would face a significant prison sentence upon conviction. Thus, the lengthy sentence BRANNON faces indicates that she has a strong incentive to flee to avoid future court proceedings.

### 3. History and Characteristics of the Defendant

BRANNON, who is 55 years old, is unmarried and has two adult children. BRANNON has no employment outside the criminal

enterprise of KOGGC. She does not have significant family or community ties to the Eastern District of Michigan where this case is being prosecuted. Her significant ties, during the course of this conspiracy, have been solely to where she has committed her criminal activity, including Taylor, Michigan, Texas, Missouri, and Florida. Most recently, on or about June 26, 2025, BRANNON submitted a name change request in the state of Florida to change her name back to her maiden name of Michelle Denise Lynn. BRANNON also changed her home address from one in Houston, Texas, to the house in Tampa, Florida. Neither address is in Michigan and both are known KOGGC call centers.

Although BRANNON does not have any prior criminal convictions, she has been engaging in a continuous course of criminal conduct that terrified her victims for approximately the past twelve years, and she demonstrated utter disregard for her obligation to tell the truth to officers of the court by lying to Pretrial Services.

In addition to her lack of legitimate ties to the Eastern District of Michigan, BRANNON has access to numerous sources of funds to flee. First, although BRANNON will no longer have access to KOGGC funds

that the government seized at the time of her arrest, KOGGC continues to actively solicit donations to support BRANNON and Taylor and will likely make those funds available for BRANNON's use. Furthermore, the manner in which the funds are currently solicited demonstrates the organization's view of the government and the judicial process. For example, on September 14, 2025, a KOGGC worker soliciting donations during a broadcast stated, "[w]e're in a war. We're in a war and it is time for you to decide if you're a warrior or you're not."

Second, BRANNON has access to many financial platforms that allow individuals and businesses to send and receive money, both domestically and internationally, including Cash App, Venmo, PayPal, and Wise.

Cash App is a mobile payment service that allows individuals to send and receive money. BRANNON had access to an account created on March 20, 2018. This account is identified with BRANNON's name and Social Security Number. An address associated with the account is the Tampa, Florida, house where BRANNON has been living. BRANNON also had access to a second Cash App Account created on or around November 20, 2020. This account is identified in the names of

MICHELLE BRANNON and KOGGC.

Venmo is a social payment app that allows users in the United States to send and receive money via the app. BRANNON had access to a Venmo Account in the name of MICHELLE BRANNON created on February 20, 2021. BRANNON also had access to a second Venmo Account in the names of MICHELLE BRANNON and KINGDOM OF GOD GLOBAL CHURCH (KOGGC) which was created on February 20, 2021.

PayPal is an online payment system and digital wallet that allows individuals and businesses to send and receive money through the platform. BRANNON had access to a personal PayPal account in the name of MICHELLE BRANNON which was created on June 9, 2024. BRANNON also had access to a second PayPal Account in the names of MICHELLE BRANNON and KOGGC which was created on February 20, 2021.

Wise is a global financial technology company that allows individuals and businesses to send and receive money internationally in many different currencies. KOGGC registered and created multiple accounts with Wise on August 7, 2022. BRANNON is listed as the

33

company shareholder/director on the account information documents obtained from Wise and may have access to these accounts.

Third, BRANNON has access to multiple credit cards that would allow BRANNON to make purchases and take cash advances:

(1) BRANNON has access to a Chase Bank credit card account in the current names of MICHELLE LYNN and KOGGC which was opened on or around June 12, 2024. The account lists a current address as the house in Tampa, Florida. The credit limit on this account is $150,000. This account also has a $7,500 cash advance limit.

(2) BRANNON has access to a CareCredit credit card account with Synchrony Bank. This account was opened on or around November 10, 2020. The credit limit on the account is $10,000.

(3) BRANNON has access to Capital One credit card account in the name of David Taylor and JMMI which was opened on May 16, 2016. BRANNON obtained a credit card to utilize the account with card number ending in #2255 and her email address is associated with this credit card account. The card has a $2,000 credit limit.

Lastly, KOGGC/JMMI has solicited and received donations in cryptocurrency. Because the government has not yet seized those funds, BRANNON likely has access to cryptocurrency.

In addition to her direct access to KOGGC/JMMI donations, financial platforms, credit, and cryptocurrency, BRANNON has made a career over the last decade of raising high dollar amounts by soliciting money from others; KOGGC/JMMI has acquired approximately $50

34

million in donations over the past eleven years with her as its financial
leader and instructor. BRANNON's history and success in raising and
laundering funds means she can easily use her skills and utilize the
KOGGC network to raise funds for her to flee.

For all the aforementioned reasons, this factor also weighs in
favor of detention.

### 4. Nature and Seriousness of the Danger to Any Person or the Community

"Danger [to the community] has an expansive meaning under the
Bail Reform Act[.]" *United States v. Conn*, No. 5:16-cr-22, 2016 U.S.
Dist. LEXIS 205056, at *15 n.12 (E.D. Ky. Apr. 12, 2016). It does not
only refer to the risk of physical violence; instead, it encompasses any
danger that the defendant might engage in criminal activity
detrimental to the community. *See United States v. McCurdy*, No. 2:17-
cr-20762, 2020 U.S. Dist. LEXIS 226435, at *5 (E.D. Mich. Dec. 3,
2020). Financial crimes, not just crimes involving physical violence,
pose a danger to the community. *See Phillips*, 2025 U.S. Dist. LEXIS
50081, at *9-11; *United States v. Giordano*, 370 F. Supp. 2d 1256, 1264
(S.D. Fla. 2005) ("There can be no question that an economic danger,
like that posed by a serial defrauder, falls under the broad umbrella of

'dangerousness' as that term is used throughout the Bail Reform Act."). In addition, "[d]anger . . . fairly encompasses danger that a defendant will seek to subvert justice, through whatever means, and includes potential threats to the integrity of the judicial process." *Conn*, 2016 U.S. Dist. Lexis 205056, at *10 n.12 (citing *United States v. LaFontaine*, 210 F.3d 125, 134 (2d Cir. 2000) (holding, in a white-collar crime case, that the defendant's attempts to influence the testimony of a witness, with or without violence, can constitute "the type of danger to the community that would support detention" and noting that "obstruction of justice has been a traditional ground for pretrial detention by the courts").

In this case, BRANNON has spent approximately twelve years playing a leadership role in an intense and intimidating forced labor conspiracy as well as a sophisticated money laundering conspiracy. *See Bell*, 2020 U.S. Dist. LEXIS 58850 (citing defendant's leadership role in a drug distribution and human trafficking conspiracy as evidence of his danger to the community); *United States v. Young*, No. 3:98-cr-38, 2020 U.S. Dist. LEXIS 212045 (M.D. Tenn. Nov. 12, 2020) (stating that the nature of the danger the defendant posed was not only from violence

and drug trafficking, it also was from the defendant's actions directing others in drug trafficking) (citing *United States v. Gotti*, 433 F. Supp. 3d 613, 620 (S.D.N.Y. 2020) (denying compassionate release based on the danger to the community posed by a leader of a criminal organization, and finding danger to the community from a leader "is not that he will personally engage in acts of violence, but that he can command others to do so"); *Ingram*, 415 F. Supp. 3d at 1080 ("Defendant's affiliation with and leadership of a conspiracy also is relevant to an analysis of the risk of danger to the community and . . . risk of flight. . . .  Leaders of criminal organizations pose a greater danger to the community. Through concerted activity, they can act through co-conspirators."). BRANNON's actions include the abuse of KOGGC/JMMI workers through manipulation and coercion and, at times, physical violence. Indeed, BRANNON continues to have supporters, despite her arrest, who would likely assist her in intimidating current and former members of KOGGC. This is particularly concerning in light of the developing evidence that female workers may have been required to send explicit sexual videos as part of their forced labor.

In addition, for at least twelve years, BRANNON has loyally followed Taylor's instructions and teachings and, at times, has been romantically involved with Taylor. *United States v. Tawfik*, No. 17-cr-20183, 2017 U.S. Dist. LEXIS 62295, at *20 (E.D. Mich. Apr. 25, 2017) (denying defendant's motion for pretrial release in a case involving human trafficking and drug distribution conspiracies, finding that, based on defendant's actions in the conspiracy and romantic involvement with the conspiracy's leader, "and her declarations of love and loyalty to him, she poses an additional danger to others and herself"). Taylor's teachings during the conspiracies included encouraging self-inflicted violence and violence against others including law enforcement when and if his organization is confronted by law enforcement. Significantly, Taylor has attempted to convince the workers to commit acts of violence against themselves or others, and Taylor has made promises to punish and "get rid of" those who do not serve him. During a meeting with workers, Taylor identified the Michigan Attorney General's Office and stated, "God will kill officials" and "like I told you the other day, they gonna be in here with their FBI jackets on . . . You don't scare me. God's gonna to get you. And I am

38

going to make sure he do, too. I am going to make sure I speed it up."
Taylor further stated, "I'm going to be looking at you in Hell and you
are going to be having your little FBI jacket on. Who gonna save you
then? The American government is not going to save you. They cannot
save you. Not from this government I serve. You think they are
protecting you, who is going to protect you after you leave here? They
are not going to protect you. Not in my realm, not in the realm that I
govern. I have been given power by the only one who counts. We will
watch you burn and the flesh melt off of your bones."

Taylor has talked about physically stopping individuals who
interfere with him. For example, he said to workers, "This probably
prophetic. God having me say this to you [name omitted of a member],
but I'm just telling you. And I think I'm probably gonna hire some
security or something too. But I am just telling you, you kill them on
contact if they come in here with that foolishness you understand?
They need to die. They come in with an "AKA" or those guns, these
niggas be carrying in Houston and they come in trying to shoot up.
Listen, do not hesitate!" The workers responded in unison, "Yes, Sir!"

Furthermore, during Taylor's meetings and online broadcasts, he

often used words like "war" and "battle;" he has claimed he is preparing "soldiers;" and listed his text thread as "military bootcamp." On more than one occasion, Taylor has referred to himself as a "General" and says he is training the "end time army." The recent KOGGC broadcast proves that BRANNON's supporters are carrying on the "war" message by declaring, "[w]e're in a war. We're in a war and it is time for you to decide if you're a warrior or you're not."

Thus, given BRANNON's own reign of terror over her victims, her leadership role in the forced labor and money laundering conspiracies, her close personal and criminal relationship with Taylor, and her years of following Taylor's directions with fierce loyalty, she is a danger to the community if released.

## CONCLUSION

All the factors outlined in 18 U.S.C. § 3142(g), and the presumption of detention, weigh overwhelmingly in favor of detention in this case. Thus, the United States respectfully requests that the Court detain BRANNON pending trial.

Respectfully submitted,

Jerome F. Gorgon Jr.
United States Attorney


*s/Sarah Resnick Cohen*
SARAH RESNICK COHEN
Assistant United States Attorney
Eastern District of Michigan
Homeland Security Unit
Human Trafficking Coordinator
211 W. Fort St., Ste. 2001
Detroit, MI  48226
313-226-9100
Sarah.cohen@usdoj.gov


*s/Christina Randall-James*
CHRISTINA RANDALL-JAMES
Trial Attorney
Human Trafficking Prosecution Unit
U.S. Department of Justice
Civil Rights Division
202-598-5701
Christina.Randall-James@usdoj.gov

41

## <u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on September 29, 2025, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.


<u>*s/Sarah Resnick Cohen*</u>
SARAH RESNICK COHEN
Assistant United States Attorney