## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

United States of America,

        Plaintiff,

                              Criminal No. 25-20560

v.

                              Hon. Terrence G. Berg

D-1 David Taylor,

        Defendant.

_____/

### United States' Memorandum in Support of Detention in the Eastern District of Michigan

The United States respectfully submits this memorandum in support of its motion, pursuant to 18 U.S.C. §§ 3142(f)(1)(A), (f)(2)(A), and (f)(2)(B), that DAVID TAYLOR be detained pending trial as he is unable to rebut the applicable presumption of detention and there is no condition or combination of conditions of release that will reasonably assure his appearance, the integrity of this proceeding, or the safety of any person or the community.

Section 3142(f)(1)(A) provides a basis for a detention hearing where, as here, the charged offenses involve a crime of violence,

1

specifically violations of 18 U.S.C. § 1589 (Forced Labor). 18 U.S.C. § 3142(f)(1)(A); *see also* 18 U.S.C. § 3156(a)(4) (defining "crime of violence" for purposes of the Bail Reform Act to include any Chapter 77 felony). In addition, the serious risk that TAYLOR will flee and attempt to intimidate victims and witnesses provides additional bases for the government's request for detention. 18 U.S.C. §§ 3142(f)(2)(A) and (f)(2)(B).

TAYLOR is unable to rebut the presumption of detention that applies under 18 U.S.C. § 3142(e)(3)(D). In addition, an analysis of the factors set forth in 18 U.S.C. § 3142(g) leads to the conclusion that detention is appropriate because there is no condition or combination of conditions that will reasonably assure TAYLOR's appearance, the integrity of this proceeding, or the safety of any person or the community. Accordingly, the Court should detain TAYLOR pending trial.

## **PROCEDURAL AND FACTUAL BACKGROUND**

### **A. Procedural Background**

On July 23, 2025, a federal grand jury in the Eastern District of Michigan indicted TAYLOR and his co-defendant, Michelle Brannon, on

one count of Conspiracy to Commit Forced Labor in violation of 18 U.S.C. § 1594(b) (Count One); five counts of Forced Labor in violation of 18 U.S.C. § 1589 (Counts Two through Seven); and one count of Money Laundering Conspiracy in violation of 18 U.S.C. § 1956(h) (Count Ten). TAYLOR is charged with an additional two counts of Forced Labor in violation of 18 U.S.C. § 1589 (Counts Eight and Nine).

These charges arise from defendants' roles as principal leaders of Kingdom of God Global Church (KOGGC), formerly Joshua Media Ministries International (JMMI). TAYLOR is the original founder of JMMI and refers to himself as "Apostle" and "Jesus's best friend," claiming that God has given him the "keys to the Kingdom on Earth." Brannon was TAYLOR's second-in-command as the Executive Director of KOGGC. Together, since 2013, TAYLOR and Brannon compelled the labor of individuals who joined their organization by prohibited means including force, physical restraint, serious harm, and threats of those actions.

On August 27, 2025, agents arrested TAYLOR in Durham, North Carolina. At the time of his arrest, TAYLOR was living at a house, leased by KOGGC/JMMI, where one of his "armor bearers" worked and

a female KOGGC worker also lived. As described in the Indictment and below, "armor bearers" worked as TAYLOR's personal servants, fulfilling TAYLOR's demands around the clock.

TAYLOR, though, lied to Pretrial Services in the Middle District of North Carolina when the Pretrial Services Officer asked TAYLOR where he resides. Instead of identifying the address in Durham, TAYLOR stated he has lived in St. Louis, Missouri for seventeen years. *See* M.D. of North Carolina Pretrial Services Report, pg. 1. TAYLOR also failed to inform Pretrial Services that both individuals TAYLOR provided to the Officer to verify his information are workers for TAYLOR and KOGGC. *See* M.D. of North Carolina Pretrial Servies Report, pgs. 1 – 2.

On August 27, 2005, TAYLOR requested a detention hearing in the Eastern District of Michigan and consented to detention until he arrived in Michigan.

On August 27, 2025, agents arrested Brannon in Tampa, Florida. At the time of her arrest, she was living at a house, owned by KOGGC, with approximately 57 KOGGC workers and victims of TAYLOR and Brannon's coerced labor scheme.

## B. KOGGC/JMMI Organization

TAYLOR's organization operated under the name JMMI from 2008 through 2021 and then KOGGC from 2021 to the present. Until their arrests on August 27, 2025, TAYLOR and Brannon operated call centers that offered prayer and dream interpretation and solicited donations. Call centers were the main source of revenue for KOGGC/JMMI. TAYLOR established his first call center in Taylor, Michigan, over ten years ago. KOGGC/JMMI has since opened and operated call centers in other locations in the United States including in Missouri, Florida, and Texas.

TAYLOR and Brannon orchestrated a forced labor scheme that resulted in KOGGC/JMMI receiving millions of dollars in donations each year through the call centers, much of which TAYLOR used to purchase luxury properties, luxury cars, and costly sporting equipment such as a boat, jet skis, and ATVs. In total, KOGGC/JMMI received approximately $50 million in donations since 2014.

## C. Defendants Engaged in a Scheme to Coerce the Named Victims and Other Workers to Provide Labor

KOGGC/JMMI call centers were worked by "full-time" KOGGC/JMMI workers. TAYLOR also selected men from the full-time

5

workers to work as his "armor bearers." Armor bearers worked as TAYLOR's personal servants, fulfilling TAYLOR's demands around the clock. The victims in Counts Two through Seven of the Indictment worked as full-time laborers; the victims in Counts Eight and Nine of the Indictment worked as armor bearers.

TAYLOR and Brannon did not pay any full-time workers—their victims—for their labor. TAYLOR and Brannon, who worked with TAYLOR to manage the organization and carry out his orders, are two of only three members of KOGGC/JMMI who received a salary. The workers were placed into different working groups, such as a media team, a finance team, a call center team, or a music team. Almost all workers were expected to participate in call center work to assist in bringing in monetary donations. TAYLOR created training regimens to teach workers how to effectively solicit monetary donations and to increase productivity and discipline. Brannon supervised and managed the workers—the victims of their scheme—and taught them how to successfully solicit donations for KOGGC/JMMI.

As part of their scheme to coerce the workers' labor, TAYLOR and Brannon used various methods of fraud to establish trust and loyalty

and to keep the workers laboring in hopes of an eventual payoff. TAYLOR first lured in workers with promises of filling their spiritual hunger, making them feel intensely loved and special through "love bombing," and promising them a unique closeness to God by serving God through KOGGC/JMMI. TAYLOR promised that, through faithful service and entering a "20-year process," what workers most desired would be given to them. Brannon parroted these promises in staff meetings. TAYLOR and Brannon taught members that (1) TAYLOR is God's best friend and his second-in-command; (2) God will bring his Kingdom on Earth through TAYLOR; and (3) being a full-time staff member is the only way to ensure your place in the Kingdom and to become ready to encounter God face-to-face as TAYLOR does. TAYLOR and Brannon also made other significant fraudulent promises to their workers which never materialized.

Once TAYLOR and Brannon drew the workers in, they then took control over every aspect of the workers' lives. TAYLOR and Brannon physically and mentally weakened the workers by subjecting them to daily public humiliation and psychological abuse, imposing excruciating work hours—sometimes more than 20 hours per day—resulting in

severe sleep deprivation, housing them in cramped quarters without privacy or adequate bedding, and, in some instances, withholding food and medical care. TAYLOR and Brannon controlled where and when the workers slept, when and what they ate, what they wore, how they spoke, and when they could go to the bathroom. They insisted that workers give up outside employment, making them wholly reliant on KOGGC/JMMI for food and shelter.

TAYLOR and Brannon also forbade relationships and punished workers for disobeying this rule, thereby isolating them from other staff and ensuring that their primary loyalty to KOGGC/JMMI was not compromised. In addition, TAYLOR and Brannon isolated workers from the outside world by breaking up marriages and other relationships, forcing them to block family that questioned TAYLOR and his teachings, and establishing grueling work hours that left them almost no time to have contact with anyone outside of KOGGC/JMMI. TAYLOR and Brannon physically and mentally wore down the workers' will to resist or to question what TAYLOR and Brannon told them. Their conduct made the workers, the victims, more vulnerable and, therefore, easier to exploit.

As TAYLOR and Brannon gained control over and weakened the workers, they also used a combination of means to create a climate of fear through psychological manipulation and physical violence that caused the workers to fear serious harm if they made a mistake, complained, did not meet monetary quotas, or left KOGGC/JMMI.

First, TAYLOR and Brannon used physical violence to intimidate and control. Specifically, the defendants sometimes assaulted workers when the actions or behaviors of workers were not consistent with the rules instituted by TAYLOR and/or Brannon. While much of the physical abuse was directed towards men, women witnessed and heard about the assaults and feared assault as a possible consequence. This abuse helped create a climate of fear in which the workers feared physical violence for any type of noncompliance.

Second, TAYLOR and Brannon also used sleep deprivation and withholding of food for failure to meet monetary quotas, as additional means of instilling a climate of fear.

Third, TAYLOR and Brannon both fostered this climate of fear by frequently "rebuking" workers when they did not follow a rule or meet an expectation imposed by TAYLOR or Brannon. Rebuking involved

yelling at workers, standing inches from their face, calling them wicked and demanding that they get on their knees and repent, reminding them of the ultimate consequence of failure to comply: eternal damnation. TAYLOR and Brannon issued many of these punishments in a public forum, berating and name-calling individual workers in front of the entire staff as a warning to others. These rebukings were both humiliating and terrifying.

During a rebuking, TAYLOR, Brannon, or a worker (as instructed by TAYLOR or Brannon), got inches from the face of another worker and screamed at them, calling them names like stupid, dumb, wicked, n***a, Lucifer, etc. Many times, workers were forced to kneel and repent to TAYLOR and God. Rebukings could last a few minutes to a few hours depending on the situation. The rebukings, sometimes coupled with the threat of being "put out" into a garage or a homeless shelter, constituted psychological coercion designed to compel the workers' labor. As the result of the actions of TAYLOR and Brannon, workers truly feared that burning in hell or meeting with some catastrophic end would be the consequence of defying TAYLOR in any way.

This power to condemn or "curse" the workers was particularly potent in establishing a climate of fear. Though the workers lived in constant fear of punishment, they were even more afraid of being deemed a "traitor." Through his sermons and teachings, TAYLOR directly instilled in them a deep fear that those who left suffered tragic consequences and the threat of eternal damnation. He repeatedly told stories of this occurring to others, tying tragic illnesses, for example, to Biblical passages where those chosen by God had such powers to call down God's judgment. Brannon parroted these threats in worker meetings and rebukings.

Since approximately 2020, TAYLOR has not been living at any of the call centers, so TAYLOR began exclusively using cell phones to communicate with KOGGC/JMMI workers. TAYLOR instructed and entrusted Brannon to carry out his orders and punishments for workers. TAYLOR and Brannon frequently communicated their orders and punishments via text messages. The text messages received by workers from TAYLOR included the following messages:

- On or about May 5, 2021, at 12:26am, TAYLOR texted an armor bearer tasked with communicating TAYLOR's orders to KOGGC staff, ". . . you'll have to raise $164k today !! Each hour you fall behind consequences will start . . we will

11

mess with the food . You will fast from the regular food or abstain for a while normally . . . As of now there's a 21 day peanut butter and jelly regiment like before ! . . . [those] who do not push in their calls individually and as a team with the right amount of people and closing numbers at 6pm they don't eat dinner at all.. if they do good afterward this time then at the end of the night they may get a snack before bed but not much and this regiment will go on every day for 21 days until they obey . . Take away the food !! There will be other consequences!! We must make them fast and pray !!"

- On or about September 11, 2021, at 3:55am, TAYLOR texted the armor bearer, "Those in the top 9 that don't do well will stay up and close and stay on top of the delinquents . . . Put the pressure of them not having their time off . . nor food . . they will fast !! . . ."

- On or about September 21, 2021, at 3:52am, TAYLOR texted the armor bearer, "Let everyone know we have to raise at least $50k by 12 midnight if this happens the top 9 and those who did well can rest but the others who didn't . . . will stay up until 4am and study notes and They will wake up at 8am-9am . . . if they don't do good the first 5 hours 9 – 2pm they will not get lunch and for dinner they will only have soup and salad and water."

- On or about September 28, 2021, at 7:57am, TAYLOR texted the armor bearer, "POUR WATER ON EVERYONES FACES THAT'S HALF WAY SLEEPING AND NOT WORKING WAKE THEM UP NOW !! . . . My next level of judgment tomorrow is that it won't be to just 4am it will be every hour you waste in the day will be added on past 4am !! TELL THEM ALL TO STAND NOW AND YOU THROW WATER ON THEIR FACES ! Especially the people not doing anything or helping bring in the money !! You tell them I don't care about them being sick !! . . "

- On or about October 27, 2021, at 3:23am, TAYLOR texted

the armor bearer, ". . . I can't be kind to you letting you start later and sleep in . . . I can't be kind with none of you ! If this doesn't change in the next 2 hours !! You'll are working until 4am and then getting up at 8am in the morning to start again !! None of you including top closers will not be able to get away with not working and raising the money we need or meeting our goal when we are in a dire push !! NOW I DONT CARE IF YOU ARE TIRED !! You've crossed the line !! You are going to work all night and get up in the morning !! I want all the names of those who are not helping with this push or doing their work or not showing change . . NOW . . They are going to the homeless shelter !! . . . "

- On or about March 10, 2022, at 11:12pm, TAYLOR texted a group of workers, "You'll are not going to bed tonight until you raise this $33K let's go!!"

- On or about March 15, 2022, at 1:44am, TAYLOR texted a group of workers, "POINT BLANK . . . If you don't work you can't eat."

- On or about April 24, 2022, at 9:04pm, TAYLOR texted a group of workers, "Repent now niggas   All of you get on your knees now and repent !! NOW !! You have pushed God and I too far !! . . . IM DONE !! EVERYONE GO INTO THE TAMPA GARAGE TONIGHT ! ! THIS WILL NEVER STOP UNTIL YOU CHANGE COMPLETETLY."

- On or about May 12, 2022, at 6:39pm, TAYLOR texted a group of workers, "WARNING TO THE WHOLE STAFF - . . . it's too expensive for us to provide for the amount of people who won't learn to close !! So I'm only buying enough for the few at this point who have applied the training and have learned to close !! . . . If you don't work (effectively) and learn closing like we told you then you won't eat !"

- On or about May 26, 2022, at approximately 11:35am, TAYLOR texted a group of workers, "WARNING – FROM APOSTLE   Michelle deal out consequences to all the closers

13

. . . that are not bringing in their amount . . Garage in tampa and take away food now !! I want those in Ocala who supposed to be doing their work but are not punished and out in the garage and their food taken away . . . "

- On or about May 27, 2022, at 7:20am, TAYLOR texted a group of workers, "JUDGEMENT – These numbers are bad !! . . 7 of the top closers need to go in the garage in tampa now !! . . Also I want food taken away . . Michele deal out consequences to all the closers . . that are not bringing in their amount . . Garage in tampa and take away food now !!"

- On or about July 31, 2022, at 12:01am, TAYLOR texted a group of workers, "You are getting up at 8 am also !! I want cold water thrown on those who drag and won't get up !  A big bucket of water . . . MICHELLE . . ENFORCE THIS !!"

As this sampling of texts demonstrates, TAYLOR adeptly used the climate of fear he and Brannon created, as well as other prohibited means, to compel the labor and services of the workers, their victims. Through this forced labor scheme, TAYLOR and Brannon grossed approximately $50 million since 2014.

Agents found evidence corroborating the forced labor allegations in the Indictment when executing a search warrant and arrest warrant at the house where TAYLOR was living in Durham, North Carolina, on August 27, 2025.[1] For example:

---

[1] The government is providing some samples of corroborating evidence located at three search warrant locations. There is substantial additional corroborating evidence not detailed in this memorandum.

- TAYLOR's armor bearer slept on an air mattress in the structure behind the house where TAYLOR lived;

- a safe in the house contained six cellular phones;

- TAYLOR had three additional cellular phones in his possession at the time of arrest;

- thrones and equipment used by TAYLOR for broadcasts were in the house and structure behind the house; and

- multiple boxes containing ledgers documenting all the money KOGGC/JMMI brought in each month were located on the property.

Agents also located evidence corroborating the allegations during the execution of a search warrant at the Taylor, Michigan, KOGGC/JMMI building. For example, agents recovered a binder entitled "Apostle David E. Taylor's Boot Camp Training" that contains hundreds of pages of training and instructions, memos and messages "from Apostle" (referring to TAYLOR), worker schedules and assignments, specific monetary quotas, lists of workers and the amounts of money they have raised, and handwritten notes of a worker.

Within the binder, there are hundreds of pages of "Memos from Apostle David E. Taylor," which include the following:

- April 14, 2022: "ALERT [] WARNING []: THE TOP 9 CLOSERS AND THE bottom 50 ARE STILL SHOWING SIGNS THAT THEY ARE GOING TO HELL EVEN AFTER HEARING GODS WORD ON SLOTHFULNESS[.] You'll

15

are lying and making excuses !! . . . . This tells me all 9 of you are still on your way to hell !! ALL OF YOU !! And you are going to go because of your real attitude and heart of slothfulness!! . . . . You top 9 and bottom 50 are evil because you don't even try to accomplish these large [fundraising] numbers"

- April 19, 2022: "Warning—All the top closers are dragging and causing us to fail in this !! There is a garage that you going to have to go into if you don't do your work starting today . . . !! You must raise $15k – 30k a day no questions asked . . . the lowest closers among the 10 who will not change has to go in the garage after this day !!"

- May 19, 2022: "ALL DAY MARATHON TO CATCH UP . . . . Every top 10 closers needs to bring in today $38.6k each . . . . All 8 of you top closers along with the ones on your team have only one more day that's Friday before I'm going to send all the top 8 staff back to Ocala in the garage along with everyone under you !! You will either change permanently or die there !! . . . . THIS IS GOD AND MY JUDGEMENT COMING !! These are the list of top closers and their teams that are going back to Ocala strait into the garage Saturday if there is no consistent repentance from the whole teams . . . . [list of workers and teams, with "WARNING" noted next to some names] THESE THREE WITH WARNING DIDN'T DO THEIR JOB TODAY AND ARE IN DANGER OF BEING NOT ONLY SENT BACK TO OCALA BUT GRAVER CONSEQUENCES NOTE: When you are sent back the pressure and consequences are going to be 10 times greater . . . . OTHER OPTION – EACH OF YOU TOP 10 MUST DO GOOD ON FRIDAY TO RAISE $38.6k . . . THEN IF NOT MUST TURN SATURDAY INTO A MARATHON DAY OR MOVE OUT OF TAMPA PLACE TO OCALA !!"

- May 26, 2022: "MEMO -You'll should be in marathon all day !! We have to raise $92k a day starting today for 6 days !! Michele make them push !! WARNING~- FROM APOSTLE

16

Michele deal out consequences to all the closers starting with those among the top 9 and bottom below now that are not bringing in their amount .. Garage in tampa and take away food now ! ! I want those in Ocala who supposed to be doing their work but are not punished and out in the garage and their food taken away to enforce all of them applying their training .. Everyone especially those who are part of the closing circle that suppose to be bringing in finances !! I WANT THIS DONE NOW MICHELE BECAUSE THESE TOP 9 ARE NOT ADMINISTERING ANYTHING THAT IS CREATING FORCED CHANGE"

- May 27, 2022: "WARNING . . . . If this $548k is not caught up in 6 days I'm sending them back to the bootcamp in Ocala!! All of them have to go back!! . . . . JUDGMENT . . . Michele deal out consequences to all the closers starting with those among the top 9 and bottom below now that are not bringing in their amount .. Garage in tampa and take away food now !! . . . . I want those in Ocala who supposed to be doing their work but are not punished and put in the garage and their food taken away to enforce all of them applying their training"

- July 20, 2022: "You 8 are not coming out of the garage until you repent of your ways that's being inconsistent in ministry and more than that not bringing in more than you ever have not just getting back to the level you was raising money on or just staying at that level !!"

- July 26, 2022, directed to Brannon: "It don't matter if you bring in $400k if you don't stay on top of the daily operation and the top 9 their numbers keeping order by dealing out consequences to these lazy inconsistent people ! . . . . If they don't do this they don't deserve to be in that tampa house they are all going back to Ocala packed like sardines with consequences in the garage !! Back in bootcamp in the trenches !!"

- July 31, 2022: "WARNING [] Everyone .. I mean every

17

single person must now be raked over the coals from Michelle down to the top 9 down to the bottom 20 and get your butts back in order !! You'll have gotten this ministry in a shambles … a complete mess !! I want consequences now put on the top bottom 20 under the 9 who can close and help but who is not and their numbers are low !! NOW !! . . . . I want cold water thrown on anyone who don't get up on time and who is dragging!!  From the top 9 down. . . . I want their numbers looked at and scrutinized then consequences put on each of them !! . . . . I want cold water thrown in the morning on anyone who don't get up on time and who is dragging!! From the top 9 down"

- August 13, 2022: "MEMO-TOP 10 MUST RAISE $17.4k TODAY!! . . . . [worker name omitted to protect their identity] after this is going to the shelter because of his lack of repentance and focus ! ! After what he's been taught he shouldn't be bringing in 1k a whole day ! ! He's messing around wasting our day and time ., Michelle after this drill and meeting today he needs to be taken to the shelter."

- September 4, 2022, "WARNING FROM APOSTLE . . . . Get busy . . . . You are not doing this work on your own that you know to do ! This is where you're going to be judged ! How you work when no one like Michelle or myself is over you making you do your work !! If this don't stop immediately you're going to the shelter . . . . This is going to stop • or I'm forcing you out!! You will either change or be put out., [worker name omitted to protect their identity], [worker name omitted to protect their identity] and [worker name omitted to protect their identity] pack your things to prepare to go to the shelter. . . . You're going to the shelter if you can't be here and focus yourself first and others on your work and your job. . . . You'll are liars, slothful , disobedient. and lazy to apply the training consistently! You do it on days you want to ., You purposely didn't do it today because you took a day off on your own to not do as much and relax in your own mind SO YOU DIDNT PUSH . Especially since you know you have to work tomorrow! THIS IS EVIL !!

> Because you are the reason the training is not growing into the lives of other people here this is why you are getting the most severe punishment first .. THE SHELTER OR LIVING ON THE STREET HOMELESS."

Agents also found evidence corroborating the forced labor allegations in the Indictment when executing a search warrant at the house in Tampa where Brannon was living on August 27, 2025. For example, agents observed evidence that multiple people were sleeping together in a single room and sharing a single bathroom, and some people were sleeping directly on the floor, instead of on a bed or mattress. Agents also observed evidence that approximately thirteen people were sleeping in the living quarters above the garage, sharing a single bathroom. Brannon, by contrast, enjoyed her own lavishly furnished multi-room bedroom suite with ensuite bathroom. The bedroom suite included an expansive sitting room with a large screen television, two large walk-in closets, a treadmill, a spinning bike, a refrigerator, a microwave, and a workspace. The ensuite bathroom included two showers and four vanities.

In addition, in executing search warrants on August 27, 2025, at the house in Tampa and at other KOGGC/JMMI locations, agents recovered the following evidence supporting the forced labor allegations:

19

- an explicit masturbation video sent to TAYLOR by a female worker in which the worker cries and apologizes for the "delay" in completing the "assignment," referring to the masturbation video, and states that she "understand[s] that [she] need[s] to do this and can't delay."

- evidence that TAYLOR frequently solicited, and received, sexually explicit photos and videos from multiple female KOGGC/JMMI workers, adding up to thousands of such photos and videos.

- notebooks documenting workers' schedules for making calls to solicit donations; specific monetary quotas; and schedules for other required work, such as cooking, cleaning, and watching children.

- evidence of consequences TAYLOR and/or Brannon imposed on workers for not meeting monetary quotas, such as restrictions on food and making workers pick up trash outside for 24 hours straight.

The government's investigation regarding TAYLOR's insistence that women in his criminal organization send him sexually explicit photographs and videos is ongoing. To date, the government can confirm that TAYLOR coerced some female workers into providing masturbation videos and sexually explicit photographs to TAYLOR. The female members who have disclosed this, to date, explain that TAYLOR regularly demanded such material; they were fearful of disobeying TAYLOR; and they felt they had no choice but to send TAYLOR what he demanded.

Equally disturbing, after the execution of search warrants at KOGGC/JMMI properties, the government confirmed that multiple minor children of KOGGC/JMMI workers lived in the call centers and/or properties operated by KOGGC/JMMI. Some of these children have been separated from their parents for years. Two minors, who have been recently interviewed, corroborated aspects of the forced labor scheme (including physical assaults) and reported their own emotional, psychological, and sometimes physical abuse and trauma during their involvement in KOGGC/JMMI.

### D. Defendants Laundered the Proceeds of their Forced Labor Scheme to Enrich Themselves

KOGGC/JMMI obtained millions of dollars in donations each year by subjecting its workers to forced labor. TAYLOR and Brannon used proceeds of the forced labor offenses that were deposited into the KOGGC/JMMI accounts listed below for monetary transactions greater than $10,000, in violation of 18 U.S.C. § 1956(h) (Money Laundering Conspiracy). TAYLOR and Brannon were authorized signatories on these bank accounts.

| Bank Account | Authorized Signatories or Named Individual |
|---|---|
| JMMI US Bank Acct #xx75 | DAVID TAYLOR, Michelle Brannon, and two others known to the grand jury |
| Michelle Brannon US Bank Acct#xx58 | Michelle Brannon |
| JMMI Regions Bank Acct#xx73 | Michelle Brannon and one other known to the grand jury |
| KOGGC Chase Bank Acct#xx55 | Michelle Brannon and one other known to the grand jury |
| JMMI PayPal Acct#xx72 | DAVID TAYLOR's name associated with PayPal Account |

TAYLOR and Brannon used KOGGC/JMMI funds obtained by forced labor to support TAYLOR's extravagant lifestyle and to enrich Brannon. TAYLOR and Brannon conspired to purchase and did purchase, among other items, a boat, luxury cars, ATVs, and jet skis. Some examples of monetary transactions greater than $10,000 are shown in the chart below:

| ITEM | TRANSACTION AMOUNT | ON OR ABOUT DATE |
|------|--------------------|--------------------|
| Mercedes Benz | $63,195.94 | 4/21/2018 |
| Bentley Continental | $70,000 down payment | 5/04/2018 |
| Crownline Boat | $105,595 | 11/08/2019 |
| Bentley Continental | $15,000 down payment | 6/29/2020 |
| Bentley Mulsanne | $50,000 down payment | 6/30/2020 |
| Mercedes Benz | $14,908 | 9/09/2020 |
| Mercedes Benz | $13,695 | 9/09/2020 |
| Mercedes Benz | $12,485 | 9/09/2020 |
| 5 ATVs St. Louis Power Sports | $31,805.00 | 6/17/2021 |
| 2 Jet Skis and a jet ski trailer St. Louis Power Sports | $24,332.00 | 6/17/2021 |
| 2 Jet Skis and a jet ski trailer Holzhauer Pro Motorsports | $24,962.20 | 6/17/2021 |
| 125 lbs. of Super Colossal Red King Crab Legs, 6 Seafood Shears, and 30 Crab Cutters | $10,353.44 | 9/30/2021 |
| Rolls Royce Cullinan | $123,028.09 lease signing payment | 5/21/2024 |
| Bulletproof Automotive (custom work on the Rolls Royce Cullinan) | $33,930 | 5/31/2024 |
| Bulletproof Automotive (custom work on the Rolls Royce Cullinan) | $32,630 | 7/08/2024 |
| Bulletproof Automotive (custom work on the Rolls Royce Cullinan) | $37,500 | 7/24/2024 |
| Bulletproof Automotive (custom work on the Rolls Royce Cullinan) | $18,302.76 | 2/14/2025 |

These purchases benefited TAYLOR and Brannon. For example,

in a video dated on or about July 11, 2020, obtained from TAYLOR's iCloud account data, Brannon thanks TAYLOR for her new car as the video shows the black Bentley Continental purchased on June 29, 2020.

Evidence recovered during the execution of search warrants on August 27, 2025, at the house where Brannon was living and at other KOGGC/JMMI locations also corroborates the money laundering allegations in the Indictment. For example, agents found at the Tampa house:

- an estimated $500,000 in gold bars in a locked safe in a closet in Brannon's bedroom;

- $60,000 in cash in a closet in Brannon's bedroom;

- valuable jewelry from a locked safe in a closet in Brannon's bedroom;

- expensive designer clothing and purses from Brannon's bedroom;

- foreign currency from a closet in Brannon's bedroom;

- multiple recently delivered life-sized expensive stone statues and decorative pillars for landscape installation on the property grounds;

- seven Mercedes Benz sedans; and

- two Bentley sedans.

Agents recovered from other KOGGC/JMMI locations:

- over $4.2 million from the primary KOGGC/JMMI bank

accounts;

- one new Lincoln Navigator from the house where TAYLOR was staying in Durham, North Carolina;

- silver coins from the Houston, Texas, and Taylor, Michigan locations;

- $2,500 in cash and additional foreign currency from the Taylor, Michigan location;

- two Bentleys, one Rolls Royce, and one Mercedes Benz from the Missouri location; and

- boxes of ledgers and spreadsheets documenting the donations to KOGGC/JMMI from TAYLOR's house where TAYLOR was staying in Durham, North Carolina.

## ARGUMENT

### A. Applicable Law and Presumption in Favor of Detention

Under the Bail Reform Act, 18 U.S.C. §§ 3141 *et seq.*, federal courts "shall" order a defendant's detention pending trial upon a determination that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). Section 3142(f) establishes when the court should hold a detention hearing, while § 3142(g) provides the factors for the court to consider in determining whether to detain the defendant. *See United States v. Demmings*, No. 3:25-cr-21, 2025 U.S. Dist. LEXIS 52547, at *2-3 (S.D.

25

Ohio March 21, 2025). Pursuant to 18 U.S.C. § 3142(f)(1), the judicial officer shall hold a hearing on the question of detention upon the motion of the government in a case that involves a crime of violence, a serious risk that the defendant will flee, or a serious risk that the defendant will obstruct or attempt to obstruct justice. 18 U.S.C. §§ 3142(f)(1)(A) and (f)(2)(A)-(b). In this case, the charged crimes of Conspiracy to Commit Forced Labor and Forced Labor are both Chapter 77 felony offenses and, accordingly, crimes of violence under the Bail Reform Act. 18 U.S.C. §§ 3156(a)(4)(C), 1589, and 1594. Furthermore, there is a serious risk that TAYLOR will flee and that TAYLOR will attempt to intimidate victims and witnesses, as discussed below. 18 U.S.C. §§ 3142(f)(2)(A)-(b).

Under § 3142(e)(3)(D), a presumption in favor of detention exists in this case. That is, where a court finds probable cause in cases involving a Chapter 77 offense "for which a maximum term of imprisonment of 20 years or more is proscribed," the court "shall . . . presume[] that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community[.]" 18 U.S.C. § 3142(e)(3)(D). "A grand jury indictment, by

itself, establishes probable cause to believe that a defendant committed the crime with which he is charged." *Stone*, 608 F.3d at 945. Here, the charged crimes that trigger this presumption are Conspiracy to Commit Forced Labor and Forced Labor, both of which are Chapter 77 offenses that carry a maximum term of imprisonment of twenty years. 18 U.S.C. §§ 1589(d), 1594(b).

"The presumption of § 3142(e) imposes a burden of production on the defendant, requiring the defendant to come forward with evidence that he does not pose a danger to the community or risk of flight." *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010); *see also United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985) (stating that the presumption "operate[s] at a minimum to impose a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption"). Even when the defendant "satisfies this burden . . . the presumption becomes 'an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g).'" *United States v. Baker*, No. 6:21-cr-32, 2021 U.S. Dist. LEXIS 123219, at *12 (E.D. Ky. July 1, 2021) (quoting *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986)); *see also United*

27

*States v. Nuckols*, No. 4:24-cr-23, 2025 U.S. Dist. LEXIS 92758, at *5-6 (W.D. Ky. May 15, 2025) (where the defendant "satisfies his burden of production, the presumption favoring detention does not disappear entirely but remains a factor to be considered among those weighed by the court"). As the Sixth Circuit has observed, "[t]he presumption [of detention] remains as a factor because it is not simply an evidentiary tool designed for the courts. Instead, the presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial." *Stone*, 608 F.3d at 945-46 ("To rebut the presumption, therefore, a defendant should 'present all the special features of his case' that take it outside 'the congressional paradigm.'").

In addition to the presumption of detention, the Court must consider the following factors to determine whether there are conditions of release that would reasonably assure the appearance of the defendant as required and the safety of any other person and the community: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including "the person's character,

physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings;" and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g). The Court applies a preponderance of the evidence standard in determining whether the defendant poses a flight risk, *United States v. Hinton*, 113 F. App'x 76, 77 (6th Cir. 2004), and a clear and convincing standard in determining whether the defendant poses a danger to the community. *Stone*, 608 F.3d at 945.

Because there is no condition or combination of conditions that will reasonably assure his appearance, the safety of any other person and the community, or the integrity of this proceeding, TAYLOR should be detained.

### 1. Nature and Circumstances of Charged Offenses

When considering the nature and circumstances of the charged offenses, one factor a court takes into account is "whether the offense is a crime of violence." 18 U.S.C. § 3142(g)(1). In this case, as discussed

above, the charged forced labor offenses are crimes of violence under the Bail Reform Act. 18 U.S.C. § 3156(a)(4). As this Court has observed, "[b]y definition, human trafficking is a violent, fraudulent, and coercive crime." *United States v. Bell*, No. 17-cr-20183, 2020 U.S. Dist. LEXIS 58850, at *11-12 (E.D. Mich. Apr. 3, 2020) (denying defendant's motion for pretrial release in a case involving a human trafficking and drug distribution conspiracy); *see also United States v. Walls*, 784 F.3d 543, 548 (9th Cir. 2015) ("Congress [has] recognized that human trafficking . . . 'is a modern form of slavery, and it is the largest manifestation of slavery today.'") (quoting 22 U.S.C. § 2101(b)(1)). Furthermore, as discussed in detail below, TAYLOR's offenses carry stiff penalties—each offense carries a statutory maximum penalty of twenty years in prison. These penalties reflect the serious nature of these crimes. *See*, *e.g.*, *Baldwin v. N.Y.*, 399 U.S. 66, 68 (1970) ("In deciding whether an offense is 'petty,' we have sought objective criteria reflecting the seriousness with which society regards the offense . . . and we have found the most relevant such criteria in the severity of the maximum authorized penalty.").

Indeed, the nature and circumstances of the charged forced labor

30

offenses involve an extensive scheme, devised and carried out by TAYLOR and Brannon, to obtain the unpaid labor of the victims in the Indictment and many other workers through prohibited means including force, threats of force, and coercion. Significantly, victims who managed to escape KOGGC/JMMI have reported profound trauma and intense fear of TAYLOR and Brannon. TAYLOR also is charged with laundering the money obtained through the forced labor scheme. TAYLOR and Brannon were leaders and organizers of these schemes. The charged offenses required intelligence, planning, sophistication, a disregard for the physical and psychological well-being of others, and a willingness to use religious belief to prey on others for their own personal financial gain. TAYLOR has spent over a decade pretending to be a religious renunciate and scamming people out of money, in partnership with Brannon, while living a life of luxury. The serious nature and circumstances of the charged forced labor and money laundering offenses weigh in favor of detention.

## 2. Weight of the Evidence

"The second factor goes to the weight of the evidence of dangerousness or risk of flight, not the weight of the evidence of the

31

defendant's guilt." *United States v. Naser*, 2025 U.S. App. LEXIS 10008, at *5 (6th Cir. Apr. 25, 2025) (quotation omitted). Significantly, courts have recognized that financial crimes like money laundering in the instant case —not just violent offenses—present a danger to the community. *See United States v. Phillips*, No. 3:25-cr-26, 2025 U.S. Dist. LEXIS 50081, at *9-11 (W.D. Ky. March 18, 2025) (collecting cases that find that financial crimes pose a danger to the community and stating that "[t]here is no question that economic crimes have victims and negatively impact the community").

In addition, where, as here, the defendant is facing a "lengthy term of imprisonment," there is an increased risk that the defendant will flee to avoid future court proceedings. *United States v. King*, No. 3:22-cr-60, 2022 U.S. Dist. LEXIS 152150, at *11 (E.D. Tenn. Aug. 24, 2022) (finding that a "lengthy" potential term of imprisonment of five to twenty years "increases the risk of flight and warrants pretrial detention"); *see also United States v. Cisneros*, 328 F.3d 610, 618 (10th Cir. 2003) (finding that defendant was a flight risk because her knowledge of the seriousness of the charges against her provided a strong incentive to abscond); *United States v. Ingram*, 415 F. Supp. 3d

32

1072, 1085 (N.D. Fla. 2019) (finding that a "defendant facing a substantial term of imprisonment has commensurate incentive to flee insofar as the cost of taking his chances at trial is great in comparison to the cost of fleeing"). A court's analysis of this factor includes the "circumstances surrounding the instant allegations." *United States v. Wesley-Hughes*, No. 5:22-mj-5132, 2022 U.S. Dist. LEXIS 75592, at *10 (E.D. Ky. Apr. 26, 2022).

In this case, the evidence is strong and credible that TAYLOR is both a danger to the community and a flight risk. TAYLOR and Brannon victimized, terrorized, and traumatized their workers for over a decade by using *inter alia* an organized and disciplined regimen of violence, threats of violence, threats of eternal damnation, sleep deprivation, and food deprivation. They forced their workers to work extraordinarily long hours soliciting money from strangers and punished them when they failed to meet staggeringly high monetary quotas. TAYLOR and Brannon wielded power from the top of the organization, doling out brutal consequences to those who did not bring in enough money or disobeyed one of their orders. With their extensive manipulation and deceit, TAYLOR and Brannon acquired

approximately $50 million in donations over the past eleven years.
Then, instead of using the proceeds to benefit the communities where
they were located across the country as a legitimate church would do,
they spent the majority of the proceeds of their forced labor scheme on
themselves.

TAYLOR's years of victimizing and manipulating individuals,
through violence and coercion and by laundering the donations he and
KOGGC/JMMI solicited under false pretenses, show that he is a danger
to the community. The danger TAYLOR poses is particularly insidious
as are the forced labor crimes with which he is charged. Congress
recognized this danger in designating forced labor as a presumption of
detention offense. Serious harm, as defined in the forced labor statute,
encompasses "any harm, whether physical or nonphysical, including
psychological, financial, or reputational harm, that is sufficiently
serious, under all the surrounding circumstances, to compel a
reasonable person of the same background and in the same
circumstances to perform or to continue performing labor or services in
order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2).

The harm forced labor victims fear is often physical abuse.

34

However, fear caused by psychological abuse is often more powerful than the fear of physical harm which a victim can be free of once the defendant is no longer physically present and able to personally inflict that physical harm.

The purposeful psychological climate of fear TAYLOR created and enforced by his orders and actions on a daily basis for over a decade does not simply evaporate when he is physically removed from his victims. The fear persists in the legitimately traumatized minds of his victims. This capacity of a defendant to continue to inflict psychological, reputational, and financial harm, among others type of harm encompassed by the statute, even at a distance, is recognized by Congress. This is exactly the kind of danger TAYLOR poses, making the weight of his dangerousness to the community strong.

In addition, the charged offenses—ten separate counts—each carry a statutory maximum penalty of twenty years in prison. The base offense level for Forced Labor is 22 under U.S.S.G. § 2H4.1(a)(1). With the likely applicable enhancements, the government's initial estimated calculation of TAYLOR's offense level, as of today's date, is 34. The corresponding sentencing range is 151 to 188 months in prison. Under

U.S.S.G. § 2S1.1(a), the offense level for the charged Money Laundering Conspiracy is that of "the underlying offense from which the laundered funds were derived." In this case, the underlying offense is Forced Labor. Accordingly, the government's initial estimated calculation of the offense level for the Money Laundering Conspiracy, as of today's date, is 34. Based on these calculations, TAYLOR would face a significant prison sentence upon conviction. Thus, the lengthy sentence TAYLOR faces indicates that he has a strong incentive to flee to avoid future court proceedings.

### 3. History and Characteristics of the Defendant

TAYLOR, who is 52 years old, is unmarried and has two adult children. TAYLOR has no employment outside the criminal enterprise of KOGGC. He does not have significant family or community ties to the Eastern District of Michigan where this case is being prosecuted. His significant ties, during the course of this conspiracy, have been solely to where he has committed his criminal activity, including Michigan, North Carolina, Texas, Missouri, and Florida. For at least five years, TAYLOR has been living in Durham, North Carolina (not in St. Louis as he told Pretrial Services following his arrest).

Although TAYLOR does not have any prior criminal convictions, he has been engaging in a continuous course of criminal conduct that terrified his victims for approximately the past twelve years.

In addition to his lack of legitimate ties to the Eastern District of Michigan, the government's financial investigation (which remains ongoing) establishes that TAYLOR has access to numerous sources of funds to flee. First, although TAYLOR will no longer have access to KOGGC funds that the government seized at the time of his arrest, KOGGC continues to actively solicit donations to support TAYLOR and Brannon and will likely make those funds available for TAYLOR's use. Furthermore, the manner in which the funds are currently solicited demonstrates the organization's view of the government and the judicial process. For example, on September 14, 2025, a KOGGC worker soliciting donations during a broadcast stated, "[w]e're in a war. We're in a war and it is time for you to decide if you're a warrior or you're not."

Second, TAYLOR has access to financial platforms that allow individuals and businesses to send and receive money, both domestically and internationally, including PayPal. PayPal is an online payment system and digital wallet that allows individuals and

businesses to send and receive money through the platform. TAYLOR had access to a personal PayPal account in the name of DAVID TAYLOR and JMMI, which was created on May 4, 2009.

Third, TAYLOR has two life insurance policies that would allow TAYLOR to obtain approximately $150,000. TAYLOR took out a fixed index universal life insurance policy with Allianz Life Insurance Company on or around March 3, 2015. Based on documents provided by Allianz Life Insurance Company, TAYLOR would have a guaranteed net cash value of $103,707 at this current age. So, if TAYLOR were to surrender his entire policy, TAYLOR would be able to obtain approximately $103,707 in cash, minus any applicable fees or penalties.

TAYLOR also took out a fixed index universal life insurance policy with Allianz Life Insurance Company on or around February 24, 2016. Based on documents provided by Allianz Life Insurance Company, TAYLOR would have a guaranteed net cash value of $49,578 at this current age. So, if TAYLOR were to surrender his entire policy, TAYLOR would be able to obtain approximately $49,578 in cash, minus any applicable fees or penalties.

Fourth, TAYLOR also has access to multiple credit cards that

would allow TAYLOR to make purchases and take cash advances:

(1) TAYLOR has access to an American Express credit card in the names of DAVID TAYLOR and JMMI that was opened on or about April 18, 2016. The card has a $4,600 credit limit and $200 cash advance limit.

(2) TAYLOR has access to a Capital One Visa Signature credit card in the name of DAVID TAYLOR and JMMI. The credit card has a $2,000 credit limit and was opened on May 16, 2016.

Lastly, KOGGC/JMMI has solicited and received donations in cryptocurrency. Because the government has not yet seized those funds, TAYLOR likely has access to cryptocurrency.

In addition to his direct access to KOGGC/JMMI donations, financial platforms, cash through his life insurance policies, credit, and cryptocurrency, TAYLOR has made a career over the last decade of raising high dollar amounts by soliciting money from others; KOGGC/JMMI has acquired approximately $50 million in donations over the past eleven years under TAYLOR's leadership. TAYLOR's history and success in raising and laundering funds means he can easily use his skills and utilize the KOGGC network to raise funds for him to flee.

For all the aforementioned reasons, this factor also weighs in favor of detention.

### 4. **Nature and Seriousness of the Danger to Any Person or the Community**

"Danger [to the community] has an expansive meaning under the Bail Reform Act[.]" *United States v. Conn*, No. 5:16-cr-22, 2016 U.S. Dist. LEXIS 205056, at *15 n.12 (E.D. Ky. Apr. 12, 2016). It does not only refer to the risk of physical violence; instead, it encompasses any danger that the defendant might engage in criminal activity detrimental to the community. *See United States v. McCurdy*, No. 2:17-cr-20762, 2020 U.S. Dist. LEXIS 226435, at *5 (E.D. Mich. Dec. 3, 2020). Financial crimes, not just crimes involving physical violence, pose a danger to the community. *See Phillips*, 2025 U.S. Dist. LEXIS 50081, at *9-11; *United States v. Giordano*, 370 F. Supp. 2d 1256, 1264 (S.D. Fla. 2005) ("There can be no question that an economic danger, like that posed by a serial defrauder, falls under the broad umbrella of 'dangerousness' as that term is used throughout the Bail Reform Act."). In addition, "[d]anger . . . fairly encompasses danger that a defendant will seek to subvert justice, through whatever means, and includes potential threats to the integrity of the judicial process." *Conn*, 2016 U.S. Dist. Lexis 205056, at *10 n.12 (citing *United States v. LaFontaine*, 210 F.3d 125, 134 (2d Cir. 2000) (holding, in a white-collar crime case,

that the defendant's attempts to influence the testimony of a witness, with or without violence, can constitute "the type of danger to the community that would support detention" and noting that "obstruction of justice has been a traditional ground for pretrial detention by the courts").

In this case, TAYLOR has spent approximately twelve years leading and organizing an intense and intimidating forced labor conspiracy as well as a sophisticated money laundering conspiracy. During that time, he has amassed a persistent and loyal following, including Brannon and multiple other female KOGGC/JMMI workers who have been romantically or sexually involved with him. TAYLOR's actions have included the abuse of KOGGC/JMMI workers through manipulation and coercion and, at times, physical violence.

In addition, there is developing evidence that TAYLOR coerced women in his criminal organization to provide him sexually explicit videos and pictures. His sexual predation makes him a danger to the community for several reasons. First, TAYLOR's apparent need for excessive sexual gratification cannot be controlled with bond conditions. *See United States v. Cox*, No. 07-cr-20544, 2008 WL 94769, at *4

(defendant's desires and impulses were "'of an addictive sexual nature that cannot be suppressed simply by a restrictive set of bail conditions'") (quoting *United States v. Minnici*, 128 F. App'x 827 (2d Cir. 2005)). Second, because TAYLOR collected sexually explicit materials electronically, this sensitive material may be in the possession of a former or current member or stored by TAYLOR in a location unknown to the government at this time. Although the government has seized a large volume of electronic devices, it is unlikely that the government has sole and exclusive possession of every single sexual video and/or picture that female members sent to TAYLOR. Third, due to the nature of the victimization that occurs to women who are coerced into providing sexually explicit material, victims will remain fearful that TAYLOR, or someone at his direction, will distribute this material.

TAYLOR is also a danger to the community because his teachings during the conspiracies included encouraging self-inflicted violence and violence against others including law enforcement when and if his organization is confronted by law enforcement. Significantly, TAYLOR has attempted to convince the workers to commit acts of violence against themselves or others and TAYLOR has made promises to

42

punish and "get rid of" those who do not serve him. During a meeting with workers, TAYLOR identified the Michigan Attorney General's Office and stated, "God will kill officials" and "like I told you the other day, they gonna be in here with their FBI jackets on . . . You don't scare me. God's gonna to get you. And I am going to make sure he do, too. I am going to make sure I speed it up." TAYLOR further stated, "I'm going to be looking at you in Hell and you are going to be having your little FBI jacket on. Who gonna save you then? The American government is not going to save you. They cannot save you. Not from this government I serve. You think they are protecting you, who is going to protect you after you leave here? They are not going to protect you. Not in my realm, not in the realm that I govern. I have been given power by the only one who counts. We will watch you burn and the flesh melt off of your bones."

TAYLOR has talked about physically stopping individuals who interfere with him. For example, he said to workers, "This probably prophetic. God having me say this to you [name omitted of a member], but I'm just telling you. And I think I'm probably gonna hire some security or something too. But I am just telling you, you kill them on

43

contact if they come in here with that foolishness you understand? They need to die. They come in with an "AKA" or those guns, these niggas be carrying in Houston and they come in trying to shoot up. Listen, do not hesitate!" The workers responded in unison, "Yes, Sir!"

Furthermore, during TAYLOR's meetings and online broadcasts, he often used words like "war" and "battle;" he has claimed he is preparing "soldiers;" and listed his text thread as "military bootcamp." On more than one occasion, TAYLOR has referred to himself as a "General" and says he is training the "end time army." The recent KOGGC broadcast proves that TAYLOR's supporters are carrying on the "war" message by declaring, "[w]e're in a war. We're in a war and it is time for you to decide if you're a warrior or you're not."

Lastly, TAYLOR continues to have supporters, despite his arrest, who have and who likely will continue to assist him in intimidating current and former members of KOGGC. *See Bell*, 2020 U.S. Dist. LEXIS 58850 (citing defendant's leadership role in a drug distribution and human trafficking conspiracy as evidence of his danger to the community); *United States v. Young*, No. 3:98-cr-38, 2020 U.S. Dist. LEXIS 212045 (M.D. Tenn. Nov. 12, 2020) (stating that the nature of

the danger the defendant posed was not only from violence and drug trafficking, it also was from the defendant's actions directing others in drug trafficking) (citing *United States v. Gotti*, 433 F. Supp. 3d 613, 620 (S.D.N.Y. 2020) (denying compassionate release based on the danger to the community posed by a leader of a criminal organization, and finding danger to the community from a leader "is not that he will personally engage in acts of violence, but that he can command others to do so"); *Ingram*, 415 F. Supp. 3d at 1080 ("Defendant's affiliation with and leadership of a conspiracy also is relevant to an analysis of the risk of danger to the community and . . . risk of flight. . . . Leaders of criminal organizations pose a greater danger to the community. Through concerted activity, they can act through co-conspirators.").

Most recently, one current member of TAYLOR's organization interfered with victims and witnesses who sought to accept victim services from victim-witness personnel and non-profit organizations following the execution of the search warrant on the call center in Tampa, Florida, on August 27, 2025.

TAYLOR, specifically, has threatened and harassed members who indicated they wanted to leave or were able to escape KOGGC/JMMI.

TAYLOR said, *inter alia,* the member will die or get cancer and go to Hell and their family will be cursed. In addition, TAYLOR has told members that he knows people in law enforcement, including the FBI, who will come after them if they leave KOGGC/JMMI.

Members who have left KOGGC/JMMI report receiving numerous threatening and harassing messages from members through text and social media accounts. Victims report that these messages are frightening and terrorize them even after they have managed to leave KOGGC/JMMI. The messages, *inter alia*, call them traitors, say they should be afraid, and say they will go to Hell.

Finally, and significantly, some women who sent TAYLOR sexual videos or photos were afraid that TAYLOR would share those explicit materials if they left KOGGC/JMMI.

Thus, given TAYLOR's reign of terror over his victims, his leadership role in the forced labor and money laundering conspiracies, his loyal following, his sexual exploitation of women, and his evangelizing of violence and obstruction in defiance of law enforcement, TAYLOR would clearly be a danger to the community if released.

## CONCLUSION

All the factors outlined in 18 U.S.C. § 3142(g), and the

presumption of detention, weigh overwhelmingly in favor of detention

in this case. Thus, the United States respectfully requests that the

Court detain TAYLOR pending trial.

Respectfully submitted,

JEROME F. GORGON JR.
United States Attorney


*s/Sarah Resnick Cohen*
SARAH RESNICK COHEN
Assistant United States Attorney
Eastern District of Michigan
Homeland Security Unit
Human Trafficking Coordinator
211 W. Fort St., Ste. 2001
Detroit, MI  48226
313-226-9100
Sarah.cohen@usdoj.gov


*s/Christina Randall-James*
CHRISTINA RANDALL-JAMES
Trial Attorney
Human Trafficking Prosecution Unit
U.S. Department of Justice
Civil Rights Division
202-598-5701
Christina.Randall-James@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 14, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*s/Sarah Resnick Cohen*
SARAH RESNICK COHEN
Assistant United States Attorney
Eastern District of Michigan
Homeland Security Unit
Human Trafficking Coordinator
211 W. Fort St., Ste. 2001
Detroit, MI  48226
313-226-9100
Sarah.cohen@usdoj.gov

48