```
 1                   UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
 2                        SOUTHERN DIVISION

 3   UNITED STATES OF AMERICA,

 4                    Plaintiff,
     vs.                               Case No. 25-20560
 5                                     Hon. Terrence G. Berg
     D-1 DAVID TAYLOR,
 6
                      Defendant.
 7   _____/

 8             MOTION TO REVOKE DETENTION ORDER

 9        BEFORE THE HONORABLE TERRENCE G. BERG
               United States District Chief Judge
10        Theodore Levin United States Courthouse
                 231 West Lafayette Boulevard
11                Detroit, Michigan  48226
                 Tuesday, October 21, 2025
12
     APPEARANCES:
13
     For the Plaintiff          SARAH RESNICK COHEN
14   United States of America:  ADRIANA DYDELL
                                U.S. Attorney's Office
15                              211 W. Fort Street
                                Suite 2001
16                              Detroit, Michigan 48226
                                313-226-9637
17
     For the Defendant          N. SCOTT ROSENBLUM
18   D-1 David Taylor:          Rosenblum, Schwartz & Fry, P.C.
                                120 S. Central Avenue
19                              Suite 130
                                St. Louis, Missouri 63105
20                              314-862-4332

21                              LAURENCE H. MARGOLIS
                                Margolis & Cross
22                              402 W. Liberty Street
                                Ann Arbor, Michigan 48103
23                              734-994-9590

24    To obtain a certified copy of this transcript, contact:
          Linda M. Cavanagh, CSR-0131, CRR, RMR, RDR, CRC
25                      Official Court Reporter
                (313) 234-2616 • www.transcriptorders.com
```

1                  <u>TABLE OF CONTENTS</u>

2                                           <u>Page</u>

3  <u>MOTION TO REVOKE DETENTION ORDER</u>:

4  Argument by Ms. Cohen                    5

5  <u>Defense Witnesses</u>:

6  ALEXIS LARIMER

7     Direct Examination by Mr. Rosenblum     30
       Cross-Examination by Ms. Cohen         38
8     Redirect Examination by Mr. Rosenblum    39

9  Argument by Mr. Rosenblum             40
    Rebuttal Argument by Ms. Cohen         64
10 Surrebuttal Argument by Mr. Rosenblum    70
    Comments/Ruling by the Court          72

11

12

13

14

15

16

17

18

19

20                      <u>EXHIBITS</u>

21  <u>Identification</u>               <u>Offered</u>   <u>Received</u>

22  NONE OFFERED

23

24

25

```
1              Detroit, Michigan
2              Tuesday, October 21, 2025
3                        –  –  –
4              (Proceedings commenced at 9:25 a.m., all parties
5              present)
6              THE CLERK:  All rise.  The United States District
7    Court for the Eastern District of Michigan is in session, the
8    Honorable Terrence G. Berg is presiding.  You may be seated.
9              Court calls Case No. 25-20560, the United States of
10   America versus David Taylor.
11             Counsel, please state your appearances for the
12   record.
13             MS. COHEN:  Good morning, Your Honor.  Sarah Cohen
14   appearing on behalf of the United States.
15             MS. DYDELL:  Good morning, Your Honor.  Adriana
16   Dydell appearing on behalf of the United States.
17             THE COURT:  Ms. Cohen, Ms. Dydell, good morning.
18             MR. ROSENBLUM:  Good morning, Your Honor.  Scott
19   Rosenblum and Larry Margolis appearing on behalf of Pastor
20   David Taylor.
21             THE COURT:  Good morning to you, Mr. Rosenblum.  Good
22   morning, Mr. Margolis.
23             MR. MARGOLIS:  Good morning, Judge.
24             THE COURT:  And good morning to you, Mr. Taylor.
25             DEFENDANT TAYLOR:  Good morning.
```

Motion to Revoke Detention Order • Tuesday, October 21, 2025

4

1          THE COURT:  You may be seated.

2          So this morning we're here for purposes of a hearing

3    on a motion to revoke the detention order that was entered by

4    the magistrate judge in this case.  And in a case like this,

5    the defendant is entitled to an appeal and to what we call a de

6    novo hearing, and that means that this Court needs to apply its

7    own judgment to the facts and the law as it relates to this

8    case.

9          I wanted to let you know that I did review the

10   materials that were filed by all of the attorneys in this case

11   and I also listened to the hearing that took place before

12   Magistrate Judge Altman, so I'm familiar with the arguments of

13   the parties and the information that's contained in the various

14   briefs that have been filed as well as what was presented

15   during that hearing.

16         And so as I'm sure you recall, Mr. Taylor, in a

17   situation like this, the question is whether or not there are

18   any conditions or combination of conditions that can assure

19   your appearance and protect the community, and the Court has to

20   decide whether the government has presented clear and

21   convincing evidence regarding any risk to the community or

22   whether they've presented by a preponderance of the evidence

23   proof that you represent an unreasonable risk of flight that

24   can't be adequately addressed by proper conditions.

25         And so that's what we're here for today and I'm going

Case 2:25-cr-20560-TGB-KGA   ECF No. 62, PageID.399   Filed 10/31/25   Page 5 of 89
Motion to Revoke Detention Order • Tuesday, October 21, 2025

5

1      to hear from both sides regarding this case, and so Ms. Cohen,

2      you may address the Court.

3              MS. COHEN:  Thank you, Your Honor.

4              Because Defendant David Taylor is charged with forced

5      labor, as this Court is well aware, Congress requires a

6      presumption of detention.  As the Sixth Circuit stated in

7      *United States vs. Stone*, the presumption reflects Congress's

8      substantive judgment that particular classes of offenders like

9      David Taylor should ordinarily be detained prior to trial.

10             It is the government's position that the defendant

11     has not rebutted the presumption of detention, but in the event

12     that the Court finds otherwise, the government's argument both

13     before Judge Altman and today will focus on the 3142(g)

14     factors, and particularly the most egregious facts as applied

15     to each one of those factors that make the defendant, David

16     Taylor, both a danger to the community and a risk of flight and

17     that establish that there are no conditions of bond that will

18     assure the safety of the community or prevent his risk of

19     flight.

20             Beginning with the nature and circumstances of the

21     charged offenses, according to the evidence, David Taylor was a

22     self-proclaimed general of this criminal enterprise.  Not only

23     was he a leader, but he was a brutal leader and he was a

24     sadistic leader as demonstrated by his own words and by the

25     evidence gathered in the course of this investigation and

1    prosecution.  He ruled for 11 years across four different

2    states across the entire country.  He terrorized and

3    traumatized his workers for over a decade with actual violence,

4    with threats of violence, with sleep deprivation, medical

5    deprivation and food deprivation.

6              Contrary to the representations of the defense,

7    victims and witnesses have testified and will testify that

8    David Taylor, with the help of Defendant No. 2, Michelle

9    Brannon, and with the help of others in the organization,

10   including some in the courtroom today, physically assaulted

11   others, including at least one minor who has come forward thus

12   far.

13             THE COURT:  You referenced that in the hearing before

14   the magistrate judge as well and you mentioned ten incidents.

15   What exactly are you talking about?  Can you give me some facts

16   that would relate to that?

17             MS. COHEN:  To be clear, Your Honor, the government's

18   number of ten is not ten incidents.  The number ten is the

19   approximate number of different individuals who have physically

20   assaulted other members in the organization, and those ten

21   members include the Defendant David Taylor and Defendant No. 2,

22   Michelle Brannon.

23             The nature of the physical assaults, Your Honor,

24   ranged from physical assaults against David Taylor's armor

25   bearers.  As the Court is aware, armor bearers are the

1    defendant's personal servants, and he has assaulted on many

2    occasions his own armor bearers.  And as identified before

3    Magistrate Judge Altman and I will do so again today, several

4    counts of the indictment include Defendant Taylor's former

5    armor bearers.

6            Michelle Brannon and other members of the

7    organization used physical violence as a form of punishment in

8    a variety of ways if someone was viewed as being disobedient or

9    out of line or out of order in any manner whatsoever, Your

10   Honor, and the circumstances vary from victim to victim.  But

11   it is important that this Court understand that David Taylor

12   specifically and Michelle Brannon specifically and other

13   members of the organization, again including people who are in

14   the courtroom today and who have been to the court proceedings

15   before, have engaged in physical violence against others, and

16   those --

17           THE COURT:  When you say ten individuals including

18   Ms. Brannon and Mr. Taylor engaged in violence, you're not

19   talking about, as you said, ten incidents of violence; you're

20   talking about more than ten incidents of violence perhaps?

21           MS. COHEN:  Perhaps, Your Honor.  The -- the purpose

22   of the government identifying ten members of the organization

23   is to highlight for the Court and stress to the Court the

24   breadth and the depth of the physical violence that occurs

25   within this organization, always at the direction of David

Case 2:25-cr-20560-TGB-KGA   ECF No. 62, PageID.402   Filed 10/31/25   Page 8 of 89
Motion to Revoke Detention Order • Tuesday, October 21, 2025

8

1    Taylor or Michelle Brannon.

2              THE COURT:  Go ahead.

3              MS. COHEN:  The physical violence against the men was

4    typically more severe than the violence against the women.

5    However, violence occurred against both.  And again, as stated

6    earlier, physical violence has occurred against children in the

7    organization.  That investigation is ongoing as minors are

8    identified and the proper forensic procedures are set up for

9    those interviews.

10             THE COURT:  What kind of violence against men, for

11   example?

12             MS. COHEN:  Minors were -- minors used the term

13   "whooped," Your Honor.  That is the term that they use for the

14   physical violence that was inflicted upon them when they were

15   viewed as being disobedient by the organization.

16             THE COURT:  What about against the men?

17             MS. COHEN:  Men typically were either punched in the

18   face or shoved or physically assaulted in some other manner.

19   They may have been physically removed from the place where they

20   were working for David Taylor, for example.  So the manner and

21   the variety of assaults varied depending on the situation.  But

22   the defense has repeatedly represented that there -- there has

23   been no physical violence and that is wholly inaccurate.

24             THE COURT:  What about with respect to women?

25             MS. COHEN:  Women were also physically assaulted,

Motion to Revoke Detention Order • Tuesday, October 21, 2025

1    Your Honor, for the same reasons.  If David Taylor or Michelle

2    Brannon viewed their behavior as being disobedient in some

3    manner or someone else in the organization reported to David

4    Taylor or Michelle Brannon that an individual was being

5    disobedient, they were also physically assaulted.  Again, that

6    could be forcible removal from where they were working.

7    Sometimes they were put out on the streets or forced to go into

8    a homeless shelter.  And sometimes with respect to both men and

9    women, a physical assault precipitated the removal from the

10   place where they were living and forcibly working for David

11   Taylor.  So -- so yes, it is a hundred percent accurate to say

12   that physical violence occurred in this organization directly

13   related to the work that -- that individuals were required to

14   perform for David Taylor and Michelle Brannon.

15          However, it is important to stress that the -- that

16   forced labor does not require physical violence.  And the other

17   punishments and daily requirements and deprivations, in the

18   government's view, were equally traumatizing to the victims.

19   Again, the consequences, punishments and daily rules included

20   extraordinary sleep deprivation, often medical deprivation, and

21   always food deprivation.  If a worker did not raise the right

22   amount of money in David Taylor's view, they were deprived of

23   food and they were deprived of sleep.  And the Court need not

24   rely on the government's representation of that.  The text

25   messages provided in the government's brief as well as in the

1   indictment repeatedly show and prove from David Taylor's own

2   words his instructions to deprive sleep and deprive food.

3          For the record, Your Honor, the government is going

4   to proffer just a few of the most egregious text messages and

5   focus on the time in which David Taylor sent some of these

6   messages.  I won't go through all of them, but for the record,

7   I'm going to provide some of them because they are from David

8   Taylor's own phone and they were communicated directly to the

9   workers in David Taylor's criminal enterprise.  For example, at

10  12:26 a.m. Taylor texted one of his armor bearers who is

11  supposed to communicate his instructions to the staff: "You'll

12  have to raise $164,000 today.  Each hour you fall behind

13  consequences will start..we will mess with the food.  You will

14  fast from the regular food."  Later in the text message he

15  continues, "Take away the food !! There will be other

16  consequences!!  We must make them fast and pray."

17         On another day at 3:55 a.m., Taylor texted the armor

18  bearer who was responsible for communicating David Taylor's

19  instructions to the workers: "Those in the 9 that don't do well

20  will stay up and close and stay on top of the delinquents...

21  Put the pressure of them not having their time off..nor food..

22  they will fast !!..."

23         Another text, 3:52 a.m. to Taylor's armor bearer:

24  "Let everyone know we have to raise at least $50,000 by 12

25  midnight.  If this happens the top 9 and those who did well

Motion to Revoke Detention Order • Tuesday, October 21, 2025

1    will can rest but the others who didn't...will stay up till 4am

2    and then they will wake at 8am to 9am..."

3        And then, Your Honor, the consequences escalate for

4    those who are so sleep deprived that they aren't able to

5    promptly wake up.  At 7:57 a.m. on another day Taylor texted

6    his armor bearer in all capital letters: "POUR WATER ON

7    EVERYONES FACES THAT IS HALFWAY SLEEPING AND NOT WORKING.  WAKE

8    THEM UP NOW !!..." It is the government's position that that is

9    a physical assault, Your Honor.  "My next level of judgment

10    tomorrow is that it won't be just to 4am.  It will be every

11    hour you waste in the day and that will be added on to past

12    4am !!" All capital letters: TELL THEM ALL TO STAND NOW AND YOU

13    THROW WATER ON THEIR FACES !  Especially the people not doing

14    anything or helping bring in the money !!"  And it finishes

15    with this, Your Honor: "You tell them I don't care about them

16    being sick !!.." Exclamation point, exclamation point.

17        And in another text message Taylor finishes his

18    instructions with "I DON'T CARE IF YOU'RE TIRED !!  You've

19    crossed the line !! You are going to work all night and get up

20    in the morning !!"

21        Another day at 1:44 a.m. in the morning Taylor texted

22    a group of workers in capital letters: "POINT BLANK...If you

23    don't work you can't eat."

24        And then on another day Taylor texted again in

25    capital letters: "Warning to the whole staff -...If you don't

Case 2:25-cr-20560-TGB-KGA   ECF No. 62, PageID.406   Filed 10/31/25   Page 12 of 89
Motion to Revoke Detention Order • Tuesday, October 21, 2025

12

 1    work (effectively) and learn closing" — closing, Your Honor,

 2    means closing the deal and having the donor actually donate and

 3    send money to Taylor's criminal organization — "If you don't

 4    work (effectively) and learn closing like we told you then you

 5    won't eat !" Exclamation point.

 6          And then, Your Honor, in the brief there are several

 7    references to sending workers to the garage in Tampa.  That is

 8    significant, Your Honor, because in this case the evidence has

 9    shown and the witnesses have reported that one means of

10    punishment was sending the workers into a garage in Florida.

11    That garage did not have air conditioning and they were forced

12    to sleep in the garage as a punishment.  And there, as Taylor's

13    own words reveal, "I want those in Florida who are supposed to

14    be doing their work to go out in the garage and their food be

15    taken away."  And again, referencing the garage in Florida,

16    those "..that are not bringing in...their amount..Garage in

17    tampa and take away food now !!"  Exclamation point,

18    exclamation point.

19          Moving on to the other disturbing evidence that is

20    being uncovered following the execution of the search warrants

21    on August 27th.  As the government referenced earlier and

22    before Judge Altman, minors have been recently interviewed.  To

23    back up a moment, let me explain the situation as we know it

24    with regard to minors.  Minors frequently were the children of

25    workers in the organization.  Sometimes both parents were in

Case 2:25-cr-20560-TGB-KGA   ECF No. 62, PageID.407   Filed 10/31/25   Page 13 of 89
Motion to Revoke Detention Order • Tuesday, October 21, 2025

13

1    the organization, sometimes only one parent.  The children did

2    not live with either parent or both parents.  They were

3    separated most of the time, not always, but most of the time.

4    So when the government explained that the children were

5    separated from their parents, they were separated in two ways:

6    either, one, separated from the parent in the organization and

7    of course separated from the parent who was not in the

8    organization.

9          Minors have been forensically interviewed and they

10   have revealed in detail the forced labor scheme.  They were

11   witnesses, Your Honor.  How terrible is that to witness the

12   forced labor and the consequences and punishments the

13   government has described.  And significantly and disturbingly,

14   they have suffered their own physical abuse, their own

15   emotional, psychological and traumatic experiences because of

16   their presence within the organization.

17         THE COURT:  When you say they were separated, what do

18   you mean by that?

19         MS. COHEN:  The investigation by the government has

20   revealed thus far that the organization sometimes maintained

21   separate housing for the minors.  So if a parent, if a -- if

22   one parent was in the organization, for example, the parent

23   might be required to work at one of the call centers, for

24   example in Houston or Tampa or St. Louis.  If there was a house

25   for the minors, the minor would be -- the minors would be

1   required to do -- live in the house away from their parents.

2           THE COURT:  In the same city?  Are you saying they

3   were in the same city or are you saying they would be separated

4   geographically?

5           MS. COHEN:  Some -- sometimes the same city,

6   sometimes not.

7           And again, as -- as proffered earlier, one minor has

8   described his physical abuse by members of the organization in

9   detail to the government and has reported the depths of his

10  psychological trauma including depression.  And again, to

11  emphasize to the Court, this is an ongoing investigation.  This

12  is the information that we have thus far to date.

13          The other very disturbing part of the investigation

14  that is being uncovered and is ongoing is that there is an

15  extraordinary amount of sexually explicit materials on David

16  Taylor's electronic devices.  As described in the government's

17  brief, it appears that David Taylor instructed women to provide

18  sexually explicit videos to him and photographs to him.  The

19  female members who have described this to the government thus

20  far explained that Taylor demanded the material.  They were

21  fearful of saying no and disobeying him.  Just like every other

22  member in the organization in the indictment described to the

23  government, the victims were always fearful of disobeying him,

24  so this was no different.  And they described to the government

25  that they felt they had no choice but to send Taylor what he

Case 2:25-cr-20560-TGB-KGA   ECF No. 62, PageID.409   Filed 10/31/25   Page 15 of 89
Motion to Revoke Detention Order • Tuesday, October 21, 2025

15

```
1    demanded of them.  These photos and videos are extraordinary in
2    number, Your Honor, and the government has not concluded its
3    review of all of the electronic devices seized from David
4    Taylor.
5             THE COURT:  How many are you talking about?
6             MS. COHEN:  I'm sorry, can you repeat the question?
7             THE COURT:  How many?  You said extraordinary.  More
8    than a hundred?
9             MS. COHEN:  Thousands.
10            THE COURT:  Go ahead.
11            MS. COHEN:  At least.
12            THE COURT:  All from people within the organization?
13            MS. COHEN:  No, there is sexually explicit material
14   sent to David Taylor from women who are not in the
15   organization.  And as represented before Judge Altman, the
16   government's case is not about an adult male receiving
17   consensual sexual material from another consenting adult.  This
18   case may include women in the organization involuntarily
19   sending sexually explicit material to David Taylor essentially
20   as part of their forced labor.  He asked them to do this and
21   they complied.  Just as they made phone calls to raise money,
22   just as they followed every other order imposed by David
23   Taylor, they followed this order as well.
24            So it's not just the serious nature and circumstances
25   of the charged forced labor and money laundering, but it is the
```

Case 2:25-cr-20560-TGB-KGA   ECF No. 62, PageID.410   Filed 10/31/25   Page 16 of 89
Motion to Revoke Detention Order • Tuesday, October 21, 2025

16

1    newly developing evidence as well that weighs overwhelmingly in

2    favor of detention under the nature and circumstances of the

3    offense.

4           Moving on to the weight of the evidence, the danger

5    that Taylor poses is particularly insidious.  Although the

6    presumption applied to Michelle Brannon as well, as described

7    by the government in its brief before Magistrate Judge Altman

8    and today, David Taylor's conduct is particularly egregious and

9    horrifying.

10          And it's important that we note that victims of

11   forced labor, just like any human trafficking scheme, are not

12   at ease when the trafficker or the leader is physically removed

13   from their presence.  The fear persists, that psychological

14   fear and the psychological trauma persists for those victims.

15   And notably those victims are across the country, Your Honor.

16   They are not just located in the Eastern District of Michigan.

17   And the names of the victims are still being uncovered by the

18   government.  Of course we know some of them, but we don't know

19   all of them because of the nature of the ongoing investigation.

20          It is significant as well that Taylor faces

21   exceptional penalties if he's convicted.  The government's

22   initial estimated calculation of his guideline range for the

23   forced labor offenses is 151 to 188 months and his guideline

24   range for the money laundering is the same.  And just like in

25   other cases when a defendant is facing such a high guideline

1   range following a conviction, there is naturally an incentive

2   to flee.

3          Moving on to the history and characteristics of the

4   defendant, David Taylor has no employment outside the criminal

5   enterprise.  He does not have significant family or community

6   ties to this district.  His only ties to this district was the

7   criminal enterprise.  Just like Michelle Brannon, the only

8   people he knows, the only people that support him, the only

9   people that can financially support him as far as the

10  government is aware are people who are very involved in the

11  organization.

12         And it is the government's position that the fact

13  that -- that David Taylor has no prior criminal convictions is,

14  quite frankly, not significant because he has been engaged in

15  criminal conduct that has terrified his victims for at least

16  the past 12 years.  And, in fact, he has made it publicly known

17  that prior to starting JMMI and then KOGGC, he says, "I used to

18  be a gangster in my teenage years, very bad in shootouts," et

19  cetera.  He states that in messages to other people, in his

20  book and on Youtube.

21         In addition to the text messages and the nature of

22  the forced labor, all of the other conduct that is being

23  revealed is terribly indicative of his character.  In addition

24  to the terrifying manner in which he abused the workers who

25  have come forward, he intentionally separated children from

1    their parents because in his view, the children would be a

2    distraction from their parents raising money, again raising

3    money for him to live a lavish lifestyle and for Michelle

4    Brannon to live a lavish lifestyle.

5         Taylor also has access to numerous sources of funds

6    to flee.  A number of those sources are identified in the

7    government's brief, but as -- as discussed before the

8    magistrate judge, the government recently uncovered an

9    additional account and in that account there is $12,100 --

10   $12,195 associated with a debit card account and then a savings

11   account has $130,910.

12        In addition to those identifiable source of funds, it

13   remains the case that the organization is continuing to raise

14   money.  They are broadcasting and asking that donors support

15   David Taylor.  Given the support by some of his followers that

16   remains, it is unquestionable that his followers will provide

17   him money.  How he uses that money is an unknown that makes him

18   a risk of flight and certainly can be used to flee the

19   jurisdiction.  And notably, he has many places to go.  He has

20   ties to a number of different districts across the country.

21        It is also significant, Your Honor, that his

22   supporters are declaring a war — declaring a war with the

23   judicial system, declaring a war with the government.  When

24   they ask for donations during a broadcast, they say things like

25   "we're in a war, we're in a war, and it's time for you to

Case 2:25-cr-20560-TGB-KGA   ECF No. 62, PageID.413   Filed 10/31/25   Page 19 of 89
Motion to Revoke Detention Order • Tuesday, October 21, 2025

19

1    decide if you're a warrior or you're not."

2          Moving on to the nature and seriousness of the danger

3    to any person or the community.  Again, in addition to the

4    intimidating forced labor conspiracy, there is the developing

5    evidence that Taylor coerced women to provide sexually explicit

6    videos and pictures.  This sexual predation makes him a danger

7    to the community for several reasons.

8          First, the evidence that the government has seen thus

9    far and the women that have shared their experiences with David

10   Taylor thus far establish unquestionably that he has an

11   excessive need for sexual gratification.  And I don't say that

12   lightly, Your Honor, because again, the government's case is

13   not about a consensual adult's behavior in the privacy of his

14   own home.  But David Taylor's excessive need for sexual

15   gratification cannot be controlled with bond conditions,

16   especially in the manner in which he sought to satiate his

17   sexual needs.  He did that electronically, Your Honor, with

18   phones, multiple phones, some of which he kept locked in a

19   safe.

20         Some of the sexually explicit material, because of

21   its nature, because it has been sent and stored electronically,

22   it may be in the possession of a former or current member of

23   the organization or stored by Taylor in an unknown location.

24   Women are fearful, Your Honor, that Taylor or someone at his

25   direction will distribute this material.  As one woman stated

1   to the government very recently, and this was a woman who

2   provided sexually explicit material to David Taylor, she said,

3   "I would have to find an island that no one heard of and would

4   go there," and she said because her whole family would be hurt

5   if they knew.  It terrified her.  And because of the ongoing

6   nature of the government's investigation, there are likely many

7   more women similarly situated and similarly fearful.  Anyone

8   who has used electronics for years to terrorize, abuse, punish

9   and degrade men and women should not have access to

10  electronics, period.

11          And as described in the brief, Your Honor, it's not

12  just David Taylor but it's all of the organization that views

13  this as a war and a battle.  His supporters are not mild

14  mannered, Your Honor.  They are engaged in this war because

15  David Taylor trained them to be.  That was a repeated theme and

16  repeated training leading up to the execution of the search

17  warrants.  They did not know the date of the search warrants

18  but they did know that the government was investigating his

19  organization, so David Taylor was preparing his workers for the

20  day he anticipated that law enforcement would come for him.

21          And finally, Your Honor, there are -- there is

22  extreme intimidation and harassment that has occurred and

23  continues to occur to current members and to former members.

24  As described during Michelle Brannon's detention appeal, one

25  member of the organization interfered with victims who sought

1   to accept victim services from personnel and nonprofit

2   organizations following the execution of the search warrant in

3   Tampa, Florida on August 27th.  There were individuals who were

4   living in the house in Tampa that wanted help from the

5   government, they asked.  They wanted to talk and they wanted

6   the provisions that were being offered by the government, and

7   one individual who described himself as No. 3 in the

8   organization interfered and convinced those people to leave the

9   hospital where victim services personnel and nonprofit

10  organizations were established to assist.

11         And as described in our brief, part of the

12  traumatization that occurred in this organization was the

13  exceptional and extraordinary and repeated threats to what

14  would happen to someone if they left the organization.  And

15  significantly, it wasn't just threats to the individual, but

16  even worse in their minds, threats to their families.

17         There are victims coming forward now, Your Honor,

18  that write to the government and describe that harassment and

19  how terrifying it is when they open their phone and they go on

20  Facebook and they see messages.  They view it as stalking and

21  nothing less.  The individuals proposed by --

22         THE COURT:  Are you saying that people who are

23  current witnesses in the case are receiving threatening or

24  intimidating messages?

25         MS. COHEN:  That is not the representation of the

Motion to Revoke Detention Order • Tuesday, October 21, 2025

1    government, I apologize.  Let me be more clear.  Individuals

2    that the government was previously unfamiliar with are writing

3    to the government and describing the nature of the harassment

4    that occurs to them.  We know that happened to individuals

5    within the organization of course.  We know the threats to

6    them.  We know the threats that were communicated to them

7    after.  It is new individuals that are coming forward that are

8    describing the nature of, again, the electronic harassment that

9    occurs by members.

10            THE COURT:  These are individuals who are part of the

11   organization now?

12            MS. COHEN:  That's correct.

13            THE COURT:  And they're receiving you say harassment

14   messages?

15            MS. COHEN:  That is correct.

16            THE COURT:  Meaning what, what kind of a message

17   would be harassing?

18            MS. COHEN:  The nature of the harassment ranges from

19   individuals within the organization who are harassed once they

20   leave, that is a category of individuals, and then there's

21   another category of individuals who are reporting to the

22   government a number of different types of harassment —

23   harassment to join the organization, harassment when they leave

24   the organization.  So I'm not implying that victims in the

25   indictment are currently being harassed, that is not the

Motion to Revoke Detention Order • Tuesday, October 21, 2025

23

1    government's position.

2            THE COURT:  All right.

3            MS. COHEN:  The government spent time before

4    Magistrate Judge Altman describing the connections of the

5    individuals proffered to live with David Taylor.  If the Court

6    wishes the government to place that on the record, I can do

7    that.

8            THE COURT:  Go ahead.

9            MS. COHEN:  The first individual -- again, I am

10   unaware at this time if these individuals are proffered to live

11   at the proposed Eastern District of Michigan address.  At the

12   time the parties were before Magistrate Judge Altman, there was

13   no bond address in the Eastern District of Michigan, and the

14   government is unaware at this time what the defense position is

15   as to who would reside at that Eastern District of Michigan

16   address. The government is aware at this time that that bond

17   address has not yet been fully approved by the management

18   company so that is not an address that is confirmed; it is

19   merely proposed by the defense.

20           But with regard to proposed third-party custodians

21   that have been proffered thus far, as described before the

22   magistrate judge, Paul Adom is known as Pastor Adom.  He has --

23   and his wife have been in Taylor's criminal organization for

24   many years.  Taylor himself has referred to him as floor

25   manager and stated he is responsible for driving everyone and

Case 2:25-cr-20560-TGB-KGA   ECF No. 62, PageID.418   Filed 10/31/25   Page 24 of 89
Motion to Revoke Detention Order • Tuesday, October 21, 2025

24

1    keeping order.  He is the owner of Kingdom Restoration For All

2    Nations, which is located in the building directly behind the

3    house where David Taylor was arrested in North Carolina.  The

4    organizations KOGGC and Kingdom Restoration For All Nations are

5    financially intertwined.  Money goes both ways, to and from

6    KOGGC and Kingdom Restoration For All Nations.  Adom was in

7    Houston, Texas when the search warrant was executed.  He had a

8    room in the former hotel which was being used at -- as a call

9    center.

10        Moving on to Alyssa Billow, also known as Alyssa Kay,

11   she's been proffered as a third-party custodian but she also

12   has information about Paul Adom.  She stated to law enforcement

13   that the address that was proffered to North Carolina, to the

14   extent that it's even being considered by the Court at this

15   time, was used as a place for male members to reside when they

16   came to North Carolina, and it was near -- it is near a house

17   where female members resided when they came to North Carolina.

18        Paul Adom is -- is on social media and he does post

19   in support of David Taylor and establishes publicly his

20   relationship with the criminal organization.

21        Continuing with Alyssa Billow, also known as Alyssa

22   Kay, she is a member of KOGGC and specifically has been living

23   with David Taylor.  She was with him in North Carolina when he

24   was arrested, and she has been involved in instructing his

25   workers, as described by the government today, at the detention

1    hearing in duty court, and in our brief.  She serves Taylor and

2    she gives orders to members who are beneath her.  She is seen

3    in group texts with Taylor and Brannon and other high-level

4    people in the organization.  She also has control over many of

5    Taylor's personal accounts and assets.

6          Like Michelle Brannon, David Taylor has a son, a son

7    who has been in the organization for a long time.  His name is

8    Joshua Taylor and he has been presented as a potential

9    third-party custodian.  He actually was listed as a director in

10   KOGGC documents.

11         Moving on to Daniel Gwinn, Daniel Gwinn has been

12   Taylor's armor bearer.  He has been Taylor's armor bearer in

13   North Carolina where Taylor has been residing for many years.

14   And as we describe in our briefing, an armor bearer is Taylor's

15   24-7 servant in KOGGC.  And as early -- earlier represented by

16   the government, armor bearers are named by number, not by

17   specific name but by number, in the indictment against David

18   Taylor.  They frankly do whatever Taylor orders them to do.  As

19   alleged in the indictment, this includes transporting women to

20   David Taylor for in-person sexual encounters and has included

21   providing those women with Plan B emergency contraceptives so

22   they don't get pregnant.  Daniel Gwinn also has knowledge of

23   David Taylor's accounts and assets and he corresponds with

24   other members daily on behalf of David Taylor.

25         With regard to David Taylor's honesty, of course the

1   nature of this organization requires an extraordinary amount of

2   dishonesty to the donors and to the members of the

3   organization.  But what is crucial for this stage of the

4   proceedings is to point out that given the opportunity to be

5   candid with officers of the court, he failed to do so, he lied.

6   He stated that he was living in St. Louis.  He was not.  He was

7   living in North Carolina where he was arrested for many years.

8           He failed to reveal that David -- that Daniel Gwinn

9   was his armor bearer.

10           He has been the leader of his criminal organization

11   for far longer than eight years as he represented to Pretrial

12   Services.  Notably, David Taylor started JMMI, and the only

13   reason he changed the name from JMMI to KOGGC is because JMMI

14   lost its nonprofit status with the IRS.

15           He also failed to reveal that Adom was part of the

16   organization.

17           He failed to reveal the extent of his international

18   travel.

19           And significantly, his financial disclosure to

20   Pretrial Services was far from complete and accurate.  He

21   merely listed one personal checking account and failed to

22   reveal any other sources of fund -- funds, either of the

23   organization or directly related to his own accounts.  And that

24   account just recently discovered by the government is -- is

25   exactly the concern that the government has, Your Honor.  The

Case 2:25-cr-20560-TGB-KGA   ECF No. 62, PageID.421   Filed 10/31/25   Page 27 of 89
Motion to Revoke Detention Order • Tuesday, October 21, 2025

27

1  complicated and extensive nature of the finances of this

2  organization not only establish the money laundering but

3  establish that David Taylor certainly has funds or access to

4  funds or funds that will be provided to him that the government

5  is either unaware of or has not yet seized.

6          THE COURT:  All right.  Does that pretty much cover

7  everything or is there anything else you wish to add?

8          MS. COHEN:  I do have some recent information about

9  the apartment proposed in Troy, Your Honor.  And again,

10  depending on what specifically the defense proffers with regard

11  to that living situation, the government will represent to the

12  Court at this time that the individuals who arranged for that

13  apartment are, of course, members of the organization.  They

14  were responsible fully, at least based upon our investigation,

15  for securing that apartment, but as of our last communication

16  with management of the apartment, they have not yet accepted

17  David Taylor as a tenant at the apartment.

18          The individuals misrepresented the circumstances

19  surrounding David Taylor's living arrangements and presence in

20  the Eastern District of Michigan.  They explained that David

21  Taylor was out of town on business and was therefore unable to

22  view the apartment himself, and they provided a cashier's check

23  to management as next steps for securing the apartment.  The

24  source of the funds is unknown at this time, Your Honor.  The

25  cashier's check was very recently presented.  It is a

Case 2:25-cr-20560-TGB-KGA   ECF No. 62, PageID.422   Filed 10/31/25   Page 28 of 89
Motion to Revoke Detention Order • Tuesday, October 21, 2025

28

1    significant amount, it's over $6,000.  And again, it was

2    presented to the management company of that apartment in Troy

3    by members of the organization.

4          For all these reasons, the presumption of detention

5    remains applicable.  If the Court concludes that the defendant

6    has rebutted the presumption, it remains a factor, significant

7    factor, as discussed by the Sixth Circuit, and in conjunction

8    with all of the other factors, the defendant should be detained

9    to protect not only the Eastern District of Michigan but the

10   victims and workers across the country.

11         THE COURT:  All right.  Thank you very much, Ms.

12   Cohen.

13         And let's hear from the defense.

14         MR. ROSENBLUM:  Thank you, Your Honor.  May it please

15   the Court.

16         Your Honor, if the Court will indulge me, I've --

17   I've -- I -- this case has been rather fast moving.  So I have

18   with me some exhibits.  I've shown them to the government.  I

19   also would like to present a witness just to give the Court

20   more context of what was going on or how the church operated,

21   if the Court would indulge me.  I didn't think --

22         THE COURT:  How much time do you think you need for

23   the witness, about?

24         MR. ROSENBLUM:  Ten minutes or less, no more than ten

25   minutes on direct.  I did make the -- I met this young lady

1   this morning and I advised the government, and advised the

2   government that she was more than willing to speak with the

3   government as well.

4           THE COURT:  Well, you can present a witness if you

5   wish to do so.

6           MR. ROSENBLUM:  At what point would you like me to do

7   so, Your Honor?

8           THE COURT:  I think you should probably do it right

9   now.

10           MR. ROSENBLUM:  Thank you, Your Honor.  Alexa [sic]

11   Larimer.  You need to be sworn.

12           THE COURT:  Swear the witness.

13           THE CLERK:  Please raise your right hand and state

14   your name.

15           THE WITNESS:  Alexis Larimer.

16           THE COURT REPORTER:  Would you spell Larimer please?

17           THE WITNESS:  Yes, ma'am.  L-a-r-i-m as in mom e-r.

18           THE COURT REPORTER:  Is Alexis the common spelling?

19           THE WITNESS:  Yes, A-l-e-x-i-s.

20           THE COURT REPORTER:  Thank you.

21                 A L E X I S   L A R I M E R

22   was called as a witness herein, and after being first duly

23   sworn to tell the truth and nothing but the truth, testified on

24   her oath as follows:

25           THE WITNESS:  Yes.

Case 2:25-cr-20560-TGB-KGA   ECF No. 62, PageID.424   Filed 10/31/25   Page 30 of 89
Motion to Revoke Detention Order • Tuesday, October 21, 2025

30

1          THE CLERK:  Thank you.

2          THE COURT:  You may be seated.  Go to the witness box

3   and sit down and adjust the microphone.

4          You may proceed.

5          MR. ROSENBLUM:  Thank you, Your Honor.

6                     DIRECT EXAMINATION

7   Q.   Good morning, Ms. Larimer.

8   A.   Good morning.

9   Q.   State your full name please for the Court.

10  A.   Yes, Alexis Larimer.

11  Q.   And Alexis, we just met this morning, correct?

12  A.   Yes, that's true.

13  Q.   Could you tell the Court when you became -- when you

14  became in contact with David Taylor and the KOGGC church?

15  A.   Yes.  So I had found out about Apostle through a friend.

16  They gave me his book in 2015.  I ended up going to a crusade

17  that was just a few hours from where I was staying and I

18  just -- I fell in love with the ministry.  I got involved from

19  that point on, and about four years later I became full time in

20  2019.

21  Q.   Okay.  And you said where were you -- you were living at

22  the time.  Where were you living at the time?

23  A.   I was in Kansas City, Missouri.

24  Q.   And then you were introduced and witnessed a crusade,

25  correct?

1    A.   Yes, yes.

2    Q.   Okay.  And once you did that, did you then decide to

3    become more involved with the ministry?

4    A.   Yeah.  I mean I was already -- so I had, you know,

5    background.  I already went to Bible college, I had a four-year

6    university, you know, degree.  I just loved God.  I was seeking

7    God but I always wanted more.  So I was actually with a

8    different ministry at that time, and I was just praying to God

9    asking for direction, what's next.  So when I found, you know,

10   Apostle's ministry -- and I had went there in person, like, I

11   saw the miracles and everything happening, and I was like, God,

12   this is it, this is what I've been asking and praying for,

13   searching for.  So I mean I didn't become full time till four

14   years later, but I just would start traveling, you know, back

15   and forth, got to know the pastors, the staff.

16   Q.   Okay.

17   A.   All that.

18   Q.   So let me stop you for a moment.  You said traveling back

19   and forth, so you would come and go as you would please to the

20   ministry?

21   A.   Yeah, yep.  So I was in Missouri, then I was in Indiana

22   for some time.

23            THE COURT REPORTER:  Wait a minute.

24            THE WITNESS:  Yes.

25            THE COURT REPORTER:  You've got to slow down.

1    THE WITNESS:  Oh, I'm sorry.

2    THE COURT REPORTER:  I'm taking all this down and

3  you're talking way too fast.

4    THE WITNESS:  Yes, ma'am.

5    MR. ROSENBLUM:  Thank you.

6    THE COURT REPORTER:  "So I was in Missouri, then I

7  was in Indiana for some time."

8  A.   Uh-huh, in Indiana, and then I would drive -- they'd have

9  conferences maybe about once a month that I would maybe go to

10 or every few months I would travel up, and that's how I first

11 started getting involved.

12 Q.   And are -- are you single?

13 A.   Yes.

14 Q.   Okay.  And let me -- at some point did you become involved

15 at a point where you would move into some of the campuses?

16 A.   Yeah.  So I became full time in 2019.  Now, at first my --

17 I moved with my sister and my mom because we were all involved

18 with the ministry.  So we got an apartment in Taylor, Michigan

19 to be closer to the ministry, so that's how it started, and we

20 would just go back and forth, you know, as we pleased.  And

21 then later I moved into the housing, you know, got even more

22 involved.  And so many of the properties that they mention,

23 I've -- I've lived there.

24 Q.   Okay.  So you said you moved in to -- to be closer to the

25 ministry at Taylor, Michigan.  Did you maintain that by

Motion to Revoke Detention Order • Tuesday, October 21, 2025

1   yourself?

2   A.   So when I first -- or I'm sorry, what do you mean?

3   Q.   I'm sorry, who -- was that provided by the ministry or was

4   that provided -- did you have to provide for yourself?

5   A.   Yeah.  So the first time I started living in the ministry

6   housing was they did a training in Missouri, so I went to the

7   ministry house there and everything was paid for — food,

8   housing, anything I needed, it was taken care of.

9   Q.   And then at that point did you actually move into one of

10  the houses?

11  A.   Yeah, yep, I was there.

12  Q.   So you -- you've had experience living in all of these

13  residences or -- or houses that have been referenced, have you

14  not?

15  A.   Yes, for years.  Houston, Tampa, yes.

16  Q.   And how would you describe Houston?

17  A.   Houston, it was awesome.  I mean it's like -- like I said,

18  I have a college degree so it's like having a dorm room.  You

19  have one roommate and, you know, your bathroom.  You go to work

20  in the morning.  You don't have to commute, it's all right

21  there.

22  Q.   Okay.  And how would you describe Tampa?

23  A.   Tampa, I mean you've probably seen it.  It's beautiful,

24  you know, it -- it's massive.  And, you know, Apostle, I know

25  he wanted that place to be able to bring supporters to bless

1  them and pastors, and it was, you know, not long term a student

2  place, but it was a beginning till we got the hotel.

3  Q.   And you were -- you maintained your association and lived

4  in these various properties through present, would that be

5  accurate?

6  A.   Yeah.  There was some time -- so my mom did get sick for a

7  little bit of time, and so Apostle did want me to go back and

8  make sure to be with her so I went back, you know.  So I would

9  be back and forth depending on what was needed just within

10 family or my own life, but yeah.

11 Q.   Was there ever any restriction of choice of coming and

12 going?

13 A.   No.  I mean at most you might, like, let leadership know

14 of your plans.  And so if they -- you know, if it was a busy

15 time in the ministry, they might say, "Okay, do it" -- you

16 know, "can you do it this time or we feel this would be best,"

17 but I was never told no or not to do or go anywhere.

18 Q.   Were you ever required to turn in any identification

19 material — passport, driver's license or anything — that would

20 keep you from being able to travel freely?

21 A.   No.  I mean -- and there was ministry cars.  If you needed

22 to go somewhere, you just say, "Hey, I have this appointment,

23 or the doctor, I need to go on this errand."  And we had people

24 that ran errands all day long.  I mean there's a lot of people

25 living there.  People need stuff, you know, so it's constant

Case 2:25-cr-20560-TGB-KGA   ECF No. 62, PageID.429   Filed 10/31/25   Page 35 of 89
Motion to Revoke Detention Order • Tuesday, October 21, 2025

35

1    going in and out.

2    Q.   Lot of coming and going?

3    A.   Yes.

4    Q.   And there were times you said you left the ministry and

5    then would come back?

6    A.   Yeah, yep.  If I had to go home to family, like I said, to

7    take care of my mom or even to help maybe watch over other

8    properties, you know, be sent back and forth.

9    Q.   Now, there's been some talk about these text messages and

10   boot camp.  Can you edify the Court somewhat what your

11   understanding of boot camp is?

12   A.   Yeah.  So I know they're mentioning like a war and all

13   this stuff.  It's not a natural war.  It's -- in Christian it's

14   a spiritual war.

15               THE COURT:  Just a moment.

16               THE WITNESS:  Uh-huh.  Approach the bench.

17               MR. ROSENBLUM:  Okay.

18               Not you.  You may be seated.

19               THE COURT REPORTER:  Do you want this on the record,

20   Judge?

21               THE COURT:  Yes.

22               (Sidebar discussion as follows):

23               THE COURT:  All right.  Number one, you should have

24   indicated that you had a witness in advance.  I don't think

25   anybody -- did you know he was going to have a witness?

1        MS. COHEN:  No.

2        THE COURT:  We didn't know you were going to have a

3   witness.

4        MR. ROSENBLUM:  I -- I just --

5        THE COURT:  This is the schedule of the Court here.

6   You're talking about introducing a significant amount of more

7   time in this hearing than what we've allotted for today.  Also

8   the government should present witnesses now.  We're going to

9   have to put this off for another day and we're going to have to

10  allow the government to present witnesses.  None of this is

11  relevant to the question of what -- whether or not there are

12  conditions that are sufficient to assure this guy's --

13       MR. ROSENBLUM:  I can wrap it up, Your Honor.

14       THE COURT:  Do you understand what I'm saying?

15       MR. ROSENBLUM:  I do, Your Honor.

16       THE COURT:  This is not a trial.

17       MR. ROSENBLUM:  I understand.  The only thing I was

18  offering it for is because the government's --

19       THE COURT REPORTER:  I need you to speak into the

20  microphone please.

21       MR. ROSENBLUM:  I'm sorry.  The reason I was offering

22  it is 'cuz the government's narrative of the church and it's

23  not a church.  So I think there's no criminal organization, so

24  I was just trying to enlighten the Court a little bit about

25  actually what our position is.  I can do it by proffer.

1          THE COURT:  The problem is that this is one witness

2     with one experience, and the question is what this fellow has

3     done and whether or not what this fellow has done is sufficient

4     to have conditions of...

5          MR. ROSENBLUM:  Okay.  I can focus in on that and

6     move on.

7          THE COURT:  All right.  Go ahead.

8          (End of sidebar discussion).

9          MR. ROSENBLUM:  Just a few more questions, Your

10    Honor.

11    BY MR. ROSENBLUM:

12    Q.  Were you allowed to keep your cell phone during the time

13    you were there?

14    A.  Yes.

15    Q.  Did you ever see any -- did you ever see David Taylor

16    commit any acts of force?

17    A.  No.

18    Q.  And the children that have been mentioned, were they kept

19    with their parents to your knowledge?

20    A.  Yeah, they would -- especially like in Houston or

21    different places, if they would be there, there'd be maybe a

22    babysitter for a time, like someone over, you know, watching

23    the children.  Then they'd be with their parents again.

24    Q.  Okay.

25          MR. ROSENBLUM:  Thank you, Your Honor.  I can do the

Motion to Revoke Detention Order • Tuesday, October 21, 2025

1    rest by proffer.  Thank you.

2            THE COURT:  All right.  Thank you very much.

3            Any questions by the government?

4            MS. COHEN:  Yes, Your Honor.

5                    CROSS-EXAMINATION

6    BY MS. COHEN:

7    Q.   Ms. Larimer, you stated on direct you've been a member of

8    JMMI and KOGGC, correct?

9    A.   Yes.

10   Q.   On August 27th you were living in North Carolina, correct?

11   A.   Yes.

12   Q.   And you had been living there for a significant period of

13   time?

14   A.   No, just a few months, kind of back and forth.

15   Q.   Your sister is a member of the organization as well?

16   A.   Yes.

17   Q.   What is her name?

18   A.   Ashley Larimer.

19   Q.   Your mother is a member of the organization as well?

20   A.   Yes.

21   Q.   What is her name?

22   A.   Susan Altman.

23   Q.   And, in fact, your mother was or is a board of director of

24   KOGGC, correct?

25   A.   Yes.

1   Q.  She is also a large donor to the organization, your

2   mother?

3   A.  Yes.

4   Q.  She also receives money from David Taylor in the

5   organization, correct?

6   A.  An allotted amount per month.

7   Q.  In fact, her name is on at least two cars associated with

8   the organization.  Are you aware of that?

9   A.  Yes.

10  Q.  Including a Lincoln Navigator that's worth over $148,000,

11  correct?

12  A.  I don't know the cars.

13  Q.  I'm sorry to ask you this but it is been the topic of this

14  hearing so I'm going to ask it.  You have been in a romantic or

15  sexual relationship with David Taylor, correct?

16  A.  Yes.

17  Q.  Your sister has as well?

18  A.  I'm not sure.

19  Q.  And your mother has as well?

20  A.  I'm not sure.

21          MS. COHEN:  I have no further questions, Your Honor.

22          THE COURT:  All right.  Thank you.

23          Any redirect?

24          MR. ROSENBLUM:  Just want to move on.

25                  REDIRECT EXAMINATION

1    BY MR. ROSENBLUM:

2    Q.   The nature of your romantic relationship, was that

3    completely consensual?

4    A.   Yes.

5              MR. ROSENBLUM:  Thank you, Your Honor.

6              THE COURT:  All right.  Thank you very much.

7              (Witness excused at 10:28 a.m.)

8              MR. ROSENBLUM:  Your Honor, I am here today asking

9    the Court to admit David Taylor to bail, craft a condition or

10   combination of conditions that will satisfy the Bail Reform

11   Act.

12             Pastor Taylor, unlike as described by the government,

13   has been in ministry for up to almost 40 years.  He's a

14   53-year-old man.  He has absolutely no criminal history.  He

15   has absolutely no history of violence in his background.  He

16   has no history of nonreporting to court or failing to come to

17   court.  He has absolutely no history at all in those types of

18   issues.

19             He was imminently aware of this investigation as of

20   August of 2022 when we started getting subpoenas from the

21   government, what ostensibly appeared to be a tax or financial

22   investigation.  My office was retained and we started having

23   conversations with the government and he was informed that he

24   was under investigation.

25             In addition, he reached out to the church counsel,

1    Mike King, who has been representing the church for some period

2    of time and giving the church guidance as to these types of

3    church issues and charitable status or not.  They followed --

4    they're following the law to the letter of the law.  Even

5    though he was aware of this investigation, Pastor Taylor made

6    no attempt to flee even though at that time he would have much

7    more access to assets.  And he wants nothing more than to

8    proceed to trial and not only vindicate himself and to

9    vindicate the church.

10          This is a man also that is in very poor health, Your

11    Honor.  When I say he's in very poor health, it's somewhat

12    critical.  He's been in a -- as of two years ago, he was in a

13    diabetic coma as a result of ketoacidosis.  Also, approximately

14    two years ago he suffered a heart event.  Didn't get to the

15    level of myocardial infarction, but it was a blood clot that

16    traveled up through his leg into his heart requiring heart

17    surgery.  His blood pressure -- he's diabetic, DKA.  His blood

18    pressure is a problem.  And within the recent weeks he's

19    showing the same swelling that gave rise to the blood clot and

20    he's not receiving his diabetic medicine as -- as he should.

21    His medical needs simply are not being taken care of and the --

22    and Mr. -- Doc -- Pastor Taylor is at risk.

23          With -- with respect to some of the other issues, all

24    his funds have been frozen to my knowledge.  In fact, any funds

25    that he listed to Pretrial Services, since Friday they have

Case 2:25-cr-20560-TGB-KGA   ECF No. 62, PageID.436   Filed 10/31/25   Page 42 of 89
Motion to Revoke Detention Order • Tuesday, October 21, 2025

42

1    been frozen.  His personal accounts have been frozen.  He has

2    basically no access to any assets.

3           His passport is seized.  He has no ability to travel.

4           He has -- there's been no attempt to liquidate any

5    assets for his benefit.  The credit cards that the government

6    mentioned in their brief are very limited.  I think one had a

7    $7,000 limit.  That's not going to get you very far.  And

8    certainly there's conditions or combination of conditions that

9    can assure that that would not be an issue.

10          With respect to the government's contention that he

11   was dishonest, I take issue with that.  I would rely on -- I

12   would rely on the Court listening to Pretrial.  I was on that

13   conversation.  It was clear that he was being interviewed after

14   he had been in custody for about five weeks at the time of this

15   district interviewing him.  And it was also clear that since he

16   had been in this five-year shut-away what they call and he is

17   having other people tend to his assets and other people make

18   deposits in his bank, he was answering the questions as

19   forthrightly as possible but there was some confusion.

20          With respect to where he lived, that's an easy

21   explanation, Your Honor.  He considers his home St. Louis.  He

22   was temporarily in this shut-away, he was absolutely candid

23   about that, and again I would ask the Court to rely on the

24   Pretrial Services Report.  There is absolutely no deception in

25   that interview.

Case 2:25-cr-20560-TGB-KGA   ECF No. 62, PageID.437   Filed 10/31/25   Page 43 of 89
Motion to Revoke Detention Order • Tuesday, October 21, 2025

43

1          The government -- and as a practical matter, Your

2    Honor, I have not been privy to the discovery in this case.  I

3    have supplied the government, as they have asked, with a hard

4    drive.  I anticipate potentially a terabyte of discovery.

5    There's a protective order in this case, a protective order,

6    which, as the Court knows, has very strict limitations on

7    what the -- where the discovery can be read and how it can be

8    handled.

9          So as just a matter of practicality, to prepare a

10   case of this magnitude with a -- with the amount of discovery

11   that I'm anticipating, with an individual that's incarcerated

12   that has no prior record would make it very, very difficult to

13   prepare logistically.  You would have to sit all day -- you

14   would have to sit for hours at a jail.  You can't leave the

15   discovery with Mr. Taylor.  You would have to make sure that

16   there's computers necessary to review this material.  It would

17   just be quite challenging in my view, Your Honor.

18         The government continues to cast a number of

19   aspersions and I have to take issue with it, I do, starting

20   with framing this as a criminal organization.  Pastor Taylor

21   has been in ministry his entire life.  He has had crusades all

22   over the world.  He has reached millions of people.  He has

23   given one crusade in Pakistan that a million people showed up.

24   This is not a religious renunciant as the government describes.

25   This is a person that has had a distinguished ministerial

Motion to Revoke Detention Order • Tuesday, October 21, 2025

44

1    career.

2         I brought with me -- and I've -- I've just gathered

3    these.  It's been difficult, given the raids, to get all

4    this -- these -- this information together.  But with me in

5    court, and I showed it to the government, are a number of

6    awards, and I can't help but imagine that before some of these

7    distinguished institutions and individuals would bestow such

8    awards on Pastor Taylor, that there would be some vetting

9    process.

10         These awards include by Barack Obama the Presidential

11    Lifetime Achievement Award in 2016.

12         We have the United States Community Chaplain

13    Association – Crime Prevention and Post-Prevention Community,

14    Program of Education.

15         We have the United States House of Representatives,

16    Congressman Jay Obernolte, Congressional Certificate of

17    Recognition.

18         On his trip to Israel David Taylor was commissioned

19    as ambassador to Israel.

20         He was featured in many magazines.

21         He was given a National Association Chaplain of the

22    United States, North American Charter.

23         He was given by the mayor of East St. Louis testimony

24    on the impact of community and his convoys, his charitable

25    convoys in the community.

Case 2:25-cr-20560-TGB-KGA   ECF No. 62, PageID.439   Filed 10/31/25   Page 45 of 89
Motion to Revoke Detention Order • Tuesday, October 21, 2025

45

1        I just -- the -- the way the government is casting

2    this case I just think is misplaced.  He was given the Spirit

3    of Detroit award by city council of Detroit, Michigan for being

4    exceptional achievement.  He's been given multiple honorary --

5    honorary degrees.  He's been the chaplain for the Cleveland

6    Browns.

7        And the individuals in this organization, in this

8    church, not a criminal organization, are educated people.  We

9    have engineers, we have NFL players.  These are not downtrodden

10   people that are being held against their will by -- by -- in a

11   reign of terror as the -- as the government has described it.

12   So when you take a deeper dive, that's not the case at all.

13       And in addition, additionally, I mean when people

14   would join -- look, anytime you go down the path of religion, a

15   number of things are going to be present.  Some people are not

16   going to understand other people's religion or how they seek

17   their spiritual food, wealth.  You can go down the line.  I

18   have no idea, the Latter-day -- some of us don't have any idea

19   about Mormons and what they wear.  I happen to be a very

20   reformed Jewish person.  I had no clue what's going on in

21   Orthodox Judaism and some of their -- and I would probably find

22   some of them appalling.  That doesn't mean it's wrong, Your

23   Honor.  These are all choices.  The same with Christian

24   Scientists.  The same with the Church of Scientology which we

25   cited in our brief.  That is an extreme example, but it's all

1   about choice, an individual choosing to seek their spirituality

2   within the constructs of these religious bodies.  The same with

3   Native Americans who use psilocybins.  Some of us may find that

4   objectionable, but it's religious freedom, what this country's

5   based on.

6          And when individuals, volunteers, staff came to pray

7   with David Taylor, it was all voluntary and with their eyes

8   wide open.  It would start by going to these sermons and -- and

9   these cavalcades and -- all around and these presentations.

10  They weren't recruited, they were invited.

11         And there's been a lot of talk about these text

12  messages.  Everything has a context.  So with respect to the

13  text messages, again, I think they are out of context and

14  misplaced.  The text messages, first of all, they were to many

15  people, not just individual.  And I'm going to get to the armor

16  bearers as well.  But the students and the volunteers would

17  typically would come see the liturgy, come see the seminars.

18  And once they would see it, they weren't recruited.  They

19  sought the ministry out, they were invited, and it was with

20  their eyes wide open.

21         So what that means is they became part of it, and

22  they were -- as they became part of it and as they were trained

23  to minister, and that's what this was about.  They weren't just

24  placed on phones and randomly asked -- answering phone calls

25  and giving spiritual advice.  They had to go through a training

Case 2:25-cr-20560-TGB-KGA   ECF No. 62, PageID.441   Filed 10/31/25   Page 47 of 89
Motion to Revoke Detention Order • Tuesday, October 21, 2025

47

1   session so they could handle these prayer calls, and they

2   handled them 24-7.  And not all of them were for money.  In

3   fact, many of them were with no request for money and no money

4   was given.  Probably percentage-wise, we could break it down to

5   less than a third.

6            And they weren't allowed on those phones until they

7   had some training.  And this whole boot camp and this whole

8   conversation about these text messages, that was in the context

9   of the boot camp.  And the boot camp was something that people

10  were asked if they want to participate in, with full knowledge

11  of what was involved.  And the purpose of the boot camp was to

12  train ministers to last for the long term, to be in it for the

13  long term because it's not easy and too many of them fail.

14           So -- and these phases of the boot camp, they weren't

15  daily at all, and there was never times when they were starved

16  at all.  There was intermittent fasting, again out of context.

17  We have plenty of text messages during this period of time

18  where Pastor Taylor would say "make sure you get eight or nine

19  hours of sleep."  Everything the government can say we can

20  controvert multitude times, many times over.

21           The boot camps either lasted for 21 days or they

22  lasted for two or three months, again with their eyes wide

23  open, always free to leave.  In fact, there's many videos, many

24  messages where David Taylor, Pastor Taylor would say over and

25  over anyone that doesn't want to participate leave.  And, in

Case 2:25-cr-20560-TGB-KGA   ECF No. 62, PageID.442   Filed 10/31/25   Page 48 of 89
Motion to Revoke Detention Order • Tuesday, October 21, 2025

48

1  fact, they would provide transportation to some of these

2  individuals to go home and they would return.  Those are the

3  facts.

4          All of the -- all of the teachings were based

5  strictly on Scripture.  Now, it may not be the Scripture that

6  everybody believes in, but everybody has their own

7  interpretation.  But all of these people believe and bought

8  into this Scripture and the meaning of this Scripture, and

9  everything comes just from the word of Jesus Christ to them and

10  that's what they want to practice and that's what they believe

11  in and that's okay.

12          Now, are there going to be disgruntled people in any

13  religion?  Sure, we see it every time.  All you have to do is

14  turn on *60 Minutes* and you see somebody that just left the

15  Church of Scientology or something -- or somebody that just

16  left some other church and they're saying "oh, no, this was

17  bad."  And sure, there's probably some people out there but

18  they all have stories.

19          One of the main antagonists of Detective -- of --

20  of -- of Pastor Taylor is an individual by the name of Frazier,

21  and this goes back to 2014 when his wife, who's in court here

22  today along with his child who's in court here today, after a

23  rather contentious divorce donated part of the money that she

24  received to Pastor Taylor and the church.  He went on a

25  rampage, contacting the FBI.  In fact, they reported him

Case 2:25-cr-20560-TGB-KGA   ECF No. 62, PageID.443   Filed 10/31/25   Page 49 of 89
Motion to Revoke Detention Order • Tuesday, October 21, 2025

49

1    because they believe he wrote KKK on their church.  In fact,

2    his daughter would testify by way -- I'm proffering -- that he

3    would consistently say "I can't believe your mom gave money to

4    a black church and a black man."

5         Those are the types of credibility issues that are

6    going to be uncovered as we go down this case.  You have to

7    understand there are major credibility issues.  The government

8    has this process of not only casting this as a criminal

9    organization, which it's not, it's a church.  Maybe not a

10   church that she likes or the government likes, but it's a

11   church that thousands of people get their spirituality from,

12   thousands of people, and it's meaningful to them.

13        She -- the government likes to cast everybody's a

14   victim.  She looks back and she says they're victims and they

15   don't know it yet.  Well, I've talked to some of these people.

16   They don't know it because they don't believe they're victims.

17   They list -- they list the armor bearers as victims.

18        I spoke to the -- what I believe -- the armor bearer

19   that's listed in the text messages and listed as a victim.  And

20   this is a gentleman that is educated.  He comes from a military

21   background.  He's been David's armor bearer, which is biblical.

22   There's nothing nefarious about these terms.  It's a person

23   who's an assistant, and he's assisted him all over the world in

24   these giant presentations in Israel, South Korea, Japan,

25   Pakistan, all over the world, and he will say it was an honor

 1   to do this.  And he was there at the raid in North Carolina.

 2   He's been next to him for eight years.  He does not consider

 3   himself a victim.  He considers himself it's an honor to serve.

 4   And he comes not only from the military but he comes from

 5   parents that were in the ministry.  He understands this.  He

 6   sees what David puts into the shut-away.  He sees him writing

 7   books.  He's written 35 books.

 8        This is not some charlatan.  He doesn't have to do

 9   that if he was a charlatan.  This is a person that is dedicated

10   to his ministry, that's dedicated to what he believes is

11   serving his -- the people that rely on him for their

12   spirituality.  He sits in the shut-away and prays.

13        And when he was -- when he -- when the raid came to

14   North Carolina and the government says that the individual was

15   in a cot, again, all throughout this case we see the government

16   taking snippets of facts and presenting them completely out of

17   context.  So the context of the air mattress was in this

18   North -- in this North Carolina residence, small residence like

19   a cottage where David had a room, the individual, Daniel Gwinn,

20   had a room, and there was a connecting church, and this is with

21   Pastor Adon [sic].

22        Incidentally, Pastor Adon [sic] is not connected to

23   the church.  Just because you're -- you do a guest ministry or

24   a guest spot, that doesn't mean you're connected to the church.

25   For instance, within the last couple years, Paula -- Paula

Case 2:25-cr-20560-TGB-KGA   ECF No. 62, PageID.445   Filed 10/31/25   Page 51 of 89
Motion to Revoke Detention Order • Tuesday, October 21, 2025

51

1   White, President Trump's spiritual leader, spoke on this very

2   stage in Detroit with David Taylor as a guest.  I would assume

3   that David would have been vetted before she would have done

4   that.  But that doesn't make -- mean that Paula White is a

5   member of this church.  It means that she was a guest minister,

6   just like Reverend or Pastor Adon [sic] has been.  He has no

7   connection with the church.  Candidly, there had been a time

8   where he was involved in the call centers as sort of an

9   overseer, fine, but no longer, and that was years ago for a

10  very brief period of time.  So again a misstatement, an over --

11  just hyperbole all throughout this presentation of the

12  government.

13        The reason that Daniel Gwinn was on an air mattress

14  is because there were issues with COVID and he was quarantining

15  at the time, quarantining for a brief period of time away from

16  Pastor Taylor 'cuz Pastor Taylor had issues with COVID.  He had

17  his own room, and he has had his own room the entire time they

18  were there for five years.  And he's been at David's side for

19  eight years, not involuntarily serving him but as a person who

20  considers it an honor to assist David in his travels and in his

21  mission and in his learning in this shut-away.

22        I know I provided the -- we provided the -- the Court

23  some -- a case and a -- and a brief, and the -- the reason I

24  think that's significant, even though it was in the context of

25  a civil case when they filed the motion to dismiss -- and this

Case 2:25-cr-20560-TGB-KGA   ECF No. 62, PageID.446   Filed 10/31/25   Page 52 of 89
Motion to Revoke Detention Order • Tuesday, October 21, 2025

52

 1    was really much more Draconian by any -- any means when you're

 2    dealing with the Church of Scientology in this particular case,

 3    but the Court focused I think on what's important on that case,

 4    and that's your own volition and whether or not you were cut

 5    off, and every one of these individuals were free to come and

 6    go.

 7            When the financial disclosures are revealed, you

 8    will -- you will see money spent to send people home for

 9    medical care and then they returned.  You will see

10    extraordinary amounts of money spent on food because that's

11    what this ministry was about — teaching, teaching the word as

12    they -- their gospel, and in exchange providing for your needs.

13            Again, when you talk about the staff and the

14    circumstances, I've also brought exhibits showing where David

15    would have huge amounts of money spent on the staff for food.

16    He would take everybody to Disney World, there's pictures of

17    that.  This was just not represented accurately, Your Honor,

18    it's just not.  They may not like this church, but that's not

19    what this church is about.  And every church has some

20    disgruntled individuals.

21            Were -- were children separated?  No, that's just

22    wrong.  During COVID they had their own rooms.  And I have not

23    been presented with one piece of evidence where somebody said

24    David Taylor inflicted this on a child or directed someone to

25    inflict this on a child.  I heard the government talk about

1    whooping.  Well, if a parent whoops a child, that's between the

2    parent and the child typically unless it's -- it's out of

3    bounds, but nobody was directed at the church.

4           The only people that corrected any children in this

5    church were their parents.  And at times -- again, a couple by

6    the name of the Wares, when he was an armor bearer and he

7    became disgruntled and the wife stayed in the church.  Often in

8    all religions there's separations and there's divorces and

9    there's accusations and there's accusations about one party's

10   involvement with the church.  We see that all the time.  It

11   just doesn't make it accurate and it certainly goes to their

12   bias.

13          I've heard these allegations, the most salacious

14   allegations that there was abuse of minors.  I haven't

15   presented -- with respect to the abuse overall, I haven't seen

16   one picture documenting any injury, not one.  I haven't heard

17   one direct story, not even by initials or by in camera or by

18   any method to protect the alleged victim, to say "this victim

19   said this person did this to me."  They're all vague

20   allegations that are very difficult to defend because you don't

21   know what you're defending.

22          Even in the government's presentation, I wasn't sure

23   whether we were talking about ten instances or ten acts.  I

24   heard ten people associated with the staff had acts of

25   violence.  I haven't heard what they were.  I haven't heard

Case 2:25-cr-20560-TGB-KGA   ECF No. 62, PageID.448   Filed 10/31/25   Page 54 of 89
Motion to Revoke Detention Order • Tuesday, October 21, 2025

54

1    whether they were actually told to do so by David Taylor at

2    his -- at his direction.  I haven't seen one text message to

3    that effect.  I haven't seen one medical bill where a person

4    needed to seek injuries.

5         I have -- with respect to the starvation and the

6    sleep deprivation, to the contrary, there's -- they're going to

7    see bills of -- of 50 to $75,000 a week for food.  Yes, there's

8    intermittent fasting, and yes, this is what everybody signed on

9    for before they even entered the -- these temporary programs to

10   increase their training.  That's what this was about, Your

11   Honor.  They don't like it, but everything was with your eyes

12   wide open.

13        And anytime anyone left, they had full means to

14   withdraw.  They had license, passports, transportation.  And,

15   in fact, there's many examples where Mr. Taylor, Pastor Taylor

16   would provide them, the church would provide them to go home,

17   and they would change their mind and come back.

18        I don't know what -- what the government's talking

19   about harassment.  It's a general term thrown out.  Every call

20   is not harassment.  She clearly said no alleged victim is being

21   harassed.  Quite frankly, most of the victims she's referring

22   to don't know they're victims.  That's the facts.  Those are

23   the facts, Your Honor.  They don't consider themselves victims.

24   They consider this a very spiritual, nourishing experience that

25   they want to continue.

Case 2:25-cr-20560-TGB-KGA   ECF No. 62, PageID.449   Filed 10/31/25   Page 55 of 89
Motion to Revoke Detention Order • Tuesday, October 21, 2025

55

1    References again -- I haven't seen no evidence of

2    anybody malnour -- malnourished.  I've seen evidence of the

3    staff having a lot of fun, going to events, traveling.  I've

4    seen no evidence of anybody underweight.  In fact, most

5    individuals would say they gained weight being there.  In fact,

6    the government shows in its forfeiture notice that they seized

7    like 125 pounds of crab.  I don't imagine that Pastor Taylor

8    was going to consume that by himself.  That was for the staff

9    for special occasions.

10    And also in context of -- these text messages were

11    occurring during COVID back from 2020, 2021, 2022, and again

12    during boot camp that they all agreed to and readily joined and

13    readily could have left.

14    A lot of this comes down again to disgruntled, some

15    disenfranchised former congregants.  Again, every religion has

16    them.  We've seen it over and over.

17    The government makes a statement that one of the

18    individuals, the third in command, was interfering at the time

19    of the raid.  To give the Court context, at this raid there was

20    57 people, give or take, at the Tampa address when it was

21    raided.  A lot of those individuals were vacation -- or not

22    vacationing but had been from Houston and they moved there

23    temporarily.  They weren't even primary residents at that

24    location.

25    And incidentally, that location is huge, with 12

1    bathrooms, and nobody's sleeping on top of each other and

2    nobody is sleeping in an uncomfortable position.  They had free

3    access to roam this place.

4            And when they were raided, quite frankly, most of

5    them had no clue what was going on.  All of a sudden they wake

6    up and they're being handcuffed and dragged off to a hospital.

7    Of course there's going to be some questions, what -- what's

8    going on, and they're looking for somebody to say what's going

9    on.  Well, the answer is nobody knew what was going on.

10           But what happened when they got to the hospital is

11   critical.  What happened was, yes, the government had

12   government services and victim services wanting to start

13   questioning them and wanting to take them into custody, and

14   these individuals had free choice.  The individual that the

15   government's talking about was the last one to leave the Tampa

16   property, and the -- and when he got to the hospital he was the

17   first one to leave.  He was only inter -- only intersected with

18   these individuals for about ten minutes at most, and at no time

19   did he give them any direction.

20           And what is interesting to note, of the 57 people

21   that were taken, all of them came back.  Now, one took the

22   government up to go home and see her family.  They flew her

23   home I think to Canada, or -- or I don't know whether it was a

24   individual, a male or female, flew to Canada and then came

25   back.  Two had preexisting medical conditions, accepted the

1    government's indication -- invitation to get treatment at the

2    hospital.  Then they returned to the church voluntarily.

3    Nobody was putting a gun to anybody's head.  That's where they

4    wanted to be.

5          Also it's interesting to note where the government

6    relies on false information.  They were prepared because they

7    had information, again I think from people that had their

8    credibility severely impinged, they had information that there

9    was going to be a number of children at this Tampa location.

10   They were ready with bags of children's clothing at various

11   sizes.  There was not one child there, not one.

12         So when you hear all these accusations of force and

13   abuse, I haven't seen one piece of documented evidence other

14   than vague allegations.  And -- and everything the government

15   wants to attribute, every part of any conduct, goes back to

16   David, even if it's a parent disciplining the child, because

17   the evidence will be the only discipline from a child -- for a

18   child came from a parent that was either offsite.  No children

19   ever went through the call center.  They're not going to

20   produce any evidence that any of the children went through

21   these call centers.

22         And the call centers were prayer lines.  As I said,

23   they would stay on the lines for sometimes up to 40 minutes

24   because Pastor Taylor never wanted to cut anybody off

25   regardless of whether they donated.  Some calls were being

1    taken because they were talking about suicide.

2         I also have exhibits -- when the government says

3    about all this improper hoarding of money, I have pictures with

4    police taking convoys into the community for charity.  I have

5    those pictures with me.  The church had two 18-wheelers where

6    they delivered aid after Hurricane Beryl.

7         This is not the -- the government has not painted the

8    appropriate picture of this church and who Pastor Taylor is.  I

9    understand they're serious charges, but given all this, the

10   Court I'm absolutely confident can construct a condition or

11   combination of conditions that can satisfy the Court's

12   obligation.

13        The -- again, in this hearing and in front of

14   Magistrate Altman, the government focused on consensual

15   photographs being disseminated to David Taylor, Pastor David

16   Taylor.  I'm not exactly sure what the proffer said, that they

17   not -- that there were some that were completely unrelated to

18   the church.  Certainly there's nothing illegal about that.

19   There was some requested by the church, or I'm sorry, some from

20   staff or some people associated with the church, but they were

21   all adults and they were all volunteered.

22        Now, in retro -- now, in this presentation, the

23   government suggests that some of these individuals have some

24   fear.  There's no proof that any of this has ever been

25   disseminated.  There is not one act of dissemination where any

1    of this was ever shown to a third person without the consent of

2    that person.  I'm sure if there was, if that was the case,

3    there are laws to prevent that and there would be prosecution.

4    There are none, there has not been because there are no --

5    there is no evidence of that.  It was being between consensual

6    adults.

7          David Taylor, yes, he was dating, and most of these

8    individuals he considered in relationships, and he was looking

9    for a wife, and he was looking for a wife, in his view, as the

10   Scripture tells him.

11         However, having said that, he is candid about his own

12   transgressions, and he -- before this ever started, he was

13   seeking counseling for this issue with a Christian minister,

14   minister by the name of Carol, Dr. Carol Ministries, and that

15   was before this he had already started counseling.  I would

16   suggest that could be continued as a condition of his bond.

17         THE COURT:  All right.

18         MR. ROSENBLUM:  And to be sure, that was before he

19   ever knew he was going to be indicted and accused of --

20   of these types of acts.  But it's important to note that in

21   context, all of this was consensual.

22         Now, there could be cognitive dissidence, there could

23   be buyer's remorse.  We see that all the time.  We see it with

24   one person that was subject to this on the Internet where she

25   was trumpeting David Taylor's praise and trumpeting how it was

1   the most meaningful experience she's ever had, and then there

2   was another relationship and she became jilted.  And that's not

3   just in this church, that's life.  You see that all the time.

4   And then she makes allegations that God spoke to her, and

5   that's why she made some of these allegations.  But nobody's

6   going to say there was ever any physical sexual assault.  We

7   haven't heard any of that.

8          Requesting pictures that were voluntarily sent, never

9   disseminated, by consensual adults.

10         And again, Pastor Taylor is -- his heart is more than

11  welcome to any counseling that -- and he's already seeing a

12  counselor, and we'll provide that individual's name and

13  credentials.  I can provide it to Pretrial Services.

14         We've provided Pretrial with two addresses.  One,

15  the -- the -- one has been vetted in this district, in the

16  Eastern District of Michigan.  As of this morning they've

17  approved it for a year lease.  It's not easy getting this in

18  order in a matter of days without the help of individuals.

19  There has been no condition where David couldn't use that help

20  up till now, so he took advantage of the help he had to present

21  something to Pretrial that would be suitable for Pretrial, and

22  as of this morning I was told it was perfectly suitable for

23  Pretrial.

24         By way of third-party custodians, there is the matter

25  of David's health.  Both of Alyssa Ballou [sic] as well as

Case 2:25-cr-20560-TGB-KGA   ECF No. 62, PageID.455   Filed 10/31/25   Page 61 of 89
Motion to Revoke Detention Order • Tuesday, October 21, 2025

61

1    Dan -- Daniel Gwinn from North Carolina, that place has been

2    vetted as well I believe, would gladly excommunicate from the

3    church and have no contact with the church to be David's health

4    care provider, mostly Alyssa Ballou [sic], because that's

5    important because his health is at issue and critical and he's

6    in jeopardy.

7           Additionally, with respect to David's son, prior to

8    this indictment, prior to the raid, I had documents which I

9    presented to the government that he had withdrawn from the

10   board of directors.  I believe that was in August, that

11   occurred in August of -- of this year, and that's his son Josh.

12   He also has a job at Amazon and the ability to earn other money

13   to help his dad subsist during the process of this case, and he

14   would also gladly be a third-party custodian, Your Honor.

15          So there are conditions and combination of conditions

16   that would assure the Court that David would appear and defend

17   himself, and I can tell you I've only had a snippet of time to

18   investigate, but that is his full intention.

19          This case is not what it's been purported to be.  I'm

20   telling you as an officer of the court of 43 years, from what I

21   can see, this an imminently triable case and an imminently

22   winnable case.  I'm looking forward to doing it.  But in the

23   meantime, I need access to my client so that we can properly

24   defend, and whatever conditions or combination of conditions

25   that the Court will set, he will absolutely abide by each and

1    every one of them.

2            THE COURT:  All right.  So what I would like to do I

3    think at this point -- are you -- are you done?  Is there --

4            MR. ROSENBLUM:  Yes, Your Honor.

5            THE COURT:  -- something you wish to add?

6            Okay.  So I think this hearing has taken more time

7    than perhaps the parties or the Court anticipated.  Oftentimes

8    these appeals take about an hour, maybe an hour and a half, and

9    so we've been at this for about two hours now and I think it

10   may be that people would need a break.  What I would like to do

11   is to adjourn until this afternoon and come back on the record

12   at 1:00 o'clock --

13           MR. ROSENBLUM:  Very good, Your Honor.

14           THE COURT:  -- if we can do that.  Do you think we

15   can do that, Ms.  Vradenburg?

16           (Brief discussion held off the record)

17           THE COURT:  All right.  Why don't we do that because

18   I have an obligation as well which is a community obligation

19   that I need to attend to.  So that'll give everybody the

20   opportunity to say everything that they need to say, give the

21   government the opportunity to say what rebuttal it needs to

22   say, and we'll be in a better position here and we'll also give

23   folks a break here, okay?

24           MR. ROSENBLUM:  Okay.  So 1:00 o'clock we're going

25   to --

```
1              THE COURT:  I'm sorry?

2              MR. ROSENBLUM:  I'm sorry.  Just so I can be clear,

3   at 1:00 o'clock we're going to convene and go over your --

4              THE COURT:  We'll be back in session at 1:00 o'clock

5   and allow the government to say any rebuttal they wish to

6   present and then we'll -- I'll render my decision.

7              MR. ROSENBLUM:  Thank you.

8              THE COURT:  All right.  Anything else?

9              MR. ROSENBLUM:  No, Your Honor.

10             THE COURT:  All right.  Thank you very much.

11             THE CLERK:  All rise.  Court's in recess.

12             (Court in recess at 11:04 a.m.)

13             (Proceedings resumed at 1:13 p.m., all parties

14             present)

15             THE CLERK:  All rise.  The United States District

16  Court for the Eastern District of Michigan is in session, the

17  Honorable Terrence G. Berg is presiding.  You may be seated.

18             Court recalls Case No. 25-20560, the United States of

19  America versus David Taylor.

20             Counsel, please restate your appearances for the

21  record.

22             MS. COHEN:  Good afternoon.  Sarah Cohen appearing on

23  behalf of the United States.

24             THE COURT:  Ms. Cohen.

25             MS. DYDELL:  Good afternoon.  Adriana Dydell on
```

1    behalf of the United States.

2            THE COURT:  Ms. Dydell.

3            MR. MARGOLIS:  Good afternoon, Your Honor.  Larry

4    Margolis and Scott Rosenblum on behalf of Pastor Taylor.

5            THE COURT:  Mr. Rosenblum, Mr. Margolis, Mr. Taylor,

6    welcome.  All right.  You may be seated.

7            So we took a break previously after we heard from

8    both the government and the defense regarding the motion to

9    revoke the detention order in this case, and we had one

10   witness, and the government has the right to make a brief

11   rebuttal.  Do you wish to be heard at this time?

12           MS. COHEN:  Yes, Your Honor.  Thank you.

13           "Beware of false prophets who come to you in sheep's

14   clothing but inwardly are ravenous wolves."  Appropriate

15   passage from the Bible, particularly as it applies to David

16   Taylor.  He is a terrible wolf in sheep's clothing.  He has

17   shown the public, the donors and apparently his defense

18   attorney only his sheep's side, but the government has

19   uncovered the wolf.  Taylor thought he could hide his wolf in

20   his phones, but with the assistance of cooperative victims and

21   witnesses, his phones and now additional witnesses have started

22   to reveal everything about him.

23           Here's what the evidence has uncovered that has not

24   yet been discussed, in total contradiction to the defense

25   presentation today and in relation to 3142 factors.  Pursuant

1   to a search warrant, the government is in possession of

2   Taylor's iCloud material from 2014 to 2023.  In that return are

3   approximately 40,000 explicit images and likely over 10,000

4   explicit videos.  That count is ongoing, Your Honor.  Based

5   upon our review to date, the majority of those images and

6   videos are of members in the organization.

7          There are threats found in the iCloud.

8          THE COURT:  What do you mean by that?

9          MS. COHEN:  I'm going to read them to you, Your

10  Honor.  Here's a sampling.  A member of the organization left.

11  This woman, like so many of the other women in the

12  organization, had a sexual relationship with David Taylor.  I

13  use the term "relationship" very loosely.  She spoke out

14  against David Taylor and KOGGC.  The following messages were

15  received by her according to the iCloud return.  The text

16  message is from No. 2 David Taylor, which has been identified

17  recently as one of David's phones, David Taylor's phones.

18  Quote, "My staff will show every nude picture and your drug

19  habit.  You want to do this publicly, we will.  Your enemies

20  and everything -- and everyone will see everything.  I don't

21  care."  Again, this is a woman who was publicly sharing

22  information about David Taylor and KOGGC, and Taylor sent those

23  messages to her.

24         As another sampling, Your Honor, David Taylor was in

25  possession of a -- at least one explicit photograph of a woman,

1    and the message she received was "you don't want your children

2    to ever look at those, don't dare use my name."

3            Other information that has been revealed in the

4    iCloud, Your Honor, shows the depraved nature of David Taylor's

5    character.  Here's another example for the Court.  His son when

6    he was a minor found explicit photos of his mother in her -- in

7    an electronic device.  His son informed his father about what

8    he had found.  David Taylor instructed his own son, a minor, to

9    download everything he had found and send them to his father,

10   especially the, quote, "really bad ones!" Exclamation point.

11   In addition to victimizing the other minors in the

12   organization, he was victimizing his own son.

13           The government earlier referenced the phones that

14   were locked in the North Carolina home where David Taylor was

15   arrested.  He had three phones, Your Honor, that were locked

16   and David Taylor gave them names: General David E. Taylor,

17   David Taylor, and David Taylor 2.  Each was used to communicate

18   with women our investigation has revealed thus far, and again

19   thus far there are sexually explicit materials on those phones.

20           During the course of today's hearing the government

21   heard for the first time that David Taylor has been treated for

22   his sexual obsession, for lack of a better term.  The

23   government isn't able to verify that he has sought counseling

24   for this, but the fact that he has should weigh strongly in

25   favor of detention.

1    Taylor's depraved character is reflected in how he

2 treated the children in the organization, and now the Court

3 knows how he treated his own son.  They were not assaulted by

4 their own parents as claimed by the defense.  They were

5 assaulted by a member or members of the organization.  They

6 were forbidden from telling their teachers their living

7 situations.  Someone from the organization was responsible for

8 everything about them, including communicating with their

9 teachers, not their parents, and those members or member lied

10 about their relationship with the children.

11    They were separated from their parents, and this was

12 demonstrated on August 27th.  There were no minors in Tampa.

13 The government of course wanted to be prepared in the event

14 that there were, but there were none.  Why?  They were

15 separated from the parents in Tampa.  They were in Michigan, so

16 very far from their very own parents.

17    And because they were in Michigan, that gives the

18 Court another reason not to release David Taylor into the

19 Eastern District of Michigan.  He should not be living anywhere

20 near minors who were forced to witness the things that they

21 witnessed in the organization, and not only what they

22 witnessed, but they -- what they experienced themselves —

23 physical abuse and psychological abuse.

24    The representation that workers could seek medical

25 care when asked or needed is simply untrue.  It's part of the

1   depraved nature of this organization.  We can speculate why

2   that would be, why a worker is -- would not be allowed to seek

3   medical care, because of course a medical provider would ask

4   why they were sick and where they were living and the

5   circumstances.  But for now, suffice it to say that that

6   characterization that workers were able to seek medical care is

7   untrue.  If there were occasions where members were treated,

8   those were rare occasions.

9         Taylor's attempts to hide the nature of this

10  organization were extensive.  The government's brief on page 8

11  talks about how the workers were forcibly isolated from family

12  and friends.  Their phones were taken away.  They were not

13  permitted to have any contact with family and friends.  This

14  assured that they remained loyal to David Taylor.  This even

15  caused the break-up of marriages and other relationships.  And

16  David Taylor and Michelle Brannon forced them to block family

17  members or anyone that questioned David Taylor.

18        And again, the donors didn't know this side of David

19  Taylor.  How could they know because the nature of the

20  organization was so closed off to the community, the workers

21  were so isolated that no one knew.  And the fact that he has so

22  many followers now does not show his priestly nature or his

23  worthiness.  It actually weighs in favor of detention.

24        Some further corrections for the record.  With regard

25  to the living situation in the Tampa house on August 27th as a

1    mere example, Your Honor, there were 13 people who were

2    apparently sleeping in the garage, some merely on mattresses on

3    the floor.

4            With regard to North Carolina, the defense has

5    represented that he only lived there a short period of time.

6    That is absolutely untrue.  David Taylor had been living in

7    North Carolina since COVID.  Women were brought to him there

8    for sexual activity despite the fact that he calls his time in

9    North Carolina shut-away.

10           As this Court is well aware, if the defendant is

11   suffering from any medical conditions, the U.S. marshals is

12   well equipped to take care of any medical needs.

13           With regard to the alleged cooperation with the

14   investigation, the government will correct the record as

15   follows.  The defense only was aware of a possible financial

16   investigation.  The returns to the government and the

17   compliance with questions was hardly fulsome, and surely the

18   penalties for any financial crimes pales in comparison to the

19   charges in the indictment.  So it is not a surprise that he

20   remained in North Carolina and continued the organization that

21   was yielding him millions of dollars.  Instead of fleeing, he

22   prepared his workers for battle and for war.  Those are not the

23   government's words, those are David Taylor's words.

24           With regard to the preparation for trial if Taylor is

25   in custody, that is not a factor under the Bail Reform Act.

Case 2:25-cr-20560-TGB-KGA   ECF No. 62, PageID.464   Filed 10/31/25   Page 70 of 89
Motion to Revoke Detention Order • Tuesday, October 21, 2025

70

1          Unless the Court has further questions, the

2     government has completed its rebuttal.

3          THE COURT:  All right.  Thank you very much.

4          Now, it's the government's burden so we don't usually

5     have the defense give a surrebuttal, but if you wish to respond

6     to something that may have been raised that was not raised

7     before, you may do so.

8          MR. ROSENBLUM:  Sure, Your Honor.

9          Again, I would just say they're try -- they're trying

10    to cast this in a sex trafficking scenario and it's just not.

11    It's -- he's charged with forced labor, and again, it was

12    completely consensual.

13         Now, there's been no evidence of any dissemination.

14         With respect to the -- the therapy that he's seeking,

15    that was before this raid, and he did so because obviously if

16    you're -- he recognizes any weaknesses.  That's part of how he

17    ministers.  This was all before 2023.

18         With respect to a continuing investigation, we have a

19    continuing investigation too.  And what I think is interesting,

20    when they're talking about -- they keep going back to the

21    minors and I just noticed it keeps flip-flopping.  I'm not sure

22    what the allegation is.  What I heard was there was one event

23    of whooping.  That was by a parent.  The minors weren't there

24    because they had bad information.  And as the information

25    develops, I was just informed that parent was told by one of

1    the individuals coming forward that he was specifically going

2    to lie to the FBI.  That's what our evidence would be on that

3    issue.  The only person that ever touched a child would be a

4    parent or controlled by a parent and it would be discipline.

5    Nobody from the church was doing that and I haven't heard one

6    concrete example.  Again, no pictures, no corroboration.

7            With respect to the continuing investigation and

8    interference, as I was sitting at lunch I received an email

9    from an individual that was following the case who was in the

10   ministry full time as of 20 -- up until 2022, left as of 2024

11   to go back for school, freely left.  And again throughout this

12   whole case I've never heard the word involuntary.  This is all

13   free will.

14           And this individual said that as she's sitting at

15   home, she's getting a call from the FBI parading as a welfare

16   check, and as soon as she answered the phone, they tried to

17   literally jam the government's narrative down her throat and

18   she just wasn't interested.  "No, David Taylor didn't do this.

19   David Taylor was a godsend to me and my family."  She's not

20   even connected with the ministry anymore.  But when you're

21   talking about interference, when the FBI is making cold calls

22   to individuals to try to shape their testimony, that's

23   interference, Your Honor.

24           This is a church.  It was incorporated appropriately.

25   It had bylaws, it had a lawyer, and everybody had their eyes

Case 2:25-cr-20560-TGB-KGA   ECF No. 62, PageID.466   Filed 10/31/25   Page 72 of 89
Motion to Revoke Detention Order • Tuesday, October 21, 2025

72

1   wide open all the way through — through the boot camp, through

2   the teachings throughout scripture.

3       With respect to his son, his son is not -- not -- not

4   even a member of the congregation anymore.  He was resigned

5   from the board of directors.  He's an adult.  He's perfectly

6   capable.

7       It's difficult when you're trying to secure premises

8   and every time you make a phone call, the FBI shows up and

9   basically invokes fear in the lessor.  In spite of that,

10  they've located a place.  It's paid for and it's good for a

11  year.  It's been -- it's been vetted by Pretrial Services.

12      With respect to any other concerns that this Court

13  may have, the Court has a full range of conditions.  Electronic

14  monitoring, they can theoretically, as the Court knows, monitor

15  the Internet.  They can do all sorts of things to assure that

16  Mr. Taylor is not a threat — he certainly isn't to himself or

17  to anybody else — and that he will appear and defend himself,

18  which he, I assure you, is looking very forward to.

19      Thank you, Your Honor.

20      THE COURT:  All right.  Thank you very much.

21      So as I said at the beginning, the Court in a hearing

22  like this has the obligation to conduct what's called a de novo

23  review of the arguments and the evidence both proffered and

24  presented to the Court.  And when it comes to the issue of

25  detention, the Court must decide whether or not there are

Case 2:25-cr-20560-TGB-KGA   ECF No. 62, PageID.467   Filed 10/31/25   Page 73 of 89
Motion to Revoke Detention Order • Tuesday, October 21, 2025

73

1    conditions or combinations of conditions that would adequately

2    assure that the defendant would not be a flight risk, that is

3    to say that he would leave the jurisdiction and avoid

4    prosecution, or that he would present a danger to the community

5    both in terms of to any individuals and also to the integrity

6    of the court process with respect to intimidation of witnesses

7    and that kind of behavior.  And so that's the standard that the

8    Court has to apply here.  And in particular, as to risk of

9    flight, the Court has to consider whether the evidence shows by

10   a preponderance that there are no such conditions that would

11   prevent his flight, and with respect to the danger to the

12   community, by clear and convincing evidence whether there are

13   no conditions that can adequately protect the community.

14        The nature of offense here is quite serious because

15   it's forced labor, and forced labor is considered a violent

16   crime and the kind of crime that under the Bail Reform Act is

17   afforded a presumption that a person who is charged with that

18   crime is a person for whom there are no conditions that would

19   adequately protect the community.

20        The presumption itself is not impossible to overcome

21   however.  It must be met by the defense with some evidence that

22   evens the playing field and turns the burden of proof to the

23   government to show by those two standards that I already

24   mentioned whether there are conditions that would be sufficient

25   or not.

Motion to Revoke Detention Order • Tuesday, October 21, 2025

74

1          Now, in this case the presumption does apply, and if
2     all we had was the presumption, the Court would still consider
3     the other factors, but of course we have evidence that was
4     presented that goes beyond just the charge itself.  And the
5     defense, for instance, points out that Mr. Taylor has been
6     involved in this enterprise for some time, really his entire
7     career, and that it has certain aspects of it that the defense
8     suggests is legitimate in terms of being a religious
9     organization that has adherents that trust and believe in it,
10    and that Mr. Taylor based on his age and his health issues is
11    unlikely to represent a risk of flight or a danger.

12          And I think that that type of evidence that's been
13    presented meets the presumption and then turns the question to
14    the Court as to what the elements are under the Bail Reform Act
15    that have to be considered in order to prove whether or not
16    these standards have been met.  And the Bail Reform Act has
17    certain factors in it and they're contained at 18 U.S. Code
18    Section 3142(g), and that -- that statute requires the Court to
19    consider four separate sets of factors in determining whether
20    there are conditions that would be adequate.

21          The first of these conditions is the nature and
22    circumstances of the offense charged, including whether the
23    offense is a crime of violence or other crimes that are listed.
24    And so in terms of the nature of the offense charged, of course
25    I've already mentioned this in talking about the presumption,

1    but the nature of the offense charged is extremely serious

2    because the allegations in the indictment are quite specific

3    with regard to a number of victims who have indicated that,

4    according to the indictment, they were subject to forced labor

5    during the time when they were working for Mr. Taylor in this

6    enterprise.

7            It's important to make a distinction in talking about

8    detention and talking about how the law treats criminal

9    conduct, or perhaps I should say conduct that's charged as

10   criminal, and that is that it's distinct from religion and

11   faith.  Criminal conduct is just that, it's conduct.  And so

12   the indictment itself charges Mr. Taylor and Ms. Brannon with

13   specific acts of conduct, and in particular, forcing the labor

14   of some nine different individuals who are represented in the

15   indictment as victims 1 through 8, so it's eight different

16   individuals.

17           And the indictment further contains a number of

18   allegations that set out messages and statements that Mr.

19   Taylor wrote often to his co-defendant, Ms. Brannon, in which

20   he would describe the requirements that he had, and I'm

21   summarizing here, for those who were raising funds for him in

22   these call centers.  And these requirements would often be

23   along the lines of working many hours , for example working

24   until 4:00 a.m. and then staying -- getting up again then at

25   8:00 a.m.  And further, that if the individuals who were

1   responsible for making these fundraising calls did not meet the

2   goals that he had set out, that they would be deprived of food

3   or that they would be deprived of shelter or that they would be

4   further deprived of sleep.

5           Both in the indictment and also in the brief that the

6   government filed, there are detailed text messages that Mr.

7   Taylor wrote that clearly used threatening language, there's no

8   other way to put it, threatening, abusive language indicating

9   that if certain goals are not met, individuals will be made to

10  go to a shelter, will be made to go to a garage, will have to

11  stay up until 4:00 a.m. and then get up at 8:00 a.m. and have

12  water thrown on them in order to wake them up.  And many of

13  these statements are in all capital letters and say things such

14  as "Everyone go into the Tampa garage tonight.  This will never

15  stop until you change completely."  As I said before, this is

16  conduct.  This has nothing to do with the faith of those who

17  followed Mr. Taylor.  This is conduct charged that Mr. Taylor

18  engaged in, and a grand jury indictment is a finding of

19  probable cause.

20          I read through the briefing that Mr. Taylor's

21  attorney filed which referred to civil cases in which

22  individuals brought civil lawsuits against religious

23  organizations charging certain kinds of abusive behavior.  And

24  in those cases, after the court had seen all of the evidence in

25  terms of the discovery in that case and read all the arguments,

1    the court in that case had concluded that the plaintiffs had

2    not shown sufficient proof to meet the civil statutes that they

3    were being brought under.

4            This is a criminal case.  In a criminal case the

5    grand jury hears evidence and makes a conclusion as to whether

6    or not that evidence shows probable cause that a crime was

7    committed and that a particular person committed the crime.

8    The indictment is the statement by the grand jury that they

9    found that probable cause.

10           And so if there is any kind of comparison with civil

11   cases, the grand jury's finding could be considered comparable

12   to a court indicating that a case needed to go to trial.

13   That's what is going to happen in this case, the case will have

14   to go to trial.  And it's a statement that, according to the

15   grand jury, there was probable cause that Mr. Taylor had

16   committed the conduct that's charged in that indictment.

17           The Court has read through that and also read through

18   all of the other examples of the statements that Mr. Taylor

19   himself made, and these statements are clearly statements that

20   are attempting to coerce people, there's no other way of

21   looking at it.  They're clearly intended, and the

22   black-and-white interpretation of them is that they are

23   coercive statements, attempting to coerce people to raise funds

24   at all hours.

25           And so that's the nature of the offense here and

1    that's a very serious offense, and it weighs in favor of

2    detention because it is an offense that shows that Mr. Taylor

3    uses his authority when he can, according to the indictment and

4    according to these text messages, to attempt to manipulate and

5    to control others and in ways that were coercing them to work

6    for him.  There has been other evidence that has been presented

7    that I'll talk about later that is of a similar nature, but

8    that's the first factor that I have to consider.

9         I also have to consider the weight of the evidence

10   against the person and that's the second factor.  That factor

11   relates not to the weight of the evidence as to the case

12   itself, but rather to the weight of the evidence with respect

13   to the danger to the community and the weight of the evidence

14   with respect to the risk of flight.

15        With regard to risk of flight, the government points

16   to a number of different things.  They point to statements that

17   Mr. Taylor made to his Pretrial Service officer that the

18   government suggests were intentionally false such as where he

19   was living.  He indicated that he was living in St. Louis but

20   he was really living in North Carolina.  But at the same time

21   the evidence is somewhat ambivalent there because Mr. Taylor

22   did, in fact, have a residence in St. Louis at the same time

23   when he was living in North Carolina, and so I don't see that

24   particular false statement or allegedly false statement as

25   particularly convincing with respect to the issue of risk of

1    flight.

2              There were similar statements about his lack of

3    having disclosed all of his financial records and also his

4    relationship with some of the individuals that he suggested for

5    his either third-party custodians or other relationships and

6    that he did not disclose the actual nature of these

7    relationships, and it does appear that he did not disclose the

8    actual relationship.  And so -- so these are factors that I

9    take into account, but I don't think that they're particularly

10   weighty with respect to a risk of flight.

11             The government also points to the assets that Mr.

12   Taylor has available, and his -- his entity itself clearly did

13   have a lot of assets available, and some accounts recently

14   having been discovered were in the nature of more than a

15   hundred thousand dollars in one case, more than 10,000 -- more

16   than $12,000 in another case.  And there were many assets that

17   were mentioned, various luxury vehicles, some of them quite

18   costly, things such as Bentleys and Mercedes Benz and several

19   Bentleys, and some of these apparently involving bullet --

20   bulletproofing customization according to the government's

21   memorandum.  So Mr. Taylor clearly through his enterprise had

22   assets available to him but many of these assets have been

23   frozen by the government or seized it appears, and so I don't

24   think he has a great deal of assets available at this time that

25   would enable him to flee.

1          Government also points out that he has -- through his

2    church he has connections around the country and maybe even

3    around the world and that these might be individuals that would

4    help him to flee.  That could be the case.  But with respect to

5    risk of flight, often there are conditions such as the use of a

6    electronic monitoring device and the giving up of one's

7    passport that clearly restricts one's travel and makes it very

8    difficult to flee the jurisdiction.  And so while there are

9    some facts that suggest that Mr. Taylor represents a risk of

10   flight, I don't think that's the main concern that I have here.

11   I think that there probably could be some conditions that could

12   be put together to control his travel and prevent him from

13   fleeing.

14          The other factor though is the weight of the evidence

15   regarding danger, and here the weight of the evidence regarding

16   danger I think is quite significant and I have two primary

17   factual bases in support of that.  One is the repeated conduct

18   involving the intimidation and the control and the coercion of

19   individuals, and these -- this was conducted through specific

20   kinds of acts such as the deprivation of food, the deprivation

21   of sleep, and even the deprivation of shelter.  Those tools

22   were used, as evidenced by the documents that the Court has

23   before it, by Mr. Taylor to conduct his fundraising operations.

24   And the nature of the messages that he writes, to me, do

25   suggest an authority, an assumed authority on his part that

Case 2:25-cr-20560-TGB-KGA   ECF No. 62, PageID.475   Filed 10/31/25   Page 81 of 89
Motion to Revoke Detention Order • Tuesday, October 21, 2025

81

1    people would do what he said.  He indicates that it's going to

2    be done now, for example, or other similar phrases.  And the

3    evidence itself suggests that he was able to utilize some kind

4    of allegiance to his personality, whether it's a cult of

5    personality or something similar, to get people to do what he

6    wanted, and this is very strong evidence, very strong evidence

7    with respect to danger to the community.

8            But it goes beyond that because there's been evidence

9    presented that in addition to these kinds of depriving

10   individuals of the basics of living in order to get them to do

11   what he wanted, he also was engaging in sexual relationships

12   with individuals from within the church and then obtaining

13   images of them.  The government mentioned previously that there

14   were many images, and then in their rebuttal they specified

15   that there were some 40,000 different images and some 10,000

16   videos.  That number is not what I'm relying on because it

17   hasn't been shown here how many of those involved people from

18   his church, but the government proffers and the Court has to

19   take it as true that some members of his church were among

20   those.

21           And further that he has sent, as the government

22   referenced during its rebuttal, messages to women whose images

23   he had taken, suggesting that he would possibly disclose those

24   images if they did not do what he wanted.  Government had

25   suggested previously that that might happen, and of course

Case 2:25-cr-20560-TGB-KGA   ECF No. 62, PageID.476   Filed 10/31/25   Page 82 of 89
Motion to Revoke Detention Order • Tuesday, October 21, 2025

82

1    that's true that that might happen if Mr. Taylor was in

2    possession of those images.  We don't know whether there were

3    other places where those images were stored other than the

4    electronic devices that the government has seized where they

5    found those images, but it was possible.  And now with respect

6    to the rebuttal information, it was shown that he has indeed

7    stated a desire or an intent to use those kind of images in

8    that way.

9            And so what we have with respect to the strength of

10   the evidence with regard to danger to the community is a very

11   strong record here and a strong series of individual acts that

12   show a pattern of conduct, and the pattern of conduct is one of

13   trying to control others.  We have the numerous messages

14   regarding the food and the shelter and the sleep.  We have the

15   specific ones regarding working until 4:00 a.m. and then

16   getting up at 8:00 a.m.  We have the attempts to impose

17   psychological control over workers, whether through pouring

18   water or indicating that if you didn't work you wouldn't be

19   able to eat, and making them stay in the garage, or has

20   threatened anyway, in shelters and being kicked out of their

21   living arrangements if they didn't do what they were supposed

22   to do.

23           And there was also evidence that Mr. Taylor had

24   coerced some of the female members into sending these

25   explicit -- explicit sexual images.  I know the defense

Case 2:25-cr-20560-TGB-KGA  ECF No. 62, PageID.477  Filed 10/31/25  Page 83 of 89
Motion to Revoke Detention Order • Tuesday, October 21, 2025

83

 1    suggests that all of these pictures, all of these videos may

 2    well have been consensual, and that's not what the government's

 3    proof is though apparently, at least with respect to some.

 4            And so on the one hand we have all of these examples

 5    of the intentional coercion and control of others, but then we

 6    also have another area that concerns the Court and that's

 7    violence.  The government proffers that some ten individuals

 8    who were working for Mr. Taylor, and including Mr. Taylor,

 9    engaged in violent activities against some of the members of

10    the organization, whether by hitting them, pushing them,

11    physically removing them from one place to another or otherwise

12    using force, physical force against other people.  That type of

13    conduct is also evidence that weighs in favor of detention.

14            And so in my view, in looking at the weight of the

15    evidence against the person, I think it weighs in favor of

16    detention because Mr. Taylor has demonstrated his use of these

17    kinds of behaviors and these kinds of conducts to intimidate

18    others and to coerce others.

19            I also have to consider the history and

20    characteristics of the individual person, the person's

21    character, their physical and mental condition, their family

22    ties, their employment, financial resources, length of

23    residence in the community, community ties, these kinds of

24    things.

25            Mr. Taylor is a 53-year-old man.  He has some health

Case 2:25-cr-20560-TGB-KGA   ECF No. 62, PageID.478   Filed 10/31/25   Page 84 of 89
Motion to Revoke Detention Order • Tuesday, October 21, 2025

84

1   concerns with respect to a heart condition and some diabetes,

2   although the marshals have sent me a report indicating that he

3   is receiving his medication for his diabetes and for whatever

4   other conditions he has and that his test for A1C was in the

5   normal level, and the Court does not -- is not aware of any

6   information that would suggest he would not be able to get the

7   kind of medical care that he needs should he remain in custody.

8        In terms of his family ties and his employment, the

9   type of employment that Mr. Taylor's been involved in normally

10  would be a positive thing.  Being the head of a church, having

11  been the head of a church for a period of time, perhaps

12  receiving all the awards that were mentioned, and also the

13  record of having written books and conducted many public

14  speaking events would be positive things.  And to the extent

15  that those things alone are a factor for the Court to consider,

16  I do think that those kinds of things are positive.  They do

17  show that he has been employed.

18       The problem, however, is that the government's

19  evidence suggests that while on the outside or from the out --

20  outward view, the organization may have appeared to be positive

21  and legitimate.  On the inside, however, the type of conduct

22  that was going on involved forced labor.  That's what the

23  evidence that's been presented here shows.

24       In terms of his community ties, he does not have

25  great ties to this district.  He does have one of his churches

Case 2:25-cr-20560-TGB-KGA   ECF No. 62, PageID.479   Filed 10/31/25   Page 85 of 89
Motion to Revoke Detention Order • Tuesday, October 21, 2025

85

1    that's here, and he has ties in many other places, whether in

2    Tampa or in Texas or in St. Louis or other places where he's

3    had his church facilities.

4         But the problem with the church facility connections

5    is that the government's evidence is suggesting that the church

6    itself was an enterprise based on forced labor, and so I can't

7    view that as a positive community tie and I don't.  In fact,

8    that is one of the biggest concerns that I have about Mr.

9    Taylor as a danger to the community, and that is that he is so

10   completely tied up with the enterprise that he was running that

11   were he to be released, he would be very likely to get

12   reinvolved in that enterprise.  And the way that it was being

13   run was, according to the information before the Court, a way

14   that was harming people, and it would be inappropriate to treat

15   that kind of connection to the community as something positive.

16   So I can't see his employment with the church as something

17   positive.

18        He doesn't have any criminal record.  That's in his

19   favor.  He doesn't have any concerns about being on parole or

20   probation or anything like that.

21        In terms of the nature and seriousness of the danger

22   to the community that would be posed by the defendant's

23   release, I think that that is a factor that tips in favor of

24   detention as well.  The reason that I say that is that the

25   evidence that's been presented here has strongly shown a

Case 2:25-cr-20560-TGB-KGA   ECF No. 62, PageID.480   Filed 10/31/25   Page 86 of 89
Motion to Revoke Detention Order • Tuesday, October 21, 2025

86

1   pattern of abusive conduct, manipulative conduct, in some cases

2   violent conduct and coercive conduct, and I don't see how there

3   can be any conditions that would separate Mr. Taylor from the

4   entity that engaged in all that kind of conduct and resulted in

5   these charges.

6          The individuals proposed by the defendant to care for

7   him or to be with him are all people from the same enterprise,

8   and I don't believe that there's any way to prevent him from

9   communicating with the people in that enterprise, to prevent

10  him from communicating threatening messages to witnesses or

11  victims as he did to those women that were mentioned by the

12  government regarding those images, and he has every incentive

13  or motive to try to do so now.

14         Those are my two main concerns about danger here.

15  One is the record of intimidation of his members that worked

16  for the fundraising operation, his additional record of

17  intimidation regarding the women who were sending him images

18  and who he threatened with disclosure of those images, and then

19  the records showing violence with respect to individuals in the

20  church.

21         I point out as well that the government has indicated

22  that some of these individuals who were subjected to violence

23  were children, that they were, quote, "whooped."  I did not get

24  the impression that this was one child on one occasion but that

25  it was more than one child.  But even disregarding that

1   completely, the evidence of at least ten people using force

2   against others is quite concerning to the Court and I think

3   justifies a concern of danger to the community.

4           I have considered all of the possible conditions that

5   the Pretrial Services has suggested.  Although, as I say, I

6   think there are conditions that would prevent him from fleeing,

7   I don't see how simply having him stay in a residence that is

8   paid for, I don't know how exactly, but to have him stay in a

9   residence where his daily communication would be with

10  individuals who were part of the same organization would

11  protect the individuals in that organization from the kind of

12  abusive and frankly cruel behavior that is set out in the

13  indictment and was set out in the government's brief,

14  particularly when engaging in that behavior would be in his

15  interest in order to prevent witnesses from cooperating in the

16  case.

17          And so I am going to find by clear and convincing

18  evidence that there is no condition or combination of

19  conditions that will adequately protect the community from the

20  defendant, and the motion that's been filed to revoke the order

21  of detention is hereby denied.  That is the order of the Court.

22  Does either party wish to place anything on the record?

23          MS. COHEN:  No, Your Honor.  Thank you.

24          MR. ROSENBLUM:  No, Your Honor.

25          THE COURT:  All right.  Thank you very much.

1          We will be setting dates in this case regarding

2     trial, and I have listened also to the statements of counsel

3     relating to the need to review evidence and prepare for trial,

4     and I want you to feel free to raise that as a concern if you

5     do have a concern going forward.

6               If there's nothing further, we can be adjourned.

7               MR. ROSENBLUM:  Thank you, Your Honor.

8               THE CLERK:  All rise.  Court's in recess.

9               (Court in recess at 2:03 p.m.)

10                         —   —   —

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T I O N

2          I, Linda M. Cavanagh, Official Court Reporter of the

3    United States District Court, Eastern District of Michigan,

4    appointed pursuant to the provisions of Title 28, United States

5    Code Section 753, do hereby certify that the foregoing pages 1

6    through 88 comprise a full, true and correct transcript taken

7    in the matter of United States of America vs. D-1 David Taylor,

8    Case No. 25-20560, on Tuesday, October 21, 2025.

9

10                         s/Linda M. Cavanagh
                           Linda M. Cavanagh, CRR, RMR, RDR, CRC
11                         Federal Official Court Reporter
                           United States District Court
12                         Eastern District of Michigan

13

14

15

16

17   Date: October 31, 2025
     Detroit, Michigan
18

19

20

21

22

23

24

25