Positive

As of: December 2, 2025 2:49 PM Z

# United States v. Mandarakas

United States District Court for the Eastern District of Michigan, Southern Division

May 31, 2024, Decided; May 31, 2024, Filed

Criminal Case No. 24-20024

**Reporter**
2024 U.S. Dist. LEXIS 97473 *; 2024 WL 2797092

UNITED STATES OF AMERICA, Plaintiff, v. GEORGE MANDARAKAS, Defendant.

**Subsequent History:** Affirmed by *United States v. Mandarakas, 2024 U.S. App. LEXIS 23043 (6th Cir., Sept. 10, 2024)*

## Core Terms

violent crime, detention, stalking, kidnapping, arrest, track, detention hearing, detention order, alteration, appearance, argues, weighs, weight of the evidence, firearm, flee, gun, attempted kidnapping, indictment, searched, bags, pending trial, past conduct, proffered, uncharged, detained, passport, factors, therapy, sail, clear and convincing evidence

**Counsel:** [*1] For George Mandarakas, Defendant: Federal Community Defender, LEAD ATTORNEY, Detroit, MI; Barton W. Morris, Jr., Barton W. Morris, Jr., Royal Oak, MI.

For United States of America, Plaintiff: Nhan Thi Ngoc Ho, LEAD ATTORNEY, Department of Justice - United State Attorney's Office, Eastern District of Michigan, Detroit, MI.

**Judges:** Honorable LINDA V. PARKER, UNITED STATES DISTRICT JUDGE.

**Opinion by:** LINDA V. PARKER

## Opinion

**OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR REVOCATION OF THE DETENTION ORDER (ECF NO. 25)**

Defendant George Mandarakas ("Defendant") is charged in a two-count indictment with: (I) Attempted Kidnapping, in violation of *18 U.S.C. § 1201(a)*, *(d)*; and (II) Stalking, in violation of *18 U.S.C. § 2261A(1)(B)*. (ECF No. 13.) On January 10, 2024, Magistrate Judge Kimberly G. Altman ordered Defendant detained pending trial after finding: (1) by clear and convincing evidence, that no condition or combination of conditions of release would reasonably assure the safety of any other person and the community; and (2) by a preponderance of the evidence that no condition or combination of conditions of release will reasonably assure the defendant's appearance as required. (ECF No. 12.)

In addition to the findings made on the record, Judge Altman also considered [*2] that: (1) the weight of the evidence against Defendant was strong; (2) Defendant is subject to a lengthy period of incarceration if convicted; and (3) Defendant lacks significant community or family ties to the Eastern District of Michigan. (*Id.*)

The matter is presently before this Court on Defendant's motion for revocation of the detention order pursuant to *18 U.S.C. § 3145*. (ECF No. 25). The Court is dispensing with oral argument and will decide this matter on the parties' briefs. *See United States v. Hughes, 668 F. Supp. 3d 744, 747 (S.D. Ohio 2023)* (citing *United States v. Romans, No. 00-5456, 2000 U.S. App. LEXIS 10708, 2000 WL 658042, at \*1 (6th Cir. May 9, 2000)*) ("A hearing on a *§ 3145(b)* motion is not required."). For the reasons to be discussed, Defendant's motion is denied.

**I. Background**

Defendant was arrested on December 25, 2023, at St. Joseph's Church in Trenton, Michigan. (ECF No. 1 at PageID. 7-8.) The affidavit in support of the criminal complaint alleges that Defendant engaged in stalking behavior of his former girlfriend, referred to as Adult

Victim-1 (AV-1) by, among other things, placing a tracking device on her vehicle and driving from his home in New Jersey to Michigan, despite AV-1 expressing her desire not to be contacted. (*Id.*) Specifically, the affidavit alleges that Defendant drove his own car, a Hyundai Elantra, from New Jersey to a rental car establishment [*3] in Woodhaven, Michigan, where he rented a Kia Forte and drove to the church in Trenton, Michigan, where he was arrested. (*Id.* at PageID. 7-9.)

After his arrest, law enforcement found several items in both vehicles. In the rental vehicle, which was searched after his arrest, law enforcement found: (1) approximately $12,000 in US and Canadian currency; (2) multiple cellphones; (3) a GPS magnetic tracking device; (4) documents indicating the distance required to sail from New Jersey to Morocco and from Florida to Cuba; (5) two advertisements for sail boats priced at $19,900 and $20,500; and (6) a to-do type list with tasks to complete such as purchasing a sail boat in cash, changing his name to Josh Tullis, not activating a burner phone until he is already on the run and left his other phone behind, as well as items to obtain including fake IDs/passports, global currency, "burner phones," scuba gear, a face mask, hair dye, and medical supplies. (ECF No. 29-2 at PageID. 162.) The list also contained a section titled "Locations" which read: (1) Med — safe weather pattern, [] safe currents, decks to EU + Turkey; (2) Cuba; and (3) SA. (*Id.* (alteration added).)

In Defendant's personal vehicle, [*4] which was searched on December 26, 2023, pursuant to a search warrant, law enforcement found: (1) a firearm; (2) ammunition; (3) handcuffs; (4) rope; (5) a stun gun; (6) a field dressing kit containing a headlamp, a knife, bags of zip-ties, rope and field dressing gloves; (7) a body bag with the shipping tag addressed to his New Jersey residence; (8) a map of South America; (9) black tape; and (10) three large Ziploc bags containing sex toys, sex products, and ovulation predictors. (ECF No. 29-1.)[1]

On December 29, 2023, Defendant made his initial appearance before Magistrate Judge David R. Grand. (ECF No. 4.) On January 10, 2024, Defendant appeared before Judge Altman for a detention hearing. (ECF Nos. 10, 11.) At the hearing, Judge Altman considered additional facts and circumstances not contained in the affidavit in support of the complaint. Namely, by way of proffer from the Government, Judge Altman considered the history and nature of the relationship between Defendant and AV-1. According to the Government, Defendant is married and has a child. (ECF No. 29 at PageID. 153 n.9.) Defendant accepted a job at a university in the State of Indiana, where, in 2019, he met AV-1. [*5] (*Id.* at PageID. 132.) Defendant did not inform AV-1, then 22-years-old, that he was a university employee who was ten years older than her and married, but instead told her that he was a single, 22-year-old student at the university. (*Id.*) In 2019, Defendant and AV-1 began a dating relationship that lasted more than four years. (*Id.*) In September 2023, upon learning these truths about Defendant, AV-1 sought to end the relationship. (*Id.*)

On October 1, 2023, after ending the relationship with Defendant, AV-1 agreed to meet him in a park. (ECF No. 1 at PageID. 4.) There, AV-1 expressed her desire to no longer speak with Defendant. (*Id.*) After stating this, Defendant attempted to block AV-1's exit but she pushed Defendant out of the way and was able to exit the park in her car, where Defendant ran after the vehicle for a short distance. (*Id.*) After AV-1 ended the relationship, Defendant attempted to contact her over the next few months. Defendant also delivered letters to her home, which the Court has reviewed.[2]

According to the Government's proffer at the detention hearing, on November 20, 2023, Defendant appeared, unannounced, at AV-1's home in Trenton, Michigan but she was not there. [*6] (ECF No. 19 at PageID. 52.)

---

[1] The parties dispute whether the ammunition fits the firearm that was found. (*Compare* Def.'s Br., ECF No. 25 at PageID. 114 (alteration added) ("[T]he ammunition discovered did not fit the firearm that was found.") *with* the Government's Br., ECF No. 29 at PageID. 135-36 (alteration added) ("[Officers] located a Glock handgun with two magazines and over 700 rounds of ammunition, including those that fit the firearm."). The Court has reviewed the evidence presented by the Government and the ammunition appears in a box labelled with the following "5.56x45mm 55GR FMJ 20 Rounds | Made in U.S.A. | M193". (ECF No. 29-3 at PageID. 165.) It is unclear to the Court whether this ammunition fits the firearm that was found. Further, along with the firearms were two magazines, and it is also unclear if these magazines were loaded with properly fitting ammunition. However, Defendant's possession of the other items identified such as the stun gun, handcuffs, knife, zipties, and body bag demonstrate his dangerousness, absent properly fitting ammunition.

[2] Having reviewed the letters, Defendant discusses, among other things, his family history as well as the details of his marriage. Of note, Defendant's father was born in Greece and immigrated to the United States when he was a teenager. (ECF No. 31-1 at PageID. 174.) Further, according to the letter, Defendant's wife and daughter live in the United Kingdom. (*Id.* at PageID. 175-76.)

AV-1's mother answered the door and told Defendant to leave. (*Id.*) On November 22, 2023, after having no contact with Defendant for approximately two months, Defendant approached AV-1 as she exited a salon in Woodhaven, Michigan. (ECF No. 1 at PageID. 4.) Defendant attempted to hug and kiss AV-1 and wedged his body between the driver's side door of her car so that AV-1 could not close it. (*Id.*) Defendant then pulled out a diamond ring and began to propose to AV-1 before she drove away. (*Id.*)

Later that day, AV-1 was with friends at a tavern in Woodhaven, Michigan, when she noticed Defendant standing at the back entrance. (*Id.* at PageID. 5.) She told Defendant to leave, which he did, but returned wearing a different set of clothes. (*Id.*) After Defendant returned, AV-1 and her friends left the tavern. (*Id.*) The Government proffered at the detention hearing that on December 1, 2023, AV-1 received a message from Defendant's wife expressing concern for Defendant's mental health, and that he recently purchased a gun. (ECF No. 19 at PageID. 53.)

Later that month, Defendant began to send AV-1 gifts in the mail, such as a laptop and old clothing. (*Id.*) AV-1 recognized [*7] the handwriting on the envelope of a card to be Defendant's handwriting. The card was also postmarked from Trenton, Michigan. (*Id.*)

The Government further proffered that a friend of Defendant called AV-1 to warn her that Defendant was considering a plot to kidnap AV-1. (ECF No. 29 at PageID. 133.) According to the Government, Defendant was watching AV-1's house, sending her links that, if she were to click on them, would inform Defendant of her location. (*Id.*) The Government also proffered that Defendant stated to this friend that he was listening to a podcast where a man kidnapped his girlfriend and fled to Mexico. (*Id.*) Defendant also, allegedly, told this friend that if he could not be with AV-1, no one could. (ECF No. 19 at PageID. 52.)

On December 24, 2023, upon receiving the warning from Defendant's friend, AV-1 searched her vehicle and discovered a tracking device. (ECF No. 29 at PageID. 132.) On December 25, 2023, AV-1 and family members drove her vehicle to St. Joseph's Church, where Defendant arrived in the rental vehicle and was arrested for Stalking. (*Id.* at PageID. 133.) On January 10, 2024, Defendant was ordered detained by Judge Altman and was indicted the following day. [*8] (ECF No. 13.)

In addition to the considerations identified by Judge Altman above, she also explained that:
> Defendant's actions show a level of deceit, dangerousness, and increasingly erratic behavior. Evidence was presented that Defendant had plans to kidnap the victim and flee the country which shows his risk of non-appearance and the danger he poses to the victim, as well as himself. Defendant simply cannot be trusted to abide by any conditions of bond. Pretrial has also recommended detention. Detention is warranted.
> (ECF No. 12 at PageID. 23.)

Parties' Arguments

Defendant now moves to revoke his detention order. (ECF No. 25.) He argues that neither Stalking nor Attempted Kidnapping are crimes of violence. (*Id.* at PageID. 107.) Defendant further argues that because these crimes are not crimes of violence, and he was not carrying a firearm at the time of his arrest, there is no presumption of detention. (*Id.* at PageID. 110, 119.) Defendant argues that the Government has not met its burden to establish detention. (*Id.* at PageID. 110.)

Defendant also attaches, as Exhibit 1 to his motion, a statement from his wife, Stephanie Bardell, describing her marriage to Defendant as "a regular marriage [*9] with regular arguments." (*Id.* at PageID. 123.) She further states that while Defendant had an affair, he is not violent, and they "had dreams of another child [and] properties in Greece." (*Id.* (alteration added).) Defendant seeks to be released on home confinement to the State of Florida. (*Id.* at PageID. 119.)

The Government argues in opposition to revocation of the detention order; however, it appears to confuse this matter's procedural history. The Government argues that it is entitled to a detention hearing pursuant to *18 U.S.C. § 3142(f)(1)(E)* and Defendant is eligible for detention on three grounds: (1) Defendants offense involves a firearm; (2) Attempted Kidnapping is a crime of violence under the Bail Reform Act; and (3) there is a serious risk that Defendant will flee. (ECF No. 29 at PageID. 142-47.) Defendant, however, has previously appeared for a detention hearing pursuant to *§ 3142(f)(1)* before Judge Altman. (*See* ECF No. 12 at PageID. 21 (identifying that the hearing was held upon motion of the Government attorney pursuant to *18 U.S.C. § 3142(f)(1)*).)

In addition to the evidence presented at the detention hearing, the Government presents supplemental evidence as a result of their investigation into Defendant's electronic device. (*Id.* at PageID. [*10] 136-

41.) The Government further argues that the factors identified in 18 U.S.C. § 3142(g) support detention. (*Id.* at PageID. 148.)

Additional Evidence

The Government presents evidence pursuant to a search warrant, where agents from the Federal Bureau of Investigation (FBI) reviewed the contents of Defendant's personal cellular device, which reveal, among other things, his search history. The Government also received a separate report of stalking from an alleged prior victim.

The Government presents search history for the months of October, November, and December of 2023. (*Id.* at PageID. 136-41.) In October, Defendant made search inquiries related to placing a tracking device on a car, as well as "how to hack a mac." (*Id.* at PageID. 136.) The Government states that the tracker found on AV-1's vehicle was digitally registered the day after these search inquiries were made. (*Id.*) It also argues that AV-1 left her MacBook computer at Defendant's residence. (*Id.* at PageID. 137.)

In November, Defendant made search inquiries on how to track a cellphone, as well as communicated with an unnamed individual who attempted, but was unsuccessful, in tracking cellphones. (*Id.* at PageID. 137-38.) Defendant also visited [*11] a website named "Grabify IP Logger & URL Shortener," which the Government argues is a website that can track the location of someone by sending them links and having the other person click on those links to reveal their location. (*Id.* at PageID. 138.) Defendant also made search inquiries related to installing spywear or recording devices on laptops. (*Id.* at PageID. 138-39.) He made search inquiries on a shopping website for "body bags," and "body bags for dead bodies." (*Id.* at PageID. 137.) He made search inquiries which read: "intentionally running into ex girlfriend"; "ex girlfriend threatening to call police"; and "ex girlfriend threatens." (*Id.* at PageID. 138.) Moreover, he made search inquiries reading: "how do ships refuel transatlantic"; "how do ships refuel at sea"; "countries not in interpol"; "Non extradition countries"; and "tile tracker slowing down." (*Id.*)

In December, Defendant messaged the previous unnamed individual, and others, for assistance with hacking, as well as messaging an individual requesting "[d]rugs and a passport with alt identity." (*Id.* at PageID. 139-40 (alteration added).)[3] Defendant made search inquiries related to private investigators in Detroit. ( [*12] *Id.* at PageID. 140.) He also communicated with individuals for how to hack social media accounts. (*Id.*) He searched: "fake passport"; "real passport for sale"; and "josh tullis notre dame." (*Id.* at PageID. 139.) He also searched Michigan's and other states' laws related to aggravated harassment, as well as searched: "is it okay to sext an ex girlfriend" and "is it ok to sext an ex girlfriend who dumped you." (*Id.* at PageID. 139-40.) Lastly, Defendant made search inquiries for the penalty for rape in Spain and the penalties for murder in the following countries: Spain, Montenegro, Albania, the United Kingdom, Ireland, Croatia, France, Italy, and Greece. (*Id.* at PageID. 139.)

The Court will consider all of the evidence presented in its analysis of the factors below.

## II. Legal Standard

The review of detention orders is governed by the Bail Reform Act, which provides in relevant part: "If a person is ordered detained by a magistrate judge . . . that person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order." 18 U.S.C. § 3145(b). The Court reviews the appeal of a detention order *de novo*. *See* United States v. Stone, 608 F.3d 939, 944 (6th Cir. 2010) (finding appropriate the district court holding a two-day [*13] *de novo* hearing on the appeal of magistrate judge's detention orders); United States v. Leon, 766 F.2d 77, 80 (2d Cir. 1985); United States v. Rueben, 974 F.2d 580, 585 (5th Cir. 1992); *see also* UNITED STATES v. KOUBRITI, No. 01-cr-80778, 2001 U.S. Dist. LEXIS 19823, 2001 WL 1525270, at *5 (E.D. Mich. Oct. 16, 2001) (noting that, although the Sixth Circuit has not squarely identified the proper standard of review of a magistrate judge's detention order, the majority of the circuits considering the issue hold that *de novo* review is appropriate).

The Bail Reform Act lists four factors that courts must

---

[3] The Government argues that on December 16, 2023, Defendant drove to Southfield, Michigan and met with this individual in a hotel, where Defendant told the individual that his name was "Mike" and that he was not affiliated with law enforcement. (*Id.* at PageID. 140 n.6.) The Government also argues that this individual charges "500/hr incall, $800/hr and Uber outcall, and 350 hh [believed to be happy hour]" for his services. (*Id.* (internal quotations omitted).)

consider when deciding release decisions. *18 U.S.C. § 3142(g)*. First is "the nature and circumstances of the offense charged." *Id. § 3142(g)(1)*. The second and third are "the weight of the evidence against the person" and the individual's "history and characteristics[.]" *Id. § 3142(g)(2)-(3)*. The latter includes:

> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law[.]

*Id. § 3142(g)(3)*. The final factor is "the nature and seriousness [*14] of the danger to any person or the community that would be posed by the person's release." *Id. § 3142(g)(4)*.

"The default position of the law . . . is that a defendant should be released pending trial." *Stone, 608 F.3d at 945*. Nevertheless, under the Bail Reform Act, "a defendant may be detained pending trial . . . if a judicial officer 'finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community.'" *Id.* (quoting *18 U.S.C. § 3142(e)*).

Moreover, a judge's finding of dangerousness must be "supported by clear and convincing evidence." *18 U.S.C. § 3142(f)(2)(B)*; *see also United States v. Hinton, 113 F. App'x 76, 77 (6th Cir. 2004)* ("The government . . . must prove dangerousness to any other person or the community by clear and convincing evidence.").

When considering the danger a defendant will pose to the community if released, numerous district courts have held that the Court may consider uncharged conduct. *See United States v. Sanders, 466 F. Supp. 3d 779, 786 (E.D. Mich. 2020)* (alterations added) ("[T]he Court also considers . . . conduct [that] did not result in criminal charges."); *United States v. Brown, No. 22-383, 2022 U.S. Dist. LEXIS 188608, 2022 WL 10080824, at *3 (N.D. Ill. Oct. 17, 2022)* (alteration added) (citation omitted) ("[E]vidence of uncharged conduct may be considered at a detention hearing, as long as it is properly evaluated and weighed."); *United States v. Tolbert, No. 3:09-CR-56-TAV-HBG, 2017 U.S. Dist. LEXIS 198744, 2017 WL 6003075, at *5 (E.D. Tenn. Dec. 4, 2017)* (alteration added) ("[T]he court may consider [*15] evidence of the defendant's past or present wrongful conduct as indicative of a defendant's dangerous tendencies, regardless of whether such conduct resulted in a state or federal prosecution. This is because the *§ 3142(g)* analysis is concerned with a practical assessment of the defendant's dangerousness, rather than an adjudication of guilt for a particular offense."); *United States v. Choudhry, 941 F. Supp. 2d 347, 350 (E.D.N.Y. 2013)* (alteration added) (citing *United States v. Rodriguez, 950 F.2d 85, 88 (2d Cir. 1991)*) ("[T]he Court may consider uncharged conduct in assessing the degree of danger posed by a defendant's release."); *United States v. Bruno, 89 F. Supp. 3d 425, 430 (E.D.N.Y. 2015)* (alteration added) ("[T]he Court may consider uncharged conduct in assessing the degree of danger posed by a defendant's release."); *United States v. Gaston, NO.: 2:21-CR-36-JD-JPK, 2021 U.S. Dist. LEXIS 58846, 2021 WL 1170201, at *5 (N.D. Ind. Mar. 26, 2021)* (citing *Sanders, 466 F. Supp. 3d at 786*) (alteration added) ("[M]ultiple district courts in several jurisdictions have noted that uncharged conduct may be considered during a detention hearing.").

### III. Legal Analysis

The Government argues that it is entitled to a detention hearing pursuant to *18 U.S.C. § 3142(f)(1)(A)* because: (1) Defendant is accused of "crime of violence"; (2) he was in possession of a firearm; and (3) there is a risk that he will flee. (ECF No. 229 at PageID. 144-45.) Judge Altman, however, conducted a detention hearing on January 10, 2024, pursuant to the statute, and ordered Defendant detained. [*16] (ECF Nos. 10, 11.) Defendant now moves to revoke the detention order, arguing that there is no rebuttable presumption of detention as Attempted Kidnapping is not a "crime of violence" that would create such a presumption.

Under the Bail Reform Act, subject to rebuttal by the person, if the judicial officer finds there is probable cause to believe that the person committed an offense under *18 U.S.C. § 924(c)*, there shall be a presumption that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community. *18 U.S.C. § 3142(e)(3)(B)*.

*18 U.S.C. § 924(c)* defines a "crime of violence" as a felony offense that

> (A) has as an element the use, attempted use, or threatened use of physical force against the person

or property of another, or
(B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3). "[P]hysical force" means "force capable of causing physical pain or injury." *Johnson v. United States, 559 U.S. 133, 140, 130 S. Ct. 1265, 176 L. Ed. 2d 1 (2010) (Johnson I)*. The first subsection is referred to as the elements clause, and the second subsection is referred to as the residual clause.

The Supreme Court recently held that the definition of "crime of violence" in the residual clause [*17] of § 924(c)(3) is unconstitutionally vague. *United States v. Davis, 588 U.S. 445, 139 S. Ct. 2319, 2336, 204 L. Ed. 2d 757 (2019)*. This decision expanded the Court's previous decisions in *Sessions v. Dimaya, 584 U.S. 148, 138 S. Ct. 1204, 200 L. Ed. 2d 549 (2018)* and *Johnson v. United States, 576 U.S. 591, 135 S. Ct. 2551, 192 L. Ed. 2d 569 (2015)* (*Johnson II*). See *Davis, 139 S. Ct. at 2326-27*; *Dimaya, 138 S. Ct. at 1213-16*.

In *Johnson II*, the Supreme Court held that the residual-clause definition of "violent felony" in 18 U.S.C. § 924(e)(2)(B)(ii) is unconstitutionally vague. *135 S. Ct. at 2563*. *Dimaya* held that the definition of "crime of violence" in 18 U.S.C. § 16(b), which is a felony "that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense," is unconstitutionally vague. *138 S. Ct. at 1211*. In all three of these decisions, however, the Supreme Court left the statute's elements clause intact. *Davis, 139 S. Ct. at 2325*; *Dimaya, 138 S. Ct. at 1224*; *Johnson, 135 S. Ct. at 2563*; *see also United States v. Richardson, 948 F.3d 733, 741 (6th Cir. 2020)* ("*Davis* leaves intact a separate definition of crime of violence supplied by the statute's 'elements clause.'").

Looking at Count I, Attempted Kidnapping, the Sixth Circuit, and others, have held that kidnapping is not a "crime of violence" as defined by § 924(c) because it can be accomplished without the use of force. See *Knight v. United States, 936 F.3d 495, 497 (6th Cir. 2019)* ("The government concedes that under *Davis*, kidnapping in violation of 18 U.S.C. § 1201(a) is not a 'crime of violence.'"); *see also United States v. Walker, 934 F.3d 375, 378 (4th Cir. 2019)* (holding that kidnapping can be accomplished by both violent and non-violent means, and therefore does not qualify as a crime of violence). Because [*18] kidnapping pursuant to 18 U.S.C. § 1201(a) is not a crime of violence under the statute, it logically follows that attempted kidnapping pursuant to 18 U.S.C. § 1201(d) is similarly not a crime of violence.

As it relates to Count II, Stalking, Courts have held that stalking, in violation of 18 U.S.C. § 2261A(1), coupled § 2261(b)—which enhances the penalties if stalking results in death—is a crime of violence. See *United States v. Griffin, No. 2:17-CR-20639, 2022 U.S. Dist. LEXIS 102433, 2022 WL 2071054, at *6 (E.D. Mich. June 8, 2022)* (alteration added) ("[T]he Court concludes that interstate stalking resulting in death is a crime of violence."). Specifically, because the "death resulting" element of § 2261(b)(1) increases the maximum penalty for which a defendant can be convicted, it is an "element" that must be submitted to a jury and be found beyond a reasonable doubt. See *Burrage v. United States, 571 U.S. 204, 210, 134 S. Ct. 881, 187 L. Ed. 2d 715 (2014)* (citing *Alleyne v. United States, 570 U.S. 99, 115-16, 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013)*) ("Because the 'death results' enhancement [of a drug offense] increased the minimum and maximum sentences to which [the defendant] was exposed, it is an element that must be submitted to the jury and found beyond a reasonable doubt.").

Here, Defendant's indictment does not couple 18 U.S.C. § 2261A(1)(B), with § 2261(b), nor any other statute. (*See* ECF No. 13 at PageID. 25.) As a result, the penalties of § 2261(b) are not incorporated as elements. The elements of § 2261A(1)(B), for which Defendant is charged, are: (1) the defendant traveled in interstate [*19] commerce; (2) the defendant traveled with the intent to injure or harass a victim; and (3) the defendant caused the intended victim substantial emotional distress in the course of, or as a result of, that travel. *United States v. Gross, 23 F.4th 1048, 1052 (8th Cir. 2022)* (citing *United States v. Al-Zubaidy, 283 F.3d 804, 808 (6th Cir. 2002)*).

Similar to Count I, Stalking, as charged in the indictment, can be accomplished without the use of force, and is therefore not a crime of violence under 18 U.S.C. § 924(c). Because Defendant is not charged with a crime of violence pursuant to 18 U.S.C. § 924(c), this case does not involve a rebuttable presumption of detention under the Bail Reform Act. Therefore, the Court will examine the factors set forth in 18 U.S.C. § 3142(g) to determine if any condition or combination of conditions can reasonably assure the appearance of Defendant as required and the safety of any other person and the community.

1. Nature and Circumstances of the Offense Charged

Defendant is charged with Stalking and Attempted Kidnapping. The nature and circumstances surrounding these charges are deeply concerning to the Court. Considering all of the evidence presented, including uncharged conduct of a prior report of stalking detailed below, which the Court is permitted to consider, as well as the evidence of Defendant's search inquiries, Defendant drove to Michigan [*20] from New Jersey, with what could only be described as a "kidnapping kit," containing a firearm, ammunition, a stun gun, handcuffs, rope, and a body bag. He met with individuals to try and obtain a fake passport and drugs. Evidence strongly suggests that Defendant was prepared to kidnap AV-1, flee from the United States, possibly by boat, to Cuba, Morrocco, South America, Europe, or elsewhere, and change his identity and appearance. Further, the evidence strongly suggests that Defendant contemplated the rape and murder of AV-1, having brought with him items of a sexual nature and made search inquiries regarding the penalty for rape in Spain and murder in various European countries.

Defendant argued at the detention hearing that he recently lost his father and, as a result, he and his mother have had to leave their family home of many years. (ECF No. 19 at PageID. 67.) Defendant argued that the items found in his vehicle during his arrest are the result of cleaning the home and moving, not items indicative of criminal activity. (*Id.*) He also argued that he does not know how to sail. (*Id.* at PageID. 66.)

The Court is not persuaded by this characterization. Defendant's conduct of tracking [*21] AV-1, confronting her unannounced, and an apparent plan to escape the country, taken in totality with possession of the referenced items, indicates to the Court that Defendant was engaged in a kidnapping plot and the items recovered were meant to be used as instruments of that plot.

Moreover, the Court is deeply concerned that Defendant has ties to Greece. As noted, his father was born in Greece, according to his Pretrial Services Report ("Report") he has family in Greece, he vacationed in Greece in 2022 and 2023, he and his wife discussed desires to own properties in Greece (*see* ECF No. 25 at PageID. 123), and one of his search inquiries was "punishment for murder in [G]reece." (ECF No. 29 at PageID. 139 (alteration added).) This factor—the nature and characteristics of the offense charged—in the strongest terms, weighs in favor of detention.

2. Weight of the Evidence

The "weight of the evidence" referenced in *§ 3142(g)(2)* goes to the weight of the evidence of Defendant's dangerousness and flight, not the evidence of the underlying offense. *United States v. Sykes, 453 F. Supp. 3d 1011, 1015-16 (E.D. Mich. 2020)* (citing *United States v. Stone, 608 F.3d 939, 948 (6th Cir. 2010)*). The evidence against the Defendant weighs strongly against his release. First, the weight of the evidence of flight is immense. Defendant has no [*22] ties to this District whatsoever. The purpose for which Defendant appeared in this District was for the alleged criminal acts related to AV-1, and no other purpose. Defendant's lack of ties to this District, connections to countries in Europe, and his apparent preparation to flee the United States as part of his kidnapping plot gives the Court no confidence that he will abide by any pretrial order to appear when required.

Further, Defendant requests that this Court release him on home confinement to the State of Florida. At the time of Defendant's arrest, Defendant was in possession of cash, advertisements for sail boats for sale, and a map and calculations to sail from the State of Florida to Cuba. Moreover, as previously mentioned, Defendant had multiple plans to flee the United States with AV-1 if he were successful in his plot to kidnap her. As noted, such plans involved obtaining false passports and changing his identity, as well as search inquiries for non-extradition countries. The weight of the evidence of flight weighs in favor of detention.

The weight of the evidence of dangerousness is also strong. Defendant was in possession of a firearm, a knife, a stun gun, body bag, and [*23] handcuffs. Even if the ammunition found did not fit the firearm, Defendant was still in possession of these other highly dangerous tools that could be used in kidnapping. Further, Defendant has, at least twice, contacted AV-1 in person, unannounced, after she expressed her intention not to see him.

Most importantly, however, Defendant has made several attempts, some of which were successful, to track her location by means of affixing a surveillance device to her automobile, as well as attempting to obtain her cellphone location by sending her fraudulent, digital links, which, if clicked, would provide Defendant with her digital location. It is clear to the Court that Defendant's behavior has advanced from unwanted communications to a clear and significant danger to AV-1. The Court, therefore, finds by clear and convincing evidence that

Defendant is dangerous and capable of significant harm to AV-1 and others. This is demonstrated by Defendant's escalating behavior and weighs strongly in favor of detention.

3. History and Characteristics

Looking at the history and characteristics of Defendant, pursuant to the factors identified in *18 U.S.C. § 3142(g)*, this factor weighs in favor of detention. Defendant is [*24] from New Jersey and is 36 years old. (ECF No. 25 at PageID. 117.) He is a college graduate, having received a bachelor's degree in chemical engineering in 2009 and a master's degree in business administration in 2014. (*Id.*) He was not on probation, parole, release pending trial, or appeal for any offense. He also has no history of failing to appear in court when required, no history relating to drugs or alcohol abuse, and no prior criminal history. As it relates to financial resources and employment, Defendant has been steadily employed for a number of years, having held positions at various companies and institutions, including the university where he met AV-1. (*Id.* at PageID. 117-18.) He is also a licensed real estate agent in the State of Florida. (*Id.*)

As it relates to family ties, Defendant is married with a daughter and his wife remains supportive of him. Defendant's mother is also supportive of him, as she is prepared to serve as custodian if he were to be released to Florida. According to his Pretrial Services Report, Defendant is in excellent physical health.

With regard to his mental health, the Report states that Defendant has received therapy services three times in his life: [*25] (1) Defendant's mother reported that he began receiving therapy services in 2009 or 2010 when he moved to Florida and was prescribed medications but did not taken them; (2) in 2017, Defendant attended approximately six therapy sessions related to anxiety due to a change in his job and was prescribed anti-anxiety medication and took them as directed, however, in early 2018, he discontinued therapy upon a change in employment, feeling therapy was unnecessary; and (3) in October 2023, Defendant began therapy through weekly video sessions from a practice in Bloomfield, New Jersey, however, these ended in November 2023, when Defendant began twice-weekly telephone session with a New Jersey psychologist. His most recent session was on December 19, 2023, approximately a week before his arrest.

The Report also states that Defendant does not have any suicidal ideations or thoughts of self-harm. However, as mentioned previously, the Government proffered that AV-1 received a message from Defendant's wife expressing her concern for his mental health and that he had recently purchased a gun. While gun ownership and seeking mental health treatment are not unlawful, the combination of these things, [*26] in light of the events detailed in the indictment, gives the Court great concern for the safety of AV-1, Defendant, and others.

The Court, moreover, is concerned about Defendant's length of residence in the community, community ties, and past conduct. Defendant is not a resident of the State of Michigan, nor does he have any ties to this District. As the Court mentioned when examining his risk of flight, Defendant's lack of residence and ties to this District, combined with his ties to other countries and apparent plan to flee, gives the Court no confidence that he will appear when required.

Further, as it relates to past conduct, which the Court is permitted to consider, the Government alleges another Adult Victim ("AV-2") has come forward and stated that she was in a five-month dating relationship with Defendant in 2010 where he allegedly engaged in similar behavior. (ECF 31-2 at PageID. 179.) The Government attaches, as an exhibit to their response brief, a statement from AV-2. (*See* ECF No. 31-2.)

AV-2 states that she is from Europe but traveled to New Jersey, where she met Defendant and they started dating. (*Id.*) She states that when she moved back to Europe, Defendant visited her [*27] twice, but she ended the relationship. (*Id.*) After ending the relationship, she claims that Defendant began to stalk her, appearing unannounced at her apartment in Europe, and made death threats to her new boyfriend. (*Id.* at PageID. 180.) She states that she reported Defendant's conduct to the appropriate authorities, but no action was taken. (*Id.*)

AV-2 further states that, while it may have been a coincidence, in November 2023, she received alerts from her Facebook and WhatsApp profiles that attempts had been made to reset her passwords with these services. (*Id.*) These alerts gave her concern that Defendant had reengaged in stalking and prompted her to search the Defendant's name on the internet, where she became aware of this matter involving AV-1. (*Id.*)

The Court is concerned with this conduct, both on its own and in the totality of circumstances in light of the allegations in the indictment. Further, while the Court does not view Defendant's failure to file a reply to the Government's brief raising this past conduct as either an

admission or concession, the Court notes that the Local Rules allow Defendant to file a brief in reply to address this past conduct which he failed to do. [*28] (*See* LCrR 12.1(a) ("Motions in criminal cases shall be filed in accordance with the procedures set forth in LR 7.1."); *see also* LR 7.1(d)-(e) (allowing a reply brief to be filed seven days after service of a response brief).)

Looking at the history and characteristics of Defendant, he is an educated individual, in good physical health, with a supportive family, and gainful employment with no criminal history, nor history of substance abuse or history of failing to appear in court when required. However, Defendant has no ties to the State of Michigan that would give the Court confidence that he will appear, is in a state of mental health that concerns his family, particularly as it relates to his gun ownership, and has past conduct appearing similar to the charged conduct in the indictment. This factor therefore weighs in favor of detention.

4. Nature and Seriousness of the Danger Posed by Release

The nature and seriousness of the danger posed by Defendant's release is significant. Defendant has demonstrated an acute ability to track and locate AV-1 using physical surveillance equipment, and a desire to track her using digital links and other forms of technology. He has also shown a high level of persistence, as his [*29] inability to achieve these ends is not a barrier. He has, on more than one occasion, sought assistance from others to accomplish this goal.

While the danger posed by Defendant's release may be limited to only AV-1, AV-2, or both, the evidence presented is highly indicative that he has the capabilities and desire to track, stalk, abduct, and flee with AV-1. The evidence also suggests that he has, at the very least, considered the possibility of the penalty for the sexual assault and murder of AV-1 in foreign countries, one of which he has visited in recent years.

Further, the evidence found when Defendant was arrested and his vehicles were searched pursuant to his arrest and search warrant—a firearm, handcuffs, tape, a stun gun and rope—demonstrates a willingness to use deadly force to achieve these goals. The Court finds by clear and convincing evidence that Defendant's release pending trial would pose an immediate danger to AV-1 and possibly to the greater community at large. This factor weighs in favor of detention.

After review, all of the factors weigh in favor of detention. As a result, the detention order will not be revoked.

IV. Conclusion

For the reasons set forth above, the Court [*30] holds that the order detaining Defendant prior to trial shall not be revoked as no condition or combination of conditions can reasonably assure the safety of any other person or the community or will reasonably assure Defendant's appearance as required.

Accordingly,

**IT IS ORDERED** that Defendant's motion to revoke the detention order (ECF No. 25) is **DENIED**.

Dated: May 31, 2024

/s/ Linda V. Parker

LINDA V. PARKER

U.S. DISTRICT JUDGE

**End of Document**